**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-2011-WJM-KLM
Consolidated with Civil Action No. 16-cv-3180-WJM-KLM

SEAN GUBRICKY, derivatively on behalf of nominal Defendant, Chipotle Mexican Grill,
Inc.,

      Plaintiff,

v.

STEVE ELLS,
MONTGOMERY F. (MONTY) MORAN,
MARK CRUMPACKER,
JOHN S. CHARLESWORTH,
KIMBAL MUSK,
PATRICK J. FLYNN,
STEPHEN GILLETT,
ALBERT S. BALDOCCHI,
DARLENE J. FRIEDMAN, and
NEIL W. FLANZRAICH,

      Defendants,

and

CHIPOTLE MEXICAN GRILL, INC.,

      Nominal Defendant.

---

## ORDER GRANTING MOTION TO DISMISS

---

      This is a shareholder derivative action brought by Sean Gubricky nominally

against Chipotle Mexican Grill, Inc. ("Chipotle"), and in reality against ten Chipotle

directors and officers (together, "Defendants").  (*See* ECF Nos. 1 (redacted complaint),

20 (unredacted, restricted complaint).)  Gubricky's complaint stems from a series of

foodborne illness outbreaks linked to Chipotle stores in the latter half of 2015.  Gubricky

alleges that Chipotle's directors shirked their duty to properly oversee the company, thus leading to the outbreaks and substantial harm to Chipotle as a company.

Before the Court is Defendants' Motion to Dismiss. (ECF No. 52.) For the reasons explained below, the Court agrees with Defendants that Gubricky has failed to plead demand futility under controlling Delaware standards. The Court therefore grants Defendants' Motion, but without prejudice so that Gubricky may consider whether to make a demand on Chipotle's board of directors (the "Board"). If Gubricky informs the Court that he has chosen not to make a demand, the Court will convert this dismissal to "with prejudice" and enter final judgment.[1]

## I. BACKGROUND

### A. Events Preceding the 2015 Outbreaks

#### 1. Kent, Ohio & the Norwalk Protocol (April 2008)

"In April 2008, more than 500 people became ill after eating at a Chipotle restaurant located near Kent State University in Kent, Ohio." (ECF No. 20 ¶ 78.) This outbreak "was rumored to have been linked to an infectious employee." (*Id.*)

In the wake of this incident, Chipotle "purportedly established" the "Norwalk

---

[1] Nearly every filing of significance to resolving Defendants' Motion to Dismiss has been made under Restricted Access, Level 1. Indeed, large portions of the complaint itself are redacted. (*See* ECF No. 1.) Having considered the matter carefully, the Court finds that it cannot properly explain its decision without summarizing and sometimes quoting Restricted Access allegations and other materials. Moreover, to the extent such materials are summarized or quoted below, the Court finds that the presumption of public access—and, in particular, the public's right to understand a court's reasons for deciding the way that it has—outweighs any private confidentiality interest asserted by the parties in this lawsuit. *See* D.C.COLO.LCivR 7.2(c). The Court also notes that a significant portion of the redacted or restricted materials relate to the "Norwalk Protocol," discussed further below, which is also summarized in *unredacted* portions of the complaint. (*See* ECF No. 1 ¶ 47.) Thus, there appears to be no basis for continuing to restrict matters related to the Norwalk Protocol.

Protocol," which requires an employee not to return to work for five days if the employee vomits or suffers from a combination of diarrhea, nausea, fever, or stomach cramps. (*Id*. ¶¶ 79, 80.) If Chipotle receives two or more complaints of illness linked to a Chipotle restaurant, the Norwalk Protocol also apparently calls for shutting down the restaurant temporarily so that it may be cleaned and sanitized. (*Id*. ¶ 47.)

### 2. Chipotle's 2014 10-K (February 2015)

On February 4, 2015, Chipotle filed its SEC Form 10-K for the year 2014. (*Id*. ¶ 77.) Among the potential risks Chipotle noted was a comparatively heightened risk of food poisoning based on Chipotle's business model: "We may be at a higher risk for food-borne illness outbreaks than some competitors due to our use of fresh produce and meats rather than frozen, and our reliance on employees cooking with traditional methods rather than automation." (*Id*. (internal quotation marks omitted).)[2]

### 3. Paid Sick Leave Policy Change (June/July 2015)

In June or July 2015, Chipotle changed its paid sick leave policy to provide employees with five paid sick days if they have been with Chipotle for a year or longer, but no paid sick days for employees with less than a year on the job. (*Id*. ¶¶ 47, 69, 79.) The complaint does not allege Chipotle's paid sick leave policy before this change.

## B. The 2015 Outbreaks

### 1. Hazel Dell, Washington, Outbreak (Early August 2015)

In early August 2015, a manager at a Chipotle restaurant in Hazel Dell,

---

[2] This statement or something like it may have been a part of Chipotle's Forms 10-K for many years, but Gubricky alleges only this one instance, likely because it most closely precedes the outbreaks around which his complaint revolves.

Washington, told a sick employee that she needed to come in to work or find someone to cover for her.  (*Id*. ¶¶ 42–43.)  The employee came to work, stayed for four hours, and was vomiting during that time.  (*Id*.)  A norovirus outbreak ensued in Hazel Dell, which the Washington State Department of Health linked to the sick employee at Chipotle.  (*Id*.)  The complaint does not describe the extent of this outbreak, nor does it allege that the Board members were aware of this outbreak at any time relevant to this lawsuit.

      2.    <u>Simi Valley, California, Outbreak (Late August 2015)</u>

During the week of August 18, 2015, a Chipotle restaurant in Simi Valley, California, became the epicenter of another norovirus outbreak, this one sickening at least 234 people.  (*Id*. ¶ 44.)  A *Wall Street Journal* article later asserted that Chipotle knew as of August 18 that one Simi Valley employee had been complaining of gastrointestinal illness—whether on duty or not is unclear from Gubricky's summary of the article—but Chipotle continued to serve food there.  (*Id*. ¶¶ 46, 48.)  A later report by the Ventura County Environmental Health Division reached a similar conclusion.  (*Id*. ¶ 48.)  Gubricky alleges, however, that the Board itself did not learn of the Simi Valley outbreak until several months later.  (*Id*. ¶ 89.)

Chipotle instituted its Norwalk Protocol to shut down and sanitize the restaurant on August 20, 2015, and it first contacted local health officials on August 21, 2015.  (*Id*. ¶¶ 48, 49.)  Inspections on August 24 and 27, 2015, uncovered a number of health code violations.  (*Id*. ¶¶ 50–51.)

3.     Minnesota Outbreak (August/September 2015)

According to the Minnesota Department of Health, sixty-four people who dined at Chipotle restaurants between August 16 and August 28, 2015, were sickened by salmonella linked to tomatoes served at twenty-two different Chipotle restaurants in Minnesota.  (*Id*. ¶ 53.)  Symptoms of salmonella poisoning began manifesting themselves between August 19 and September 3, 2015, and nine people were hospitalized.  (*Id*.)  The complaint says nothing about whether the Board was informed of this outbreak at any time relevant to this lawsuit.

4.     Internal Corporate Reports (August/September 2015)

"[A]ccording to a Board Pre-Read Executive Summary from Chipotle's Safety, Security and Risk Department provided to the Board on August 24, 2015 in advance of the Board meeting scheduled for September 1, 2015, the Safety, Security and Risk Department stated that 'there were no material food safety events this quarter.'"  (*Id*. ¶ 89 (emphasis removed).)  The complaint does not specify what "this quarter" refers to, which is ambiguous given the phrasing "there *were* no material food safety events," implying a quarter already closed (as opposed to "there *have been* no material food safety events this quarter").

In any event, Chipotle held an Audit Committee meeting on August 31, 2015. (*Id*. ¶ 90.)  At that time, the Audit Committee comprised Baldocchi, Charlesworth, Flanzraich, and Gillett.  (*Id*. ¶ 20.)  The Audit Committee received a report, prepared earlier that month, of the hours and dollars expended on internal auditing activities as of July 31, 2015.  (*Id*. ¶ 90 (footnote omitted).)  This appears to be a calendar-year-to-date

report.  It informed the Audit Committee that Chipotle had budgeted 303 hours for store audits but had spent only 95, and expected to spend only 150 more hours (for a total of 245) through the remainder of 2015.  (*Id*.)  It further informed the Audit Committee that Chipotle had budgeted about $38,000 for store audits that year, but so far had spent only about $13,000, and expected to spend approximately $17,500 during the remainder of the year (for a total of about $30,500).  (*Id*.)

This same report provided figures for a separate "2016 risk assessment internal audit." (*Id*.)  The company had budgeted 61 hours but spent only 1, and had budgeted just under $11,000 but spent a little less than $200.  (*Id*.)

Also included with this report was a narrative regarding audits that had been performed that year.  Chipotle's Internal Audit department (sometimes referred to as "IA"), noted "[m]ultiple instances of non-compliance . . . including improper cooking procedures" and "inaccurately marked food items."  (*Id*. ¶ 92.)

The report additionally included IA's self-evaluation of Chipotle's performance as compared to standards established by the Institute of Internal Audit.  (*Id*. ¶ 98.)  One of those standards, known as "Standard 2100," states that "the internal audit activity must evaluate and contribute to the improvement of risk management, control and governance processes using a systematic and disciplined approach."  (*Id*. ¶ 100 (internal quotation marks omitted).)  IA reported that Chipotle "Partially Conforms" to the standard, explaining as follows:

> Standard 2100 encompasses risk assessment procedures.
> It is considered best practice to take a broader and more
> formalized approach in performing risk assessment
> procedures than is currently in practice at Chipotle.  It is the

> opinion of IA that this level of detail is not necessary or
> appropriate in the Chipotle environment, and that our risk
> assessment procedures include an acceptable level of
> detail.  However, a third party reviewer may comment that
> our risk assessment and evaluation could be more
> comprehensive.

(ECF No. 40-4 at 4;[3] *see also* ECF No. 20 ¶ 100.)

Chipotle held a Board meeting on September 1, 2015.  (*Id*. ¶ 89.)  The minutes

for that meeting contain nothing regarding discussion of the Simi Valley outbreak.  (*Id*.)

The complaint does not allege whether the Board discussed the Hazel Dell or

Minnesota outbreaks.

### 5. Multistate Outbreak (October/November 2015)

Beginning on October 19, 2015, and apparently continuing into early November,

an E. coli outbreak sickened fifty-three people who had dined at Chipotle restaurants in

California, Illinois, Maryland, Minnesota, New York, Ohio, Oregon, Pennsylvania, and

Washington state.  (*Id*. ¶ 54.)  Forty of the fifty-three cases occurred in Oregon and

Washington.  (*Id*.)

Chipotle addressed this outbreak for the first time in a November 3, 2015 press

release announcing that it had voluntarily closed forty-three Chipotle restaurants in

Oregon and Washington for deep cleaning and replacement of ingredients, although

only eight restaurants were the subject of investigation.  (*Id*.)  On the doors of these

restaurants, Chipotle announced that they were closed for "equipment issues" or

"supply issues."  (*Id*. ¶ 55.)

---

[3] All ECF page citations are to the page number in the ECF header, which does not
always match the document's internal pagination, particularly in exhibits.

Chipotle announced on November 10, 2015 that it would soon reopen all of the closed stores in Oregon and Washington, claiming, "Health officials have concluded that there is no ongoing risk from this incident." (*Id*. ¶ 60 (internal quotation marks omitted; emphasis removed).) However, the Food and Drug Administration ("FDA"), the Centers for Disease Control ("CDC"), and the Washington and Oregon health departments were continuing to investigate the incident overall. (*Id*. ¶¶ 57–59, 63.)

On December 4, 2015, Chipotle issued a press release announcing that its food safety practices had long been within industry norms, but it had now adopted a program to implement practices that were far stricter than industry norms. (*Id*. ¶¶ 65–66.)

All of the various press releases during this time contained statements from Chipotle's Chairman of the Board, Defendant Ells, expressing Chipotle's commitment to food safety.

6.    Boston Outbreak (Early December 2015)

In the days immediately preceding and following Chipotle's December 4 press release, a Chipotle restaurant near the campus of Boston College became the center of a norovirus outbreak that sickened 141 persons. (*Id*. ¶ 68.) A local health department inspection on December 7, 2015 found certain violations, including meat on the serving line being kept at too low a temperature and an employee that worked while sick. (*Id*.) A later news article claimed the outbreak was due to "a sick worker who wasn't sent home although Chipotle began offering paid sick leave in June." (*Id*. ¶ 69 (internal quotation marks omitted).)

7.    Midwest Outbreak (December 2015)

On December 22, 2015, the FDA publicly announced that it was investigating an

E. coli outbreak stemming from Chipotle stores in Kansas and Oklahoma.  (*Id*. ¶ 72.)

Five individuals were sickened.  (*Id*.)

By this point, investigators had failed to locate with certainty "the sources of most

of the outbreaks" (*id*. ¶ 73)—presumably the outbreaks that could not be linked to a sick

employee.  A December 2015 press account quoted a CDC investigator as stating that

the investigation had been a challenge because Chipotle's record-keeping practices

somehow prevented investigators from "figur[ing] out what food is in common across all

those restaurants."  (*Id*. (internal quotation marks omitted).)

8.    Internal Reaction (December 2015)

A "pre-read executive summary by [Chipotle's] Safety, Security and Risk

Department provided to the Board on December 8, 2015 in advance of the Board

meeting on December 16, 2015" announced that the department's "field audit team"

would be

> performing scored operations and food safety audits for
> every Team Director (TD) each quarter.  We will also
> conduct audits in 70–90% of our restaurants each quarter.
> . . .  Through these stepped-up audits, our operational
> leaders will be provided with crisp, objective, scored
> assessments of restaurant food safety as well as operational
> execution on customer service, cleanliness and food quality.
> By visiting the vast majority of restaurants each quarter, this
> audit team will have a magnified impact upon food safety
> and operational execution, as compared to the current
> status quo wherein each Field Leader is visited only
> annually.

(*Id*. ¶ 93.)  The complaint does not explain the duties of a Team Director or Field Leader.

9

Other materials provided in advance of the December 16, 2015 Board meeting acknowledged, apparently for the first time, the Simi Valley outbreak from the previous August.  (*Id*. ¶ 104.)

### 9. Billerica, Massachusetts, Threatened Outbreak (March 2016)

"[O]n March 8, 2016, a Chipotle restaurant located in Billerica, Massachusetts, shut down for two days after word emerged that at least one employee had tested positive for the norovirus."  (*Id*. ¶ 113.)  Chipotle claimed that it proactively closed the store "after four of [its] employees—none of whom worked while sick—called to say they were at home and not feeling well."  (*Id*. (internal quotation marks omitted).)  However, the local health department stated that Chipotle had opened its doors on March 8 but only closed them after the department "sent an inspector to the store because [it] was alerted to the potential outbreak by [a local television news provider]."  (*Id*. (internal quotation marks omitted; emphasis removed).)  The complaint does not allege that anyone who dined at the Billerica restaurant became sick.

## C.     Chipotle's Current Board

Chipotle's current Board comprises nine individuals.  Two members of the Board also hold officer positions with Chipotle—namely, Defendants Ells and Moran, who are "co-CEOs" of the company.  (*Id*. ¶¶ 9–10.)  The remaining seven Board members (Defendants Baldocchi, Charlesworth, Flanzraich, Flynn, Friedman, Gillett, and Musk) are outside directors.  (*Id*. ¶¶ 12–18.)[4]  The Audit Committee still comprises Baldocchi,

---

[4] The remaining Defendant, Crumpacker, has never been a director.  He has served as chief marketing officer and chief development officer, and currently bears the title "Chief Creative and Development Officer."  (ECF No. 20 ¶ 11.)

Charlesworth, Flanzraich, and Gillett.  (*Id*. ¶ 20.)

## II.  RULE 12(b)(1) ANALYSIS

Defendants challenge the Court's Article III jurisdiction to hear this lawsuit, claiming the dispute is unripe.  (ECF No. 40 at 20–22.)  Specifically, Defendants note that two major aspects of the injury Defendants allegedly caused—a federal criminal investigation into Chipotle's food safety practices, and a federal securities fraud class action[5]—present nothing more than "speculative future damage" to the company. Gubricky counters that he alleges much more than potential criminal sanctions or damages from the securities fraud class action.  For example, he alleges that Chipotle is now incurring investigation and defense costs related to the securities fraud lawsuit and the criminal investigation, as well as costs from loss of consumer confidence; and that Chipotle already incurred damages when it was forced to close restaurants involved in the outbreaks.  (ECF No. 20 ¶ 116.)  The Court agrees with Gubricky that such damages show his claim is ripe.  Accordingly, Article III subject matter jurisdiction exists.[6]

## III.  RULE 23.1(b)(3) ANALYSIS

### A.    Legal Standard

At this stage, pleadings are normally evaluated for facial "plausibility," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), but with a thumb on the plaintiff's side

---

[5] *See Metzler Inv. GmbH et al. v. Chipotle Mexican Grill, Inc. et al.*, No. 1:16-cv-00141-KPF (S.D.N.Y., filed Jan. 8, 2016).

[6] Statutory subject matter jurisdiction likewise exists under 28 U.S.C. § 1332(a) because Gubricky is an Illinois citizen, no Defendant is also an Illinois citizen, and the amount in controversy exceeds $75,000.  (ECF No. 20 ¶¶ 7–18.)

of the scale to ensure that the plaintiff is not thrown out of court for failure to possess facts that the plaintiff could not possess without discovery, *see, e.g.*, *Gee v. Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010); *Tantlinger v. Duchaine*, 2015 WL 3941503, at *3–4 (D. Colo. June 26, 2015). Standards are different, however, in a shareholder derivative lawsuit where the shareholder-plaintiff made no demand on the board of directors to institute the lawsuit. In such circumstances, the plaintiff must plead "with particularity * * * the reasons for . . . not making the effort." Fed. R. Civ. P. 23.1(b)(3)(B).

Here, Plaintiff alleges (as most shareholder derivative plaintiffs do) that demand on the Board would have been "a futile and useless act because the Current Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action." (ECF No. 20 ¶ 124.) Whether a demand would have been futile is a matter of the incorporating state's substantive law. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96–97 (1991) ("the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure'"). Thus, the Court must apply Delaware law to determine if Plaintiff has properly pleaded demand futility, and the Court may hold the Plaintiff to his Rule 23.1(b)(3)(B) duty to plead futility with particularity.[7]

---

[7] Informational asymmetry is much less of a problem in the shareholder derivative context, at least for Delaware corporations, because Delaware law offers shareholders a fairly broad right to inspect corporate books and records. *See* Del. Code Ann. tit. 8, § 220; *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 791–93 (Del. Ch. 2016) (discussing scope of books-and-records provision). Delaware courts have specifically counseled prospective shareholder plaintiffs to employ this tool if they wish to plead demand futility adequately. *See*

According to the Delaware Supreme Court,

> [t]wo tests are available to determine whether demand is
> futile.  The [test established in *Aronson v. Lewis*, 473 A.2d
> 805, 814 (Del. 1984)] applies to claims involving a contested
> transaction[,] *i.e.*, where it is alleged that the directors made
> a conscious business decision in breach of their fiduciary
> duties.  That test requires that the plaintiff allege
> particularized facts creating a reason to doubt that (1) the
> directors are disinterested and independent or that (2) the
> challenged transaction was otherwise the product of a valid
> exercise of business judgment. . . .  The second [test
> established in *Rales v. Blasband*, 634 A.2d 927, 934 (Del.
> 1993)] applies where the subject of a derivative suit is not a
> business decision of the Board but rather a violation of the
> Board's oversight duties.  The *Rales* test requires that the
> plaintiff allege particularized facts establishing a reason to
> doubt that the board of directors could have properly
> exercised its independent and disinterested business
> judgment in responding to a demand.

*Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) (internal quotation marks, certain

alterations, and footnotes omitted).

Here, Gubricky alleges oversight failures, such as failure to implement and

enforce a system of effective food safety procedures, failure to monitor restaurants'

compliance with food safety laws, failure to act on the August 2015 Internal Audit

report, and failure to commit necessary resources to store audits and risk assessment.

(ECF No. 20 ¶ 2.)  Consequently, the *Rales* test applies, meaning Gubricky must allege

particularized facts establishing a reason to doubt that the Board, if presented with a

demand, could have properly exercised independent and disinterested business

---

*Beam v. Stewart*, 845 A.2d 1040, 1056 & n.51 (Del. 2004) ("Both this Court and the Court of
Chancery have continually advised plaintiffs who seek to plead facts establishing demand futility
that the plaintiffs might successfully have used a Section 220 books and records inspection to
uncover such facts.").  Plaintiff claims to have taken advantage of this opportunity in preparing
his complaint.  (ECF No. 61 at 7–8.)

judgment.  And wait, there's more—under Delaware law Gubricky must even more particularly "plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand."  *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007) (emphasis in original).  Under the circumstances of this case, then, Gubricky must plead facts sufficient to show that at least five of the nine directors could not have exercised disinterested business judgment if the Board had been presented with a demand.  Directors are deemed "interested" if "a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders."  *Rales*, 634 A.2d at 936.

B.    **Threat of Personal Liability**

Perhaps the most common argument that a director could not have exercised appropriate business judgment if presented with a demand is that the director would be whether to sue him- or herself.  But Delaware law is adamant that this does not make a demand "necessarily futile."  *Brehm v. Eisner*, 746 A.2d 244, 257 n.34 (Del. 2000).  The possibility of personal liability must be "a substantial likelihood," not "a mere threat."  *Rales*, 634 A.2d at 936 (internal quotation marks omitted).

Moreover, establishing a substantial likelihood of personal liability is even more difficult in oversight-failure claims, commonly known as *Caremark* claims because the proper pleading standard was first articulated in *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996)—a standard that has since been explicitly adopted by the Delaware Supreme Court, *see Stone v. Ritter*, 911 A.2d 362,

369–70 (Del. 2006).  According to *Caremark*,

> only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability.  Such a test of liability—lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight—is quite high.

698 A.2d at 971.

And, as if the bar was not already set high enough, Delaware law raises it higher still in cases where § 102(b)(7) of Delaware's corporation code is at issue.  That section provides that a Delaware corporation's certificate of incorporation may appropriately contain

> [a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title [regarding unlawful payment of dividends or unlawful stock purchases or redemptions]; or (iv) for any transaction from which the director derived an improper personal benefit.

Del. Code tit. 8, § 102(b)(7).  Chipotle's certificate of incorporation contains just such an exculpatory clause:

> A director of the Corporation shall not be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its shareholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under Section 174 of the DGCL; or (iv) for any transaction from which the director derived an improper personal benefit.

(ECF No. 40-5 at 5.)

In light of this clause, "a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts." *Wood*, 953 A.2d at 141 (internal quotation marks omitted; emphasis in original). In practice, this means that a plaintiff "must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had actual or constructive knowledge that their conduct was legally improper." *Id*. (internal quotation marks omitted). As applied to a *Caremark* claim, a derivative plaintiff must "plead with particularity that the board *consciously* failed to implement any sort of risk monitoring system or, having implemented such a system, *consciously* disregarded red flags signaling that the company's employees were taking facially improper, and not just ex-post ill-advised or even bone-headed, business risks." *Asbestos Workers Local 42 Pension Fund v. Bammann*, 2015 WL 2455469, at *15 (Del. Ch. May 21, 2015) (internal quotation marks omitted; emphasis in original), *aff'd*, 132 A.3d 749 (Del. 2016) (table).[8]

In this light, Gubricky cannot plead that the Board failed to implement any sort of risk monitoring system because Gubricky's own allegations (*e.g.*, regarding the IA department) show that a risk monitoring system existed, even if Gubricky believes it was inadequate. Gubricky must therefore allege that the Board consciously disregarded "red flags" that Chipotle employees were taking "facially improper" business

---

[8] Gubricky argues that the exculpatory clause creates an affirmative defense that cannot be resolved at the pleading stage. (ECF No. 61 at 26–27 & n.20.) To the contrary, Delaware courts have routinely considered the exculpatory clause as a proper consideration when determining whether a shareholder derivative plaintiff had properly pleaded demand futility. *See, e.g.*, *Wood*, 953 A.2d at 141; *Malpiede v. Townson*, 780 A.2d 1075, 1094–95 (Del. 2001).

risks.  *Asbestos Workers*, 2015 WL 2455469, at *15.  The complaint appears to allege five or six possible red flags, depending on how the allegations are interpreted.

The first red flag seems to be the Board members' likely awareness of Chipotle's potentially heightened risk for transmitting foodborne illnesses due to its cooking procedures and ingredient selection, as disclosed in the company's 10-K.  (*See* Part I.A.2, *above*.)  But it is not clear what any Board member consciously disregarded in this respect, unless Gubricky means to say that the Board members knew that food safety and inspection procedures were inadequate in light of Chipotle's business model.

The only particular allegations regarding inadequate safety and inspection lead to the second red flag, *i.e.*, the August 2015 Audit Report (*see* Part I.B.4, *above*) informing the Audit Committee that IA was far under budget both as to hours and dollars expended, and did not expect to exhaust the budget before the end of the year. The Audit Report also admitted only partial compliance with Standard 2100, regarding "a broader and more formalized approach in performing risk assessment procedures than is currently in practice at Chipotle," and that IA believed Standard 2100's "level of detail is not necessary or appropriate in the Chipotle environment."  (ECF No. 40-4 at 4.)  Finally, the Audit Report noted "[m]ultiple instances of non-compliance . . . including improper cooking procedures" and "inaccurately marked food items."  (ECF No. 20 ¶ 92.)

IA's failure to take advantage of its budget and its opinion that full compliance with Standard 2100 was unnecessary at Chipotle are both, at worst, "ex-post ill-advised" business risks; they are not "facially improper."  *Asbestos Workers*, 2015 WL 2455469,

at *15; *see also In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 124 (Del. Ch. 2009) ("When one looks past the lofty allegations of duties of oversight and red flags used to dress up these claims, what is left appears to be plaintiff shareholders attempting to hold the director defendants personally liable for making (or allowing to be made) business decisions that, in hindsight, turned out poorly for the Company.").[9]

As for the report of non-compliance with proper cooking procedures, Gubricky has pleaded nothing from which the Court can reasonably infer that the Audit Committee consciously chose to ignore whatever risk this imposed. Indeed, without more, the Audit Committee was entitled to presume that IA's *discovery* of non-compliance also allowed IA to *correct* non-compliance. Moreover, around the same time, the entire Board (including the Audit Committee) received a report from the Safety, Security and Risk Department that "no material food safety events [occurred] this quarter." (ECF No. 20 ¶ 89.) The Board's knowledge, or lack of it, regarding the August 2015 outbreaks will be discussed next, but at least on the record presented to the Audit Committee in August 2015, the Audit Committee knew of potential non-compliance but had no reason to suspect that it was leading to actual harm, or a serious threat of it.[10]

---

[9] Gubricky includes details from documents provided to the Board in advance of the December 2015 Board meeting regarding the company's plans to significantly increase the number of audits and inspections. (*See* Part I.B.8, *above*.) To the extent Gubricky included these details to emphasize what Chipotle had failed to do up until that point, the same analysis would apply. The scope and of number of audits is a question of business risk.

[10] Gubricky's allegations concerning the August 2015 Audit Report would be more persuasive if he had included some context, particularly with respect to 2009 through 2014—years in which Chipotle apparently suffered no notable food safety incidents. For example, if IA had been using most or all of its budget in those years, but was suddenly slacking off in 2015, the red flag inference would become stronger. The inference likewise might have been

The third potential red flag, as just noted, was the three outbreaks in August 2015: Hazel Dell, Simi Valley, and Minnesota. (*See* Parts I.B.1–3, *above*.) Chipotle's actions during the Simi Valley outbreak show that, at some managerial level, the company was aware of what was happening there. However, Gubricky alleges that the Board itself was *unaware* of the Simi Valley outbreak until December 2015. (ECF No. 20 ¶ 89.) Thus, the Board could not have consciously disregarded any red flag potentially raised by the Simi Valley outbreak. As for Hazel Dell and Minnesota, Gubricky alleges nothing about the Board's knowledge of those incidents as they were happening, or at any later time. Even assuming the Board was aware of the outbreaks generally, Gubricky also fails to allege that any Board member was aware of the cause(s) of these outbreaks, such as sick employees still showing up to work—and thus aware of allegedly "facially improper" employee decisions. Thus, Gubricky cannot allege the Board's conscious disregard of these potential red flags.

It is not clear whether Gubricky considers the outbreaks in October and December 2015 to be red flags, or simply the consequence of ignoring prior red flags. To the extent he takes the former position, he has not established conscious disregard. Rather, his allegations show that from early November onward, Chipotle was paying close attention and taking steps to design a stronger food safety program.

Another potential red flag arises from the allegations that Chipotle's record-keeping practices made it difficult for investigators to determine the source of some of

stronger if, before 2015, IA's reports had rarely noted non-compliance with food safety procedures. But Gubricky includes no such allegations, despite his professed access to Chipotle's books and records.

the outbreaks, particularly the Multistate and Midwest Outbreaks.  (*See* Part I.B.7, *above.*)  But Gubricky fails to allege any conscious disregard of a known, facially improper risk being taken either by the Board itself or by Chipotle employees.

The final potential red flag the Court discerns from the complaint arises from a combination of allegations regarding the April 2008 outbreak near Kent State University, the subsequent adoption of the Norwalk Protocol, and Chipotle's paid sick leave policy. (*See* Parts I.A.1 & 3, *above.*)   Although the Norwalk Protocol shows the opposite of conscious disregard, Gubricky appears to be alleging that the Kent State outbreak should have alerted the Board to the need for paid sick leave for all employees, regardless of tenure, or the Norwalk Protocol would never be strictly followed.  But in context, this is simply another potential "ex-post ill-advised" business risk.  *Asbestos Workers*, 2015 WL 2455469, at *15.  It does not suggest conscious disregard of facially improper conduct.

In sum, Gubricky has failed to allege a serious or substantial risk of personal liability on the part of any Board member.

## C.    Public Statements

Another theory of potential liability that Gubricky advances is a breach of the duty of loyalty allegedly by "permitting the Company to issue materially false and misleading statements concerning the effectiveness of the Company's policies and procedures with respect to food safety."  (ECF No. 20 ¶ 114(iii).)  It is not clear how an allegation such as this fits into the *Caremark* pleading standard, as modified by the presence of an exculpatory clause in the corporate charter.  Regardless, this allegation fails to establish

a substantial likelihood of liability because Gubricky fails to allege that any Board member other than Ells (one of nine) participated in preparing any portion of the relevant public statements.

Gubricky argues that the "'group-published documents' exception" excuses any duty to plead with particularity any Board member's participation. (ECF No. 61 at 22.) In the context of federal securities fraud lawsuits and the requirement to plead fraud with particularity under Federal Rule of Civil Procedure 9(b), the Tenth Circuit holds that "[i]dentifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers." *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir. 1997). But the question of whether a shareholder derivative plaintiff has properly pleaded *demand futility* is a matter of Delaware law, not federal law. *Kamen*, 500 U.S. at 96–97.

Delaware law requires a plaintiff to plead "facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." *Desimone*, 924 A.2d at 943 (emphasis in original). Delaware courts do not accept the group-published document exception when analyzing demand futility. *See Rattner v. Bidzos*, 2003 WL 22284323, at *10 n.53 (Del. Ch. Sept. 30, 2003) (rejecting a plaintiff's argument that it was "appropriate to treat the [directors] as a group for pleading purposes and *to presume* that the false, misleading and incomplete information they conveyed in the Company's public filings and press releases . . . are . . . collective actions of the [directors]" (internal quotation

marks omitted; emphasis in original)).  Thus, Gubricky has failed in his burden to plead facts showing that any director other than Ells participated in allegedly misleading public statements, and has consequently failed to show that any director other than Ells faces any likelihood of liability for his or her alleged participation in any public statements.

**D.    Relationships and Other Interests**

Gubricky additionally alleges that personal interests other than potential liability could also prevent Board members' disinterested consideration of a demand.  *See Beam*, 845 A.2d at 1049 ("A director's interest may be shown by demonstrating a potential personal benefit or detriment to the director as a result of the decision.").  Such interests include certain Board members' long-standing tenure, as well as personal and business relationships with other Board members.  More specifically:

- Ells and Moran have been a part of Chipotle's executive management (if not directors) since the 1990s;

- Baldocchi, Flynn, Friedman, and Charlesworth have all been Chipotle directors since the 1990s; and

- Flynn and Charlesworth "are holdover directors and prior executives of McDonald's, Chipotle's former parent company and thus[] have a long standing association with one another."

(*See* ECF No. ¶¶ 146–47; *see also id*. ¶¶ 12–18.)[11]

_____

[11] Gubricky also emphasizes that some of the Board members (Baldocchi, Moran, and Musk) are Colorado residents, as if this could affect their independent judgment, but he does not explain why or how.  (*See id*. ¶ 146; ECF No. 61 at 21.)  Gubricky derives this allegation from an institutional investor's April 2016 letter to Chipotle shareholders urging them not to reelect Flynn and Friedman at the upcoming annual shareholder meeting.  (ECF No. 20 ¶ 146.)  In that context, the institutional investor argues that Chipotle's Board could make better

22

"It is well established under Delaware law that the number of years that defendants have served on a board or multiple boards together cannot suffice as a basis to successfully plead a lack of independence for demand futility purposes." *In re Pfizer, Inc. Derivative Sec. Litig.*, 307 F. App'x 590, 595 (2d Cir. 2009). Moreover, "[a]llegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Beam*, 845 A.2d at 1050. However, a combination of such allegations can, in some circumstances, establish that the director is interested. *See, e.g.*, *Cal. Pub. Employees' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) ("On these facts, however, none of the allegations stands alone 'without more.' Taken together, they give this Court reason to doubt that Mandigo is disinterested and independent.") ("*Coulter*"). Such an inference must nonetheless arise from "specific factual allegations." *Beam*, 845 A.2d at 1050 (internal quotation marks omitted).

The *Coulter* decision provides a good example of specific allegations that, in combination, established that a particular director was interested. The director whose independence was at issue, Mandigo, was lifelong friends with the director most under scrutiny, Coulter; Mandigo's son's livelihood depended to some degree on Coulter; Mandigo acquiesced in all of Coulter's allegedly self-dealing transactions; Mandigo stood to gain or lose based on the lawsuit in question because it challenged repricing of stock options that Mandigo himself owned; and various other allegations. The

---

decisions if it were more geographically diverse. The Court cannot see how this affects any Board member's ability to be disinterested, nor has Gubricky cited any case law finding geography to be a relevant factor in the demand futility analysis.

Delaware Chancery Court found that these allegations, in combination, showed that Mandigo was interested. 2002 WL 31888343, at *9.

Another helpful decision is *In re EZCORP Inc. Consulting Agreement Derivative Litigation*, 2016 WL 301245 (Del. Ch. Jan. 25, 2016). There, a particular director named Rotunda had been the company's CEO for ten years, had been a highly paid consultant for another three years, and had health insurance through the company for some time after the lawsuit was filed. *Id*. at *42. Moreover, the company had designated Rotunda as "not independent" for purposes of NASDAQ listing rules. *Id*. These considerations, combined with the majority shareholder's alleged propensity for retributive action against dissenting directors, led the Delaware Chancery Court to conclude that "a reasonable doubt" existed as to Rotunda's "ability to consider a litigation demand impartially." *Id*. at *43.

Gubricky alleges nothing approaching this level of specificity. All of his allegations, although phrased somewhat differently, simply reduce to bare assertions of longstanding association with other Board members and with Chipotle as an institution. These allegations remain in the "without more" category, and therefore do not negate the presumption of disinterestedness.

All of the above makes it very clear to this Court that the legislature and appellate courts of the State of Delaware wished to leave no doubt whose interests they wished to protect in the face of claims such as those that Plaintiff asserts here. It is also this Court's view that justice is poorly served by imposing these impossibly sky-high pleading burdens on putative plaintiffs, such as Gubricky. But it is equally manifest that this one-sided pleading framework is deeply entrenched in Delaware corporate law

24

jurisprudence, and this Court is powerless to alter this reality.

As a consequence, the undersigned reluctantly concludes that Gubricky has failed to plead demand futility and his claims against Defendants must be dismissed.[12]

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Defendants' Motion to Dismiss (ECF No. 52) is GRANTED;

2.    This action is DISMISSED WITHOUT PREJUDICE; and

3.    On or before **July 7, 2017**, Gubricky shall file with the Court a notice stating either that he has made a demand on the Board, or that he has no intent to make a demand. If Gubricky chooses the latter course, the Court will convert the foregoing dismissal to "with prejudice" and enter final judgment.

Dated this 7th day of June, 2017.

BY THE COURT:

William J. Martinez
United States District Judge

---

[12] In light of this disposition, the Court need not and does not reach Defendants' alternative arguments regarding failure to state a claim. (ECF No. 40 at 22–28.)