## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02011-WJM-KLM
Consolidated with Civil Action No. 16-cv-3180-
WJM-KLM

SEAN GUBRICKY, Derivatively on Behalf of
Nominal Defendant, CHIPOTLE MEXICAN
GRILL, INC.,

      Plaintiff,

v.

STEVE ELLS, *et al.*,

      Defendants,

-and-

CHIPOTLE MEXICAN GRILL, INC., a Delaware
Corporation,
              Nominal Defendant.

### DECLARATION OF STUART J. GUBER, ESQUIRE, IN SUPPORT OF UNOPPOSED MOTIONS FOR: (i) FINAL APPROVAL OF DERIVATIVE ACTION SETTLEMENT; AND (ii) AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

    I, STUART J. GUBER, declare as follows:

    1.      I am a partner in the law firm of Faruqi & Faruqi, LLP ("Faruqi"). Faruqi is Co-

Lead Counsel in the above-captioned consolidated Pending Action.[1]

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings as set forth in the Stipulation and Agreement of Settlement and Release dated September 29, 2017 (the "Stipulation"), which was attached as Exhibit 1 to Lead Plaintiff's Unopposed Motion for Preliminary Approval of Settlement. ECF No. 110-1.

2.      I respectfully submit this Declaration in support of (i) the proposed Settlement of the Actions, and (ii) Plaintiffs' Counsel's application for an award of attorneys' fees and reimbursement of expenses.  I make this based upon my personal knowledge.

3.      This Declaration presents to the Court a detailed factual background of the various events underlying the efforts of Plaintiffs' Counsel in support of the Actions to assist the Court in evaluating: (a) the fairness of the proposed Settlement; (b) the quality of the legal services rendered on behalf of Plaintiffs by their counsel; and (c) the reasonableness of Plaintiffs' Counsel's application for attorneys' fees and expenses.  The facts set forth in this Declaration are principally derived from the pleadings and proceedings in the Actions and Plaintiffs' Counsel's review of relevant documents filed and produced.

## BACKGROUND

4.      Lead Plaintiff Sean Gubricky ("Gubricky") commenced the Pending Action by filing an 84-page Verified Shareholder Derivative Complaint and Jury Demand on August 8, 2016. ECF No. 1 (the "Complaint").  The Complaint alleged breaches of fiduciary duty, waste, and unjust enrichment by the Individual Defendants (defined below) by, among other things, "(i) failing to implement and enforce a system of effective internal controls and procedures with respect to food safety; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with restaurant procedures and federal, state and local food safety regulations; (iii) permitting the Company to issue materially false and misleading statements concerning the effectiveness of the Company's policies and procedures with respect to food safety resulting in the commencement of a class action lawsuit alleging violations of the federal securities laws . . . and the criminal investigation into the history of the Company's food safety practices." *Id.* ¶ 2.

5.     The Complaint was based substantially on the contents of 3,100 pages of confidential Chipotle materials Gubricky secured through a books and records demand on the Company pursuant to Section 220 of the Delaware General Corporation Law (8 *Del. C.* § 220), as well as United States Securities and Exchange Commission ("SEC") filings, newspaper articles, press releases, websites, and other publicly available information regarding the Company.

6.     The "Defendants" are M. Steven Ells, Montgomery F. Moran, Mark Crumpacker, John S. Charlesworth, Kimbal Musk, Patrick J. Flynn, Stephen Gillett, Albert S. Baldocchi, Darlene J. Friedman and Neil W. Flanzraich (collectively, the "Individual Defendants"), together with Nominal Defendant Chipotle.

7.     On November 1, 2016, Defendants responded to Gubricky's Complaint by filing a Motion to Dismiss.  ECF No. 52.  Gubricky filed his opposition to that Motion on December 22, 2016.  ECF No. 61.  Defendants filed their reply on January 19, 2017.  ECF No. 77.

8.     On December 27, 2016, while Gubricky and Defendants were engaged in briefing the Motion to Dismiss, another Chipotle stockholder, Cyrus Lashkari ("Lashkari"), commenced a second derivative action on behalf of Chipotle, advancing allegations that substantially overlapped with the allegations advanced by Gubricky (*see Lashkari v. Ells, et al.*, C.A. No. 1:16-cv-3180-RM-MJW (D. Colo.), ECF No. 1).  Lashkari's complaint, like Gubricky's, was based largely on confidential Chipotle documents secured through a Section 220 books and records demand.

9.     Gubricky and Lashkari conferred and agreed to seek consolidation of their two actions as well as a structure for prosecution of the consolidated action whereby Gubricky would serve as Lead Plaintiff, the parties' respective lead counsel—Faruqi for Gubricky and Labaton Sucharow LLP ("Labaton") for Lashkari—would serve as Co-Lead Counsel, and their mutual Colorado counsel, Berens Law LLC ("Berens"), would serve as Liaison Counsel.   Gubricky and

Lashkari further agreed that Gubricky's action should become the lead case and that Gubricky's Complaint would remain the operative complaint.   Accordingly, Gubricky and Lashkari moved for consolidation on January 24, 2016.  ECF No. 81.

10.   The Court granted Plaintiffs' motion, instituting the proposed leadership structure on May 24, 2017.  ECF No. 89.

11.   Defendants' Motion to Dismiss did not need to be re-briefed because Gubricky's Complaint remained operative following consolidation.

12.   On June 7, 2017, the Court granted Defendants' Motion to Dismiss for failure to plead demand futility adequately under Delaware's "sky-high pleading burdens." The Action was dismissed without prejudice so as to afford Gubricky until July 7, 2017, to consider making a demand on Chipotle's Board of Directors (the "Board"). *Gubricky v. Ells*, 255 F. Supp. 3d 1119 (D. Colo. 2017) (ECF No. 91).

13.   At the time the Court granted Defendants' Motion to Dismiss, Plaintiffs' Counsel and counsel for Defendants had been engaged for months in arm's-length negotiations concerning the terms of a potential settlement.  Following the granting of the Motion to Dismiss, the parties jointly moved for and were granted several extensions of the July 7, 2017 deadline.  ECF Nos. 91-92, 95-96, 101-02, 106-09.

14.   These negotiations involved numerous telephonic and written communications between Plaintiffs' Counsel and counsel for Defendants. The negotiations were hard fought and each of the Corporate Governance Reforms and Addendums containing updated charters for the Audit Committee and Food Safety Council were painstakingly negotiated.

15.   On September 29, 2017, the Parties entered into the Stipulation, which contained the terms of their agreement to settle the Action.  ECF No. 110-1.

16.     The plaintiffs in a related consolidated shareholder derivative action pending in Colorado state court, *In re Chipotle Mexican Grill, Inc. Derivative Litigation,* Case No. 2016CV31215 (Colo. Dist. Ct. Denver Cnty.), were parties to the Stipulation and agreed to dismiss the State Court Action with prejudice within five business days of entry of judgment in the Pending Action. *Id.* ¶ 4.5. The three cases consolidated into the State Court Action are (i) *Skorski v. Ells, et al.,* Case No. 2016CV31215 (Colo. Dist. Ct. Denver Cnty.); (ii) *Arnold v. Ells, et al.,* Case No. 16CV31335 (Colo. Dist. Ct. Denver Cnty.); and (iii) *Weintraub v. Ells, et al.,* Case No. 2016CV33217 (Colo. Dist. Ct. Denver Cnty.). The plaintiff in *Weintraub,* like plaintiffs Gubricky and Lashkari, made a books and records demand on Chipotle pursuant to 8 Del. C. § 220 prior to filing his complaint.

17.     As part of the Settlement, Defendants agreed, among other things, to implement certain corporate governance changes significantly enhancing the Board's oversight of food safety and financial reporting, as well as the Company's employee whistleblowing program. ECF No. 110-1. These corporate governance changes are related to allegations in both the Complaint and the State Court Action consolidated complaint. ECF No. 1; Ex. 1.

18.     Specifically, Exhibit A to the Stipulation provides that Chipotle will implement the following corporate governance reforms:

### CORPORATE REFORMS AND COMMITMENTS

In connection with a settlement of the derivative lawsuits facing Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company") and its directors and officers, Chipotle will enter into the following commitments and implement the following corporate reforms, each of which shall extend for a period of not less than two years, unless otherwise stated herein and/or in Addendum A and Addendum B, attached hereto:

1. Chipotle will commit that commencing November 2016 ("Commencement Date") and completing by May 2018 ("Completion Date") not less than three of Chipotle's Board members as of the Commencement Date will no longer be on the Board of Directors, and not less than three new members of the Board of Directors

will have been appointed (each of whom will be independent directors as determined under applicable New York Stock Exchange listing standards). For avoidance of doubt, Montgomery Moran's departure from the Board, Chipotle's four new Board appointees as of December 2016, and the four Board members who will not be running for reelection to the Board in 2017 shall be credited towards Chipotle's compliance with this provision.

2. Chipotle will continue to maintain the Food Safety Advisory Council ("Council") established in November 2016, and the Executive Director, Food Safety, will be a participant in the Council. The Council will be comprised of independent consulting experts in food safety dedicated to evaluating and making recommendations regarding food safety. The Council's recommendations will be reported to the Board by the Executive Director, Food Safety at least quarterly and more often as needed. The Council's respective responsibilities shall be set forth in a charter as provided in the attached Addendum B, which shall be reviewed and assessed by the Audit Committee at least annually. Any proposed changes to that charter shall be submitted to the Board for approval.

3. The Council shall review the Company's protocols, including but not limited to the Norwalk Protocol, to ensure that they comply with food safety industry standards, as well as with applicable federal regulations. If any part of the Norwalk Protocol is found by the Council to be deficient, the Council shall recommend enhancements to the Norwalk Protocol to the Executive Director of Supply Chain and Safety, Security & Risk and the Executive Director of Food Safety. The Council shall perform this review at least annually.

4. Chipotle shall continue its generous sick leave policy, which provides hourly employees with at least twenty-four hours of paid sick leave each year and salaried employees with forty hours of paid sick leave each year. Most employees do not have to accrue paid sick time hours to take advantage of this policy. Further, this policy requires all employees who have experienced vomiting and/or diarrhea at home or at work to be excluded from work and the manager on duty to immediately notify Safety, Security and Risk. (In those locations, like California, that have mandated sick leave laws, paid sick leave will continue to be made available to employees in accordance with local law.)

5. Chipotle shall continue to enforce its "no work while sick" policy and implement the Norwalk Protocol when appropriate. Under the "no work while sick" policy, employees are forbidden to work when sick, and the manager in charge for each shift is required to interview each employee and exclude sick employees. This policy requires all employees to immediately report to the manager in charge if the employee is suffering certain symptoms or if the employee has been diagnosed with any infectious or communicable disease, including but not limited to Salmonella, Shigella, E. coli, Hepatitis A, Norovirus, or other gastrointestinal virus. When an employee's described symptoms are consistent with a communicable disease, the manager in charge shall confirm with the Safety, Security and Risk hotline the

appropriate course of action. (The hotline is supported by on-call nurses who make appropriate medical determinations and recommendations concerning exclusion of ill employees.) When appropriate and consistent with the guidelines, the Norwalk Prevention Protocol is implemented. Safety, Security and Risk will direct the Norwalk Protocol's implementation with the appropriate additional escalations and interventions, as recommended.

6. Chipotle shall continue training all Chipotle hourly and salaried employees through in-person and online training as appropriate and continue to notify employees of new and updated policies through the use of policies, procedures, and handbooks.

7. The Audit Committee shall have oversight responsibility for the Internal Audit Self-Evaluation and shall mandate that Chipotle utilize the Institute of Internal Audit or other applicable standards to evaluate its internal audit performance on an annual basis and compliance with those standards, as set forth in the Audit Committee Charter.

8. Chipotle shall continue to have and enforce Codes of Conduct for its Employees, Directors, Chairman and CEO, and CFO.

**Reforms to the Company's Whistleblower Program**

9. Chipotle shall continue to maintain a Whistleblower Policy that allows for Chipotle employees to report any complaints or concerns they may have about Chipotle's business and operations, including but not limited to accounting and internal accounting controls, audit matters, food safety issues, and any Code of Conduct violations. Each complainant will be treated as confidential and the anonymity of the complainant, if requested, will be preserved to the fullest extent reasonably possible in light of Chipotle's need to investigate the complaint, the requirements of applicable law, and other Chipotle policies. To ensure that Chipotle employees feel comfortable utilizing this policy, Chipotle will continue to maintain the "Chipotle Confidential" hotline 24 hours per day, seven days a week that permits anonymous reporting by phone or email to an independent party (the "Third Party"). Chipotle's policy will not allow any form of discipline or retaliatory action related to the terms and conditions of employment against employees as a result of their raising questions or concerns with management or the hotline, or as a result of their providing information or assistance in connection with any governmental proceeding or investigation.

This Policy shall be amended, as necessary, to make clear that the whistleblowing provisions are designed to report any potential or suspected violation of any federal, state, or local law (in any form, including accounting violations, insider trading, etc.), and not simply to report violations of internal Chipotle policies.

Chipotle further agrees that:

a. The General Counsel shall be responsible for reporting to the Audit Committee details of any significant food-borne illness related complaint and shall provide a detailed report concerning his or her investigation no later than the next Audit Committee meeting.

b. A log of such significant food-borne illness related complaints, as well as the results of all investigations of such complaints, shall be memorialized in writing and maintained by the CFO and General Counsel for a period approved by the Audit Committee. Chipotle shall continue to allow its independent auditor access to the log and investigation results upon request. Chipotle will continue to allow the Audit Committee full access to the complaint log, complaint reports, and related materials.

c. Where the whistleblower has identified him/herself in the complaint, the General Counsel (or his or her designees) shall notify the whistleblower when the investigation or evaluation of the complaint is complete and convey the results thereof. The whistleblower shall further be notified that if he or she does not believe that his or her report was properly explained or resolved, he or she may contact the full Board, the Company's outside counsel, and/or its external auditor concerning the complaint; and

d. Contact information and directions for the Whistleblower Hotline shall be posted by Chipotle on its website.

**Revisions to the Audit Committee Charter**

10. Chipotle's Audit Committee Charter shall be amended as provided in the attached Addendum A.

**Reforms to the Company's Related Persons Transaction Policy**

11. Chipotle shall continue to have and enforce a "Related Persons Transaction" policy that requires the Audit Committee of the Board of Directors to approve any such transaction, subject to certain de minimis exceptions, prior to its commencement. A Related Person Transaction is any financial transaction, arrangement, or relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements, or relationships in which Chipotle is a participant, and in which a Related Person has a direct or indirect interest. Related Person means: all executive officers and members of the Board of Directors; any nominee to become a member of the Board of Directors of Chipotle; any immediate family member of a director, nominee for director or executive officer of Chipotle; and any holder of more than five percent (5%) of any class of Chipotle's common stock, or a member of the immediate family of such holder. The Audit Committee's approval or ratification is necessary for any related-party transactions, subject to de minimis exceptions, and Chipotle must make

timely disclosures on an annual basis of all such transactions that are determined to be material. The Audit Committee will consider the business purpose for any proposed related-party transaction, the fairness of the transaction to the Company, and whether the proposed transaction impairs the independence of any outside director or presents an improper conflict of interest for any Chipotle officer or director.

This Policy shall be amended, as necessary, to include the following:

> All Board members shall submit to Chipotle's General Counsel (or his or her designees) an up-to-date list of companies in which they are a director, an officer, and/or of which they own a controlling interest, and shall promptly update the list when any changes occur.

**Commitments With Respect to Chipotle's Insider Trading Policy**

12. Chipotle shall continue to have and enforce its Insider Trading Policy. That policy: (i) prohibits a designated Insider (including all executive officers and members of the Board of Directors), either personally or on behalf of others, from trading in Chipotle stock or other securities except during certain "open window periods" during which it is least likely that there is any material non-public information concerning Chipotle; (ii) requires an Insider to obtain pre-clearance from Chipotle's General Counsel or similar compliance officer prior to effecting any transaction in the Company's stock, including the exercise of stock options or stock appreciation rights, during such open window period; and (iii) prohibits Insiders from effecting any transaction in the Company's stock at any time (including during an open window period) in which such Insider is in possession of material non-public information concerning Chipotle. Under the policy, Insiders are advised when an open window period commences and when such open window period closes. The policy also prohibits certain transactions altogether and explicitly prohibits an Insider from holding shares of Chipotle stock in a margin account or pledging shares of Chipotle stock as security.

13. Chipotle will continue to require pre-clearance by the General Counsel (or his or her designees) of all proposed transactions in Chipotle securities by Section 16 officers that are not executed pursuant to a valid SEC Rule 10b5-1 trading plan;

14. Chipotle will continue to prohibit trading of Chipotle securities by Section 16 officers for the period of time beginning no later than the fifteenth day of the last month of each quarter and ending no earlier than the commencement of trading on the second business day after the release of earnings each quarter, other than pursuant to a pre-cleared Rule 10b5-1 trading plan entered into during an open trading window; and

15. Violations of Chipotle's insider trading policy will result in an assessment by the General Counsel concerning appropriate disciplinary action, including but not

limited to cancellation of outstanding stock options, disqualification from performance-based compensation, and termination.

**Additional Terms**

16. Chipotle reserves the right to amend or update any of the policies stated above to comply with updates, revisions, and new statutes and regulations, including but not limited to the NYSE Listed Company Manual, Securities and Exchange Commission Rules and Regulations, and other applicable laws.

**Addendum A**
**EXHIBIT A**

**CHIPOTLE MEXICAN GRILL, INC.**
**CHARTER FOR AUDIT COMMITTEE**

**As of September 29, 2017**

## I. Statement of Purpose

The Audit Committee (the "Committee") is a standing committee of the Board of Directors (the "Board") of Chipotle Mexican Grill, Inc. (the "Company"). The purpose of the Committee is to assist the Board in fulfilling its oversight responsibility relating to (i) the integrity of the Company's financial statements and its internal control system (including the implementation and effectiveness of internal control over financial reporting); (ii) the performance of the internal audit services function; (iii) the annual independent audit of the Company's financial statements, the engagement of the independent auditors and the evaluation of the independent auditors' qualifications, independence and performance; (iv) the compliance by the Company with legal and regulatory requirements; (v) the implementation and effectiveness of the Company's disclosure controls and procedures; (vi) the evaluation of enterprise risk issues; and (vii) the fulfillment of the other responsibilities set out herein. The Committee shall also prepare the report of the Committee required to be included in the Company's annual proxy statement.

In discharging its responsibilities, the Committee is not itself responsible for the planning or conduct of audits or for any determination that the Company's financial statements are complete and accurate or in accordance with generally accepted accounting principles. This is the responsibility of management and the independent auditors.

## II. Organization

A. *Charter.* At least annually, this charter shall be reviewed and reassessed by the Committee and any proposed changes shall be submitted to the full Board for approval.

10

B. *Members.* The Committee shall consist of a minimum of three Board members. The members of the Committee shall be appointed by the full Board upon the recommendation of the Nominating and Governance Committee. Each Board member appointed to serve on the Committee shall meet the independence, experience and expertise requirements of the New York Stock Exchange and applicable law, and at least one Board member appointed to serve on the Committee shall qualify as an "audit committee financial expert" as defined in applicable rules of the Securities and Exchange Commission. No member of the Committee may serve on the audit committees of more than three public companies, including the Company. Committee members may be removed from the Committee, with or without cause, by action of the majority of the members of the Board other than the member whose removal from the Committee is being acted upon.

C. *Chairperson.* The Board shall also designate a Committee Chairperson.

D. *Meetings.* In order to discharge its responsibilities, the Committee shall each year establish a schedule of meetings; additional meetings may be scheduled as required. In planning the annual schedule of meetings, the Committee shall periodically meet separately (i) with the independent auditors and the head of internal audit (or internal audit service providers), without management present; and (ii) with management, without the independent auditors and/or the head of internal audit (or internal audit service providers) present. The Committee shall also regularly meet in executive session with only the Committee members present.

E. *Quorum; Action by Committee.* A quorum at any Committee meeting shall be a majority of the members of the Committee. All determinations of the Committee shall be made by a majority of the members present at a meeting duly called or held at which a quorum was present, except as specifically provided herein (or where only two members are present, by unanimous vote). Any decision or determination of the Committee reduced to writing and signed by all of the members of the Committee shall be fully as effective as if it had been made at a meeting duly called and held at which a quorum was present.

F. *Agenda, Minutes and Reports.* An agenda, together with materials relating to the subject matter of each meeting, shall be sent to members of the Committee prior to each meeting. Minutes for all meetings of the Committee shall be prepared to document the Committee's discharge of its responsibilities. The minutes shall be circulated in draft form to all Committee members to ensure an accurate final record, shall be approved at a subsequent meeting of the Committee and shall be made available to the full Board. The Committee shall make regular reports to the Board.

G. *Performance Evaluation.* The Committee shall evaluate its performance on an annual basis and establish criteria for such evaluation.

## III. Responsibilities

The following shall be the principal responsibilities of the Audit Committee:

*A. Engagement of Independent Auditors.* The Committee shall engage the independent auditors for all audit services, and shall approve the engagement of the independent auditors for all non-audit services in accordance with policies and procedures approved by the Committee or the full Board. The Committee shall oversee, evaluate and, where appropriate, replace the independent auditors.

B. *Pre-Approval of Audit and Non-Audit Services.* The Committee shall approve procedures for the pre-approval of the engagement of the independent auditors to provide audit and non-audit services. The Committee shall, in accordance with such procedures, pre-approve all audit and non-audit services provided to the Company by the independent auditors, all as required by applicable law or listing standards.

C. *Review of Independence and Performance of Independent Auditors.* The Committee shall receive periodic reports from the independent auditors as required by applicable law or standards of the PCAOB (United States) regarding the auditors' independence, which shall be not less frequently than annually. The Committee shall discuss such reports with the auditors and take appropriate action to satisfy itself of the independence of the auditors. The Committee shall review the performance of the Company's independent auditors annually. In doing so, the Committee shall consult with management and the head of internal audit (or internal audit service providers) and shall obtain and review a report by the independent auditors describing their internal control procedures, issues raised by their most recent internal quality control review, or peer review (if applicable), or by any inquiry or investigation by governmental or professional authorities for the preceding five years and the response of the independent auditors. The Committee shall consider whether it is appropriate to adopt a policy of rotating independent auditors on a periodic basis. Any selection of the auditors by the Committee may be subject to shareholders' approval, as determined by the Board.

D. *Review of Performance of Internal Auditors.* The Committee shall annually review the experience and qualifications of the senior members of the internal audit function (or the internal audit service providers), including the responsibilities, staffing, budget and quality control procedures of the internal audit function. If the internal audit services are outsourced, the Committee shall be responsible for the engagement, evaluation and termination of the internal audit service providers and shall approve fees paid to the internal audit service providers. As part of its responsibility to evaluate any internal audit service providers, the Committee shall review the quality control procedures applicable to the service providers. The Committee shall also obtain not less frequently than annually a report of the internal audit service providers addressing such service providers'

internal control procedures, issues raised by their most recent internal quality control review or by any inquiry or investigation by governmental or professional authorities for the preceding five years and the response of such service providers.

E. *Audits by Internal and Independent Auditors.* The Committee shall discuss with the head of internal audit (or the internal audit service providers) and the independent auditors the overall scope and plans for their respective audits, including the adequacy of staffing, budgets and other factors that may affect the effectiveness and timeliness of such audits. The Committee, in consultation with the head of internal audit, shall develop and maintain a quality assurance and improvement program that covers all aspects of the internal audit activity and continuously monitors its effectiveness, including audit compliance and specific measures and timeframes to remediate any areas of noncompliance. The Committee shall discuss with management, the head of internal audit (or the internal audit service providers) and the independent auditors the Company's major risk exposures (whether financial, operating or otherwise), the adequacy and effectiveness of the Company's internal control over financial reporting and the steps management has taken to monitor and control such exposures, among other considerations that may be relevant to their respective audits. To facilitate these discussions, the Chief Financial Officer or his/her designee(s) shall, on at least an annual basis, prepare a written risk assessment pertaining to, at a minimum, financial reporting risks and potentially unlawful activities, and this risk assessment will be presented to the Committee for its review and evaluation. The independent auditors are responsible for auditing and attesting to the Company's financial statements and understanding the Company's system of internal control over financial reporting sufficient to plan and to determine the nature, timing and extent of audit procedures to be performed.

F. *Oversight of Financial Statements and Internal Control over Financial Reporting.* The Committee is required to review, together with the independent auditors, any material or unusual accounting issues that require the exercise of a high degree of judgment regarding the appropriate treatment under generally accepted accounting principles, and to approve the Company's treatment of these issues. Additionally, the Committee shall review with management and the independent auditors the Company's overall system of internal control, including management's annual assessment of the Company's internal control over financial reporting and the related report issued by the independent auditors. The Committee shall also review with management and the independent auditors: (i) significant deficiencies and material weaknesses in the design or operation of the Company's internal control over financial reporting; (ii) any fraud (regardless of materiality) involving management or other employees having a significant role in internal control over financial reporting; and (iii) changes in the Company's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, such internal control over financial reporting.

G. *Review of Disclosure Controls and Procedures.* The Committee shall review with the Chief Executive Officer, the Chief Financial Officer and the General Counsel the Company's disclosure controls and procedures and shall review periodically, but in no event less frequently than quarterly, management's conclusions about the effectiveness of such disclosure controls and procedures, including any material non-compliance with them.

H. *Review of Annual SEC Filings.* The Committee shall review with management and the independent auditors the financial information to be included in the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of the Form 10-K), including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," their judgment about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments made in the preparation of the financial statements and the clarity of the disclosures therein. The Committee shall also discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under applicable standards of the PCAOB (United States) or applicable law or listing standards. The Committee may discuss with the national office of the independent auditors issues on which it was consulted by the Company's audit team and matters of audit quality and consistency. Based on such review and discussion, the Committee shall determine whether to recommend to the Board that the audited financial statements be included in the Company's Form 10-K.

I. *Review of Quarterly SEC Filings.* The Committee shall review and discuss with management and the independent auditors the quarterly financial information to be included in the Company's Quarterly Reports on Form 10-Q, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and shall discuss any other matters required to be communicated to the Committee by the independent auditors under applicable standards of the PCAOB (United States) or applicable law or listing standards. The Committee shall also discuss the results of the independent auditors' review of the Company's quarterly financial information conducted in accordance with applicable standards of the PCAOB (United States).

J. *Review of Certain Other Communications.* The Committee shall review the Company's earnings press releases and financial information and earnings guidance, including non-GAAP financial measures, periodically provided to analysts and rating agencies (which may consist of a discussion of the types of information to be provided and types of presentation to be made) to the extent required by applicable law or listing standards.

K. *Review of Certain Matters with Management and the Independent Auditors.* The Committee shall review periodically with management and independent auditors (i) significant financial reporting issues, including material changes in the Company's selection or application of accounting principles and the

effects of alternative applications of accounting principles on the Company's financial statements; and (ii) the effect of new or proposed regulatory and accounting initiatives on the Company's financial statements and other public disclosures.

L. *Additional Consultations with Independent Auditors.* The Committee shall review with the independent auditors any problems or difficulties the auditors may have encountered in connection with the annual audit or otherwise and any management letter provided by the auditors and the Company's response to that letter. Such review shall address: (i) any restrictions on the scope of activities or access to required information; (ii) any disagreements with management regarding generally accepted accounting principles and other matters; and (iii) material adjustments to the financial statements recommended by the independent auditors and adjustments that were proposed but "passed," regardless of materiality.

M. *Preparation of Report for Proxy Statement.* The Committee shall produce the report required to be included in the Company's annual proxy statement, all in accordance with applicable rules and regulations.

N. *Policies for Employment of Former Audit Staff.* The Committee shall approve guidelines for the Company's hiring of former employees of the independent auditors, which shall meet the requirements of applicable law and listing standards.

O. *Establishment of "Whistleblowing" Procedures.* The Committee shall establish and publish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

P. *Oversight of Compliance and Ethics Program.* The Committee shall periodically, but not less frequently than annually, review with management, including the General Counsel, the implementation and effectiveness of the Company's compliance and ethics program, including the "whistleblowing" procedures referred to above. In performing such oversight, the Committee shall also review with appropriate members of management, including the head of internal audit (or service providers) and, if appropriate, the independent auditors any correspondence with, or other action by, regulators or governmental agencies and any employee complaints or published reports that raise concerns regarding the Company's financial statements, accounting or auditing matters, or compliance with the Company's Code of Business Conduct and Ethics or other applicable law or listing standards. The Committee shall also meet periodically with the chief legal officer to review the material legal affairs of the Company.

Q. *Review of Certain Transactions with Directors and Related Parties.* The Committee shall review periodically, but no less frequently than annually, a summary of the Company's transactions with Directors and officers of the Company and with firms that employ Directors, as well as any other material related party transactions.

R. *Conduct of Investigations.* Without limiting the authority of the Board, any other committee of the Board, or the Company's management, the Committee shall have the authority to investigate any matter brought to its attention, including, but not limited to, actions by Company officers.

S. *Outside Advisors and Counsel.* The Committee shall have the authority to retain such outside counsel, accounting advisors, and other advisors as the Committee may deem appropriate in its sole discretion, and shall have sole authority to approve related fees and retention terms. The cost of any such advisors retained by the Committee shall be borne by the Company.

T. *Access to Records, Consultants and Others.* In discharging its responsibilities, the Committee shall have full access to all books, records, facilities and personnel of the Company, and to request any officer or employee of the Company, the Company's outside counsel, internal auditor, internal audit service providers or independent auditors to attend a meeting of the Committee or to meet with any members of, or consultants counsel, or other advisors to, the Committee.

U. *Delegation.* The Committee may delegate any of its responsibilities to a subcommittee comprised of one or more members of the Committee.

V. *Other Delegated Responsibilities.* The Committee shall also carry out such other duties that may be delegated to it by the Board from time to time.

**Addendum B**
**EXHIBIT A**

**CHIPOTLE MEXICAN GRILL, INC.**
**CHARTER FOR FOOD SAFETY ADVISORY COUNCIL ("CHARTER")**

**As of September 29, 2017**

## I. Statement of Purpose

The Food Safety Advisory Council (the "Council") is an independent group of food safety experts dedicated to evaluating and providing recommendations to improve the food safety program at the Company. The purpose of the Council is to assist the Executive Director of Food Safety.

The Company shall maintain the Council for at least two years from the date of final approval of the settlement of the derivative lawsuits filed on behalf of the Company. Based on changed circumstances and by approval of a majority of independent directors consistent with their fiduciary duties, the two-year period set forth above may be amended for good cause.

## II. Organization

At least annually, this Charter shall be reviewed and reassessed by the Audit Committee of the Board, and any proposed changes shall be submitted to the Board for approval.

The Council will be organized as follows:

A. Members. The Council shall consist of a minimum of three experts in food safety dedicated to investigating, evaluating, and making recommendations regarding food safety to the Executive Director of Food Safety. The Executive Director of Food Safety shall participate in all Council meetings, and shall serve as the liaison between the Company and the Council.

B. Meetings. In order to discharge its responsibilities, the Council shall meet quarterly, with the authority to convene additional meetings as circumstances require. All Council members are expected to attend each meeting, in person or via videoconference or teleconference.

C. Agenda. At each Council meeting, an agenda shall be agreed upon by the Council for the following meeting.

D. Reporting. The Executive Director of Food Safety shall report the Council's activities to the Board on a quarterly basis.

## III. Responsibilities

The following shall be the principal responsibilities of the Council:

A. The Council shall meet quarterly, as set forth in section II, above. The Council shall review the Company's food safety program and risks associated therewith and make suggestions and recommendations. The Council will continually review Chipotle's food safety procedures and strategies, validating existing initiatives and advising on opportunities for improvement. The Executive Director of Food Safety shall communicate the Council's recommendations to the Company.

B. The Council shall, as necessary, review and analyze reports from independent third-party consultant(s) (including, but not limited to, Azule's Local

Farmer Program and Ecolab) regarding the status of the Company's food safety program and emerging risks.

C. The Council shall review the Company's protocols, including but not limited to the Norwalk Protocol, to ensure that they comply with food safety industry standards, as well as with applicable federal regulations. If any part of the Norwalk Protocol is found to be deficient, the Council shall recommend enhancements to the Norwalk Protocol to the Executive Director of Supply Chain and Safety, Security & Risk, Restaurant Support Officers and the Executive Director of Food Safety. The Council shall perform this review at least annually.

D. The Council shall review reports and trends compiled from the results of internal and external food safety audits and the results of all health inspections conducted by local, state and federal regulators and/or authorities.

E. The Executive Director of Food Safety shall report to the Company, on behalf of the Council, on a quarterly basis concerning the Council's recommendations and findings concerning the Company's food safety protocols.

ECF No. 110-2.

19.     In exchange, Plaintiffs, acting on behalf of Chipotle, agreed to release all claims against the Individual Defendants and Chipotle that were or could have been asserted in the Actions that relate to the Actions.  The Individual Defendants and Chipotle agreed to release Plaintiffs and Plaintiffs' Counsel from all claims arising out of or relating to the Actions, Plaintiffs' Claim, and Plaintiffs' Allegations.  ECF No. 110-1 ¶¶ 2.1-2.4.

20.     The released claims specifically exempted two pending federal securities class actions, *Ong v. Chipotle Mexican Grill, Inc.*, 1:16-cv-00141-KPF (S.D.N.Y) and *Kelley v. Chipotle Mexican Grill, Inc.*, CA No. 1:17-cv-01760-STV (D. Colo.), which are based on facts similar to those in the Actions.  *Id.* ¶ 2.1 n.1.

21.     Defendants have acknowledged, without admitting wrongdoing, that "the filing, prosecution, and settlement" of the Actions "were a major factor influencing the Company's agreement to undertake implementation of the Corporate Governance Reforms and that the Corporate Governance Reforms confer a substantial benefit on the Company." *Id.* ¶ 1.2.

22.     Plaintiffs in the *Gubricky* Action, the *Lashkari* Action and the *Weintraub* Action, prior to the filing of their respective complaints, all engaged in document collection and review pursuant to statutory books and records demands under Delaware law and, along with the remaining plaintiffs in the State Court Action, utilized such documents to confirm that the terms of the Settlement are fair, reasonable, and adequate to the Company and its shareholders.

23.     On September 29, 2017, Gubricky filed an Unopposed Motion for Preliminary Approval of Settlement. ECF No. 110. The Court granted the motion on October 24, 2017. ECF No. 111 ¶ 1.

24.     The Preliminary Approval Order scheduled a settlement hearing (the "Settlement Hearing") for March 15, 2018:

> to (i) determine whether the above-captioned action (the "Action") may proceed as a shareholder derivative action pursuant to Federal Rule of Civil Procedure 23.1, solely for purposes of the Settlement and without prejudice to the Company's right to raise defenses under Rule 23.1 or any other defenses in the Action in the event that the Court fails to grant final approval of the Settlement, (ii) determine whether the Settlement, on the terms and conditions provided for in the Agreement, is fair, reasonable, and adequate and in the best interests of Chipotle Mexican Grill, Inc. ("Chipotle") and its shareholders, (iii) determine whether the Court should finally approve the Settlement and enter a judgment, substantially in the form attached to the Agreement as Exhibit E, dismissing the Action with prejudice and extinguishing and releasing the claims as set forth therein, (iv) hear and determine any objections to the Settlement, (v) rule on Plaintiffs' application for an award of attorneys' fees and expenses and application for a service award for the individual plaintiffs, and (vi) rule on such other matters as the Court may deem appropriate.

*Id.* ¶ 2.

25.     In addition, the Preliminary Approval Order approved the form and content of the Notice of Pendency of Derivative Action, Proposed Agreement of Settlement and Release, and Settlement Hearing (the "Notice"); the Summary Notice of Pendency of Derivative Action, Proposed Settlement of Derivative Action, and Settlement Hearing (the "Summary Notice," and

together with the Notice, the "Notices"); and directed the sending of Notices to the Company's shareholders. *Id.* ¶¶ 3-6.

26.    The Parties agreed to stay all proceedings in the Actions other than those incident to the Settlement itself pending Court approval of the Settlement.  ECF No. 110-1 ¶ 11.13.

27.    Pursuant to the Preliminary Approval Order, the Summary Notice was issued on the newswire service PR Newswire on December 22, 2018; a link to the Notice was posted in a prominent fashion on the front page of Chipotle's website on December 22, 2018; and the Notice was mailed to Chipotle shareholders commencing on January 8, 2018.

28.    To the Parties' knowledge, there are no objections to the Settlement.

29.    Plaintiffs' Counsel have concluded, based upon their initial investigation and the information that became available during the course of the Actions, that the terms and conditions of the Settlement are fair, reasonable, and adequate to the Company and its shareholders, and have agreed to settle the claims raised in the Actions pursuant to the terms and provisions of the Stipulation after considering:  (a) the benefits conferred upon Chipotle by the Settlement; (b) the anticipated significant expense of continued litigation (including to Chipotle); and (c) the risks of continued litigation. *Id.* at 4.

30.    As set forth in the Stipulation, Chipotle and the Individual Defendants have denied, and continue to deny, each and all of the claims and contentions alleged in the Actions. The Company and Defendants have denied, and continue to deny, any and all allegations of wrongdoing, fault, liability, or damage and deny that they or any of the Company's other current or former officers or directors engaged in, committed, or aided or abetted the commission of any wrongdoing or violation of law or breach of duty, deny that the Company or any of its shareholders suffered any damage whatsoever, deny that they acted improperly in any way, believe that they

acted properly at all times, and maintain that they diligently and scrupulously complied with their fiduciary and other legal duties. Nonetheless, the Company and the Individual Defendants wish to settle all disputes on the terms and conditions stated in the Stipulation solely to eliminate the uncertainties, burden, and expense of further protracted litigation and to put the claims to be released in the Stipulation to rest finally and forever. *Id.* ¶ 6.3.

31.     Plaintiffs and Plaintiffs' Counsel believe the claims asserted in the Actions have merit. Plaintiffs and Plaintiffs' Counsel, however, recognize and acknowledge the expense and length of proceedings necessary to prosecute the Actions against Defendants through trial and, potentially, through appeals, especially now that Defendants' Motion to Dismiss has been granted and Plaintiffs' sole option is to make a demand on Chipotle's Board. Plaintiffs and Plaintiffs' Counsel have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Actions, as well as the difficulties and delays inherent in such litigation. Plaintiffs and Plaintiffs' Counsel also are mindful of the inherent problems of proof under and possible defenses to the claims that may be asserted in the Actions. *Id.* ¶ 6.4.

32.     Based on their investigation, discovery efforts, and their analysis of the applicable legal principles, Plaintiffs' Counsel concluded that the negotiated benefits of the Settlement are fair, reasonable, and adequate, considering the benefits conferred upon Chipotle by the Settlement, the anticipated significant expense of continued litigation (including to Chipotle), and the risks of continued litigation.

33.     Plaintiffs' Counsel have substantial experience in shareholder derivative and class action litigation. *See* Exhibit A to Exhibits 2-8.

34.     Even if Plaintiffs made a demand on the Board which was refused, Plaintiffs would have to overcome Defendants' inevitable motion to dismiss and, if successful, fight through the

difficult process of additional motions, discovery, trial, and the likely battle of experts. Ultimately it was at best debatable whether a more successful result could be obtained, or, at the very least, that a judgment could have been attained that would equal the negotiated benefits obtained by Plaintiffs' Counsel through the Settlement process. The Settlement eliminated the need to litigate these and other complex issues to trial, with the likelihood of an appeal to follow, and conferred a substantial benefit upon the Company and its shareholders.

35.     Moreover, the Stipulation provided that Plaintiffs' Counsel intend to seek an aggregate award of up to $375,000 in attorneys' fees and expenses in connection with the Actions, as well as a service award of $1,000 for each of the five named Plaintiffs in the Actions to be paid from the Fee and Expense Award. Defendants agreed not to oppose a requested fee and expense award in that amount. ECF No. 110-1 ¶ 10.1.

## THE STIPULATION OF SETTLEMENT

36.     As set forth in the Stipulation, Defendants have acknowledged "the filing, prosecution, and settlement" of the Actions "were a major factor influencing the Company's agreement to undertake implementation of the Corporate Governance Reforms and that the Corporate Governance Reforms confer a substantial benefit on the Company." *Id.* ¶ 1.2.

37.     Plaintiffs and their counsel believe that: (a) the claims Plaintiffs can assert by making a demand on the Board have legal merit, although they recognize that there are legal and factual defenses to any resulting claims that Defendants could and would raise throughout the pendency of the Actions, and (b) the Settlement is fair, reasonable, and adequate.

38.     After Plaintiffs' Counsel assured themselves the terms of the proposed Settlement were fair and reasonable, the parties exchanged numerous drafts of the Stipulation and various related documents, including the proposed Order and Final Judgment. ECF No. 110-3, Ex. E at

14.

39.     The Stipulation was entered into on September 29, 2017.  ECF No. 110-1.

40.     The Stipulation contained as an exhibit the proposed form of Notice to be sent to the Company's shareholders, advising them of the background and terms of the proposed Settlement.  The Notice informed shareholders of, *inter alia*:

- The background and history of the litigation;

- The nature of the claims asserted;

- The terms of the Settlement as consideration for the release of claims contemplated thereby;

- The amount of the fee requested by Plaintiffs' counsel; and

- The time and place of the Settlement Hearing and the procedures that shareholders must follow if they wish to appear or object, or otherwise be heard at the hearing.

ECF No. 110-3, Ex. C at 6.

41.     Additionally, the Summary Notice informed shareholders of the Settlement as well as the time and place of the Settlement Hearing.  *Id.*, Ex. D at 12.

42.     After the Parties had agreed to all of the substantive terms of the Stipulation, they began discussions concerning Plaintiffs' Counsel's aggregate request for attorneys' fees and expenses.  These arm's-length negotiations, conducted during numerous, difficult sessions, culminated in Defendants' agreement not to oppose Plaintiffs' Counsel's aggregate request for fees and expenses in an amount not to exceed $375,000, as well as a Service Award of $1,000 for each of the five Plaintiffs to be paid from the Fee and Expense Award.

## PLAINTIFFS' COUNSEL'S FEE APPLICATION

43.     Contingent upon Court approval of the Settlement, Plaintiffs' Counsel seek an aggregate award of attorneys' fees and reimbursement of expenses in the amount of $375,000.

Defendants have agreed to pay such fees and expenses as awarded by the Court.

44.     Plaintiffs' Counsel believe their request is fair and reasonable under the standards applicable in this Court and the relevant facts of this case.  The Parties negotiated the requested fee at arm's length and the fee award will in no way diminish the relief provided through the Settlement.

45.     Defendants acknowledged in the Stipulation "the filing, prosecution, and settlement" of the Actions "were a major factor influencing the Company's agreement to undertake implementation of the Corporate Governance Reforms and that the Corporate Governance Reforms confer a substantial benefit on the Company." ECF No. 110-1 ¶ 1.2.

46.     The Fee and Expense Award is in line with other awards in cases providing significant benefits.

47.     Plaintiffs' Counsel's services to obtain the benefits achieved through the Settlement required experience and expertise in shareholder litigation.  Plaintiffs' Counsel have expended significant time, effort, and resources in the successful prosecution of the Actions and settlement negotiations.  Plaintiffs' Counsel expended 1,754.70 hours prosecuting the Actions and incurred approximately $11,770.95 in expenses.  Exhibits 2-10. Plaintiffs' Counsel's collective lodestar in the Actions is $1,065,684.75.

48.     Prior to the initiation of the Actions and the date the Parties executed the Stipulation, Plaintiffs' Counsel, among other things:  (a) investigated the relevant facts and transactions of the case, which included reviewing SEC filings, newspaper articles, press releases, websites, and other publicly available information regarding the Company; (b) reviewed and analyzed internal documents produced by Chipotle and designated as confidential in connection with demands for inspection of books and records of the Company pursuant to 8 *Del. C.* § 220

made by plaintiffs Gubricky, Lashkari, and Weintraub; (c) drafted pleadings, including the detailed Complaint (ECF No. 1) in the Pending Action and the original complaints and amended complaint in the State Court Action; (c) made a written settlement demand upon the Company; (d) drafted Plaintiffs' Memorandum of Law in Response to Defendants' Motion to Dismiss (ECF No. 61); (e) conducted research to formulate both litigation and negotiation strategies; and (f) engaged in successful settlement negotiations with Defendants.  In Plaintiffs' Counsel's view, all of these efforts were necessary and reasonable in connection with the prosecution of these proceedings.

49.     Plaintiffs' Counsel respectfully submit that the fee request is fair and reasonable, based on, among other things, the corporate governance benefits achieved in the Settlement, the prosecution of the Claims on a fully contingent basis, and the quality of the services rendered in pursuing and resolving the Claims asserted by Plaintiffs and their counsel, including the investigation and analysis of the underlying facts and successful negotiations with Defendants' counsel.

50.     Given the substantial benefits conferred through the efforts of Plaintiffs' Counsel and the numerous litigation risks and complexities Plaintiffs would have confronted had the case been prosecuted to trial, I respectfully submit that the proposed Settlement is fair, reasonable, and adequate and should be approved by the Court.  Additionally, given the material benefits achieved and services rendered by Plaintiffs' Counsel, I respectfully submit that the requested aggregate award of attorneys' fees and expenses of $375,000 is both fair and reasonable and fully merits the Court's approval.

51.     A modest service award of $1,000 for each of the five named Plaintiffs in the Actions to be paid from the Fee and Expense Award is fair and reasonable under the circumstances, is in line with similar awards of this nature, and will reward Plaintiffs for pursuing corporate

governance benefits on behalf of Chipotle.

52.     Attached hereto as exhibits are true and correct copies of the following documents:

Exhibit 1       Amended Shareholder Derivative Complaint and Jury Demand, *In re Chipotle Mexican Grill, Inc. Derivative Litigation*, Case No. 2016CV31215 (Consolidated), July 29, 2016 (Colo. Dist. Ct. Denver Cnty.);

Exhibit 2       Affidavit of Stuart J. Guber, Esquire, on Behalf of Faruqi & Faruqi, LLP in Support of Application for an Award of Attorneys' Fees and Reimbursement of Expenses;

Exhibit 3       Affidavit of Ned Weinberger, Esquire, on Behalf of Labaton Sucharow LLP in Support of Application for an Award of Attorneys' Fees and Reimbursement of Expenses;

Exhibit 4       Affidavit of Jeffrey A. Berens, Esquire, on Behalf of Berens Law LLC in Support of Application for an Award of Attorneys' Fees and Reimbursement of Expenses;

Exhibit 5       Affidavit of Phillip Kim, Esquire, on Behalf of The Rosen Law Firm, P.A. in Support of Application for an Award of Attorneys' Fees and Reimbursement of Expenses;

Exhibit 6       Affidavit of Timothy W. Brown, Esquire, on Behalf of The Brown Law Firm, P.C. in Support of Application for an Award of Attorneys' Fees and Reimbursement of Expenses;

Exhibit 7       Affidavit of Marc A. Rigrodsky, Esquire, on Behalf of Rigrodsky & Long, P.A. in Support of Application for an Award of Attorneys' Fees and Reimbursement of Expenses;

Exhibit 8       Affidavit of Rusty E. Glenn, Esquire, on Behalf of The Shuman Law Firm in Support of Application for an Award of Attorneys' Fees and Reimbursement of Expenses;

Exhibit 9       *In re Chiquita Brands International, Inc., Alien Tort Statute & Shareholder Derivative Litigation*, No. 08-01916-MD (S.D. Fla. Oct. 15, 2010) (ORDER);

Exhibit 10      *Louisiana Municipal Police Employees' Retirement System v. Alvarez*, C.A. No. 5620-VCN (Del. Ch. Sept. 27, 2010) (ORDER);

Exhibit 11      *In re Lifelock, Inc. Derivative Litigation*, Case No. CV2015-054087 (Superior Ct. Maricopa Co. Ariz. Sept. 8, 2016); Stipulation of Settlement (June 30, 2016);

Exhibit 12     *In re Google Inc. S'holder Derivative Litig.,* CV-11-04248-PJH (N.D. Cal. Jan. 21, 2015); Stipulation of Settlement (Aug. 7, 2014);

Exhibit 13     *Belova v. Sharp,* Lead Case No. CV-07-0299-MO (D. Ore. Nov. 6, 2009); Stipulation of Settlement (Oct. 30, 2009);

Exhibit 14     *Blevins v. Applebaum,* Case No.: MER-C-26-08 (N.J. Super. Nov. 18, 2008);

Exhibit 15     *In re Activision, Inc. Shareholder Derivative Litigation,* No. CV-06-04771-MRP(JTLx) (C.D. Cal. July 21, 2008); Stipulation of Settlement (May 12, 2008);

Exhibit 16     *City of Pontiac Gen. Emps.' Ret. Sys. V. Langone, et al,* No. 2006-cv-122302 (Ga. Sup. Ct., Fulton Cnty., June 10, 2008);

Exhibit 17     *Karstadt v. Isenberg,* Civil Action No. 4:07-cv-00509 (S.D. Tex. May 14, 2008); Stipulation of Settlement (Mar. 6, 2008).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 23rd day of February, 2018, at Jenkintown, Pennsylvania.

**FARUQI & FARUQI, LLP**

Stuart J. Guber
101 Greenwood Avenue
Suite 600
Jenkintown, PA  19046
Tel: (215) 277-5770

*Co-Lead Counsel for the Pending Action*