**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-2011-WJM-KLM
Consolidated with Civil Action No. 16-cv-3180-WJM-KLM

SEAN GUBRICKY, Derivatively on Behalf of Nominal Defendant, CHIPOTLE MEXICAN GRILL, INC.,

Plaintiff,

v.

STEVE ELLS,
MONTGOMERY F. (MONTY) MORAN,
MARK CRUMPACKER,
JOHN S. CHARLESWORTH,
KIMBAL MUSK,
PATRICK J. FLYNN,
STEPHEN GILLETT,
ALBERT S. BALDOCCHI,
DARLENE J. FRIEDMAN, and
NEIL W. FLANZRAICH,

Defendants,

-and-

CHIPOTLE MEXICAN GRILL, INC., a Delaware Corporation,

Nominal Defendant.
ROBBINS GELLER RUDMAN & DOWD, LLP and
MOTLEY RICE LLC,

Intervenors.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND JURY DEMAND**

---

## INTRODUCTION

Plaintiff Sean Gubricky ("Plaintiff"), by and through his undersigned attorneys, submit this Verified Shareholder Derivative Complaint (the "Complaint") against defendants named herein. Plaintiff alleges the following based upon information and belief, except as to those

allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, the investigation conducted by and under the supervision of his counsel which included, among other things: (a) a review and analysis of regulatory filings filed by Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by Chipotle; (c) a review of other publicly available information concerning Chipotle, including articles in the news media and analyst reports; (d) complaints and related materials in litigation commenced against some or all of the Individual Defendants and/or the Company; (e) documents produced by Chipotle pursuant to 8 Del. C. §220; and (f) applicable rules and regulations.

## SUMMARY OF THE ACTION

1. This is a shareholder's derivative action brought for the benefit of Nominal Defendant Chipotle. Chipotle, together with its subsidiaries, operates Chipotle Mexican Grill restaurants, which serve a focused menu of burritos, tacos, burrito bowls and salads, made using fresh ingredients. As of December 31, 2015, the Company operated 1,971 Chipotle restaurants throughout the United States, as well as 11 in Canada, seven in England, four in France and one in Germany. Chipotle is headquartered in Denver, Colorado. This derivative action is brought against certain members of the Company's Board of Directors (the "Board") and certain of its executive officers (collectively, the "Individual Defendants") seeking to remedy the Defendants' violations of state law and breaches of fiduciary duty during the period beginning July, 2015 through the present (the "Relevant Period").

2. The Individual Defendants breached their duties of loyalty, care and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures with respect to food safety; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with restaurant procedures and federal, state and local food safety regulations; (iii) permitting the Company to issue materially false and misleading statements concerning the effectiveness of the Company's policies and procedures with respect to food safety

resulting in the commencement of a class action lawsuit alleging violations of the federal securities laws (the "Securities Class Action") and the criminal investigation into the history of the Company's food safety practices; (iv) permitting the Company to violate the California Health and Safety Code by failing to timely notify the local health authorities upon learning that two Chipotle employees at the Simi Valley Restaurant were experiencing symptoms associated with an acute gastrointestinal illness; (v) consciously disregarding the results of the Company's own August 2015 Internal Audit, which revealed "multiple instances of non-compliance with restaurant procedures" and failing to timely conduct a follow up audit to ensure that the areas of non-compliance had been remediated; (vi) failing to commit the necessary resources for risk management, as evidenced by the *de minimis* time and expenditures spent by the Company on store audits and risk assessment; (vii) consciously disregarding and failing to ensure that the Company's risk assessment procedures adhered to best practices; (viii) failing to exercise their oversight duties commensurate with the risk, given the recognition by senior management and the Board that Chipotle may be at a higher risk for food-borne illness outbreaks than its competitors due to its use of fresh produce and meats and its reliance on employees cooking with traditional methods by not: (a) periodically monitoring various news outlets, such as *CBS News*, which reported on the Simi Valley Outbreak on August 22, 2015; or (b) periodically visiting certain Chipotle restaurant locations and/or Chipotle's suppliers to ensure that employees and/or suppliers were complying with restaurant procedures, as well as federal, state and local food safety regulations; (ix) causing and/or allowing the Company to shut down the Simi Valley restaurant and sanitize it prior to contacting local health authorities, thus preventing health officials from conducting a proper investigation and identifying the source of the outbreak; (x) failing to maintain accurate books and records with respect to restaurant operations and incidents and/or outbreaks regarding food-borne illnesses; and (xi) maintaining and implementing the Norwalk Protocol which, among other things, fails to include a requirement that the Company immediately notify local health authorities upon learning that two Chipotle employees at the Simi Valley Restaurant were experiencing symptoms associated with an acute gastrointestinal illness.

3. As a result of these revelations, the Company is now subjected to the Securities Class Action alleging violations of the federal securities laws on behalf of purchasers of Chipotle stock between February 5, 2015 and January 5, 2016, inclusive (the "Class Period"). The case is currently pending in the United States District Court for the Southern District of New York.[1]

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5. This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

6. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding in violation of fiduciary duties owed to Chipotle occurred in this District and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have an effect in this District.

## PARTIES

7. Plaintiff Sean Gubricky is currently and has continuously been a stockholder of Chipotle since the beginning of the Relevant Period. Plaintiff is a citizen of Illinois.

8. Nominal Defendant Chipotle is incorporated under the laws of the State of Delaware and maintains its headquarters in Denver, Colorado. According to the Company's SEC filings,

[1] The case is docketed at: *Ong et al. v. Chipotle Mexican Grill, Inc. et al.*, Case No.: 1:16-cv-00141.

Chipotle states that it, along with its subsidiaries, operates Chipotle Mexican Grill restaurants, which serve a focused menu of burritos, tacos, burrito bowls (a burrito without the tortilla) and salads made using fresh ingredients. As of December 31, 2015, the Company operated 1,971 Chipotle restaurants throughout the United States, as well as 11 in Canada, seven in England, four in France, and one in Germany. Chipotle's shares are listed and traded on the New York Stock Exchange under the ticker "CMG." As of April 27, 2016, the Company had 29,201,412 shares of the Company's common stock outstanding.

9. Defendant Steve Ells ("Ells") is the founder of Chipotle and has served as Co-Chief Executive Officer ("CEO") of the Company and a Chairman of the Board since 2005. According to the Company's proxy statement filed on Schedule 14A with the SEC on March 24, 2016 (the "2016 Proxy"), the Company stated that Ells' "visionary thinking has led Chipotle to extraordinary accomplishments, such as growing from a single restaurant to over 2,000 and serving more responsibly-raised meat than any other restaurant company. This thinking has also resulted in Mr. Ells remaining a principal driving force behind making our company innovative and striving for constant improvement, and he continues to provide important leadership to our executive officers, management team, and Board." Ells is a defendant in the Securities Class Action. Upon information and belief, Ells is a citizen of New York.

10. Defendant Montgomery F. (Monty) Moran ("Moran") is the Co-CEO and secretary of the Company. Moran was appointed as Co-CEO on January 1, 2009, after serving as the Company's President and Chief Operating Officer ("COO") since March 2005. Moran previously served as CEO of the Denver law firm Messner & Reeves, LLC ("Messner Reeves"), where he was employed since 1996, and as general counsel of Chipotle. According to the 2016 Proxy, the Company stated that Moran's "experience as our outside counsel from the time we had only a few restaurants through our growth to several hundred restaurants at the time he joined us as an employee has given him an in-depth knowledge and understanding of every aspect of our business. His legal experience ran from trial and employment matters to real estate and other transactional matters, as well as general corporate counseling. As a result, he has an outstanding skill set in

such areas as risk management and crisis handling, and also is thoroughly familiar with management personnel throughout our organization." Moran is a defendant in the Securities Class Action. Upon information and belief, Moran is a citizen of Colorado.

11. Defendant Mark Crumpacker ("Crumpacker") has served as the Company's Chief Marketing Officer ("CMO") since January 2009, and as Chief Development Officer since October 2013. On March 12, 2015, his title was changed to Chief Creative and Development Officer. Upon information and belief, Crumpacker is a citizen of Colorado.

12. Defendant John S. Charlesworth ("Charlesworth") has served as a director of the Company since 1999. Prior to retiring in 2000, Charlesworth worked for McDonald's for 26 years. Charlesworth is a member of the Audit Committee. According to the 2016 Proxy, the Company stated that Charlesworth's "experience with McDonald's included responsibility for managing a large and diverse employee workforce similar in many ways to Chipotle's, and also gave him a detailed knowledge of restaurant operations and food safety, site selection and related matters." Upon information and belief, Charlesworth is a citizen of Virginia.

13. Defendant Kimbal Musk ("Musk") has served as a director of the Company since 2013. According to the 2016 Proxy, the Company stated that Musk's "extensive experience with fast-growing and innovative companies as well as restaurants and other retail operations, and his experience on numerous boards of directors, are an asset to our Board." Upon information and belief, Musk is a citizen of Colorado.

14. Defendant Patrick J. Flynn ("Flynn") has served as a director of the Company since 1998. Flynn is a member of the Compensation Committee and is the Chairperson of the Nominating and Corporate Governance Committee ("NCG Committee"). According to the 2016 Proxy, the Company stated that "from his background as a senior-level restaurant industry executive, Mr. Flynn developed strong capabilities in guiding corporate strategy, and tremendous knowledge of the operational aspects of the restaurant business as well." Upon information and belief, Flynn is a citizen of Florida.

15. Defendant Stephen Gillett ("Gillett") has served as a director of the Company since March 12, 2015. Gillett is a member of the Audit Committee and the NCG Committee. Upon information and belief, Gillett is a citizen of Washington.

16. Defendant Albert S. Baldocchi ("Baldocchi") has served as a director of the Company since 1997. Baldocchi is the Chairperson of the Audit Committee and has also been designated by the Board as an "Audit Committee Financial Expert" as defined in SEC regulations. According to the 2016 Proxy, the Company stated that Baldocchi's "extensive involvement with restaurant companies over a period of 17 years has given Mr. Baldocchi an in-depth knowledge of restaurant company finance, operations and strategy. He also has considerable experience with high-growth companies in the restaurant industry and in other industries." Upon information and belief, Baldocchi is a citizen of Colorado.

17. Defendant Darlene J. Friedman ("Friedman") has served as a director of the Company since 1995. Friedman is a member of the Compensation Committee and the NCG Committee. Upon information and belief, Friedman is a citizen of Arizona.

18. Defendant Neil W. Flanzraich ("Flanzraich") has served as a director of the Company since 2007 and as lead director since September 2014. Flanzraich is a member of the Audit Committee and has served as the Chairperson of the Compensation Committee since September 2015. According to the 2016 Proxy, the Company stated that Flanzraich's "executive experience has helped him develop outstanding skills in leading and managing strong teams of employees, and in oversight of the growth and financing of businesses in a rapidly-evolving market. His legal background also is valuable to us in the risk management area." Upon information and belief, Flanzraich is a citizen of Florida.

19. Defendants Charlesworth, Musk, Moran, Flynn, Gillett, Ells, Baldocchi, Friedman and Flanzraich are sometimes collectively referred to herein as the "Current Director Defendants."

20. Defendants Baldocchi, Charlesworth, Flanzraich and Gillett are sometimes collectively referred to herein as the "Audit Committee Defendants."

21. Defendants Flanzraich, Friedman and Flynn are sometimes collectively referred to herein as the "Compensation Committee Defendants."

22. Defendants Flynn, Friedman and Gillett are sometimes collectively referred to herein as the "NCG Committee Defendants."

23. Defendants Ells, Moran, Crumpacker, Charlesworth, Musk, Flynn, Gillett, Baldocchi, Friedman and Flanzraich are sometimes collectively referred to herein as the "Individual Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

24. By reason of their positions as officers, directors and/or fiduciaries of Chipotle during the Relevant Period and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Chipotle and its shareholders fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Chipotle and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

25. Each director and officer of the Company owes to Chipotle and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Chipotle, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Due to their positions with Chipotle, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

27. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the

Company. By virtue of such duties, the officers and directors of Chipotle were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c. Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d. Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

e. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

28. Moreover, Chipotle maintains a Code of Conduct (the "Code"), which the Company describes is a "guide to ethical behavior," and applies to all employees, officers, and all members of the Board. The Code states the following, in relevant part:

> **Chipotle's Ethics and Conflicts of Interest Policy**
>
> ***Chipotle is a company based on integrity. Integrity is about being real and being honest. It means doing the right thing even when no one is watching.*** These values permeate the way we do, and do not do, business.

You are expected to use good judgment, adhere to high ethical standards, and avoid situations that create an actual or perceived conflict between your personal interests and those of Chipotle. ***Chipotle requires that the transactions you participate in are ethical and within the law, both in letter and in spirit.*** When in doubt, consult with your Manager/Director or the People Support Department (Officers and members of the Board of Directors should consult with Chipotle's General Counsel). ***They will determine if a conflict exists and establish controls to prevent abuse*** or, if such control is not feasible, they may require that you terminate the activity in question or divest your interest in any relevant transaction. NO matter what, each of us must accept personal responsibility for doing the right thing.

Conflicts of interests or unethical behavior may take many forms. In the simplest form, you should act for the long-term benefit of our customers and Chipotle, never for personal gain, or to favor family or friends. What follows are some of the key principles of ethical and conflict-free conduct. There is no way to develop a single set of rules to cover all situations. Rather, this policy outlines basic guidelines for ethical behavior at Chipotle. It does not replace good judgment.

***

**Communicating with the Public**

Whenever Chipotle communicates with the public, including the media and government agencies, accuracy and thoroughness are critical. In general, only Officers or the Director of Public Relations are authorized to make or approve public statements made on behalf of Chipotle. ***Public statements should be sufficiently candid, clear, and complete so that they neither mislead nor lend themselves to misinterpretation.*** To ensure that accurate and appropriate information is relayed to the public, all public statements made on behalf of Chipotle or our business must be made in accordance with the 'Regulation FD External Communication Policy,' or if not subject to that policy, must first be reviewed by the Director of Public Relations. This applies to all public statements made on behalf of Chipotle, including those made on internet bulletin boards and chat rooms. Likewise, you are requested to refer any requests for information about Chipotle to an Officer or the Director of Public Relations.

***

**Be Professional**

Act professionally and conscientiously when making business decisions. Personal relationships should never interfere, or give the appearance of interfering, with

business actions, judgments, or decisions. When making decisions, weigh all factors impartially and without prejudice and make all decisions solely based on merit. Honor your agreements and do not encourage or interfere with other parties' contracts or agreements. Avoid legal speculation or conclusions in your communications. Do not discuss areas beyond your knowledge or expertise.

***

**Recording and Reporting Information**

***Chipotle maintains a system of internal controls that we believe provides reasonable assurance that transactions are executed in accordance with management's authorization and are properly recorded.*** The system is characterized by a control-oriented environment that includes written policies and procedures. All employees are expected to adhere strictly to these policies.

***Our records are critical in meeting our financial, legal, and business obligations.*** All records, including employment, payroll and financial data, checks and payments, as well as other essential data, ***must therefore be prepared with accuracy and care.*** Dishonesty or carelessness in recording or reporting information, either inside or outside the Company, is not only strictly prohibited, but could lead to civil and criminal liability for you and for Chipotle.

Following are important guidelines to adhere to:

- All books and financial records must be kept in such a way as to fully and accurately reflect, in reasonable detail, all receipts, expenditures, transactions, assets, and liabilities in conformity with Chipotle's internal controls and generally accepted accounting principles.

- No false or artificial information may be recorded for any reason.

- Employees are prohibited from making false or misleading statements in connection with any audit or examination of Chipotle's financial statements and records, business operations, or for compliance with laws or regulations.

***

**Retention of Records**

***The retention and proper disposition of documents that are produced or received by or on behalf of Chipotle is crucial to comply with business and legal requirements.*** The law requires Chipotle to maintain certain types of documents, usually for a specified period of time. Failure to retain documents as required could subject you and Chipotle to penalties and fines and seriously disadvantage us in

litigation. In addition to documents required by law to be retained, we also want to maintain documents and records with important historical and operational value.

***

**It's the Law**

Chipotle strives to be an honorable company and employer. Our employees must always operate within the law in all business dealings. It is our policy that the Company and our employees obey all applicable federal, state, local, and international laws and regulations. Employees have a personal responsibility to become familiar and comply with the laws and regulations related to job responsibilities. There are also other laws, not directly related to your job but of general relevance to work situations, of which you should be aware. If you have any questions about what is within the law and what is not, seek advice from Chipotle's Corporate Compliance Counsel.

(Emphasis added).

29. Additionally, the Company maintains a Director Code of Conduct ("Director Code"), which states the following, in relevant part:

**INTRODUCTION**

Chipotle Mexican Grill, Inc. (the "Company") is ***committed to the highest standards of integrity and fair dealing in all of its activities and compliance with both the letter and spirit of the law.*** We expect that all of our directors will reflect these standards in their day-to-day dealings on behalf of the Company. The attached Code of Business Conduct (the "Code") is for all directors and employees of the Company and is a guide to ethical behavior. The Company has an "open door" policy with respect to any concern relating to compliance with the Code and other Company policies, and no person will be subject to disciplinary or other retaliatory action by raising any concern in good faith.

Approval of any activity or matter not in compliance with the Code, including this code of conduct, relating to any director of the Company may be granted only by the Board of Directors or an appropriate Board committee and will be promptly disclosed publicly.

**DIRECTOR RESPONSIBILITY**

No code of ethics will be effective in the absence of the right "tone at the top." ***The Company expects the members of its Board of Directors at all times to set the right tone by being mindful of their obligations as fiduciaries and by adhering to high standards of conduct, including the policies set out in this Code. Directors***

***should seek to promote those standards in fulfilling their responsibilities to the Company and its shareholders.***

Like our employees, ***directors are expected to act honestly, in compliance with law and in the best interests of the Company. They must conduct themselves in a professional and respectful manner and act in good faith and with due care. In their oversight of management, directors should be vigorous in their inquiries and exercise independent judgment to promote the interests of Company.*** Directors are also expected to maintain the confidentiality of Company information and to disclose any possible conflicts of interest that they may have with respect to matters being considered by the Board.

Any director who has concerns about compliance with the Code should direct his or her inquiry to the Chairman of the Nominating and Corporate Governance Committee or to the Company's chief legal officer.

(Emphasis added).

30. Additionally, with respect to Defendants Moran and Ells, Chipotle maintains a Code of Ethics for Co-Chief Executive Officers ("Co-CEO Code"). The Co-CEO Code was signed by Moran and Ells on September 13, 2013 and September 16, 2013, respectively. The Co-CEO Code states the following, in relevant part:

As the **Co-Chief Executive Officer** of **Chipotle Mexican Grill, Inc.** (the "Company"), I acknowledge that the Company is committed to honesty and ethical conduct in all areas of its business and that officers with responsibility for the conduct or supervision of the Company's financial affairs play a special role in preserving and protecting shareholders' interests.

In furtherance of the above and to the best of my ability, I will adhere to the following principles and responsibilities:

- Act at all times in accordance with this Code of Ethics and the Company's Code of Business Conduct, a copy of which has been provided to me;
- Act at all times with integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships;
- Address any apparent conflict of interest in personal and professional relationships in accordance with the highest ethical standards and promptly disclose to the Company's chief legal officer the nature of any such conflict of interest or any material transaction or relationship that reasonably could be expected to give rise to such a conflict of interest;

- Provide, in the Company's reports filed with the Securities and Exchange Commission and other public communications, ***disclosure that is full, fair, accurate, complete, objective, timely and understandable;***

- ***Comply with rules and regulations of all U.S. and non-U.S. governmental entities and other private and public regulatory agencies to which the Company is subject, including any exchanges on which the Company's securities may be listed;***

- ***Act in good faith, responsibly, with due care, competence and diligence, and without misrepresenting material facts or circumstances;***

- ***Act in what I reasonably and independently believe to be in the best interests of the Company;***

- Respect the confidentiality of Company information, except when authorized or otherwise required to make any disclosure, and avoid the use of any Company information for personal advantage;

- Share my knowledge with others within the Company, to the extent appropriate and consistent with applicable law;

- Maintain my professional skills to improve the Company's communications to its constituents;

- ***Promote ethical behavior among employees under my supervision;***

- Accept accountability for adherence to this Code of Ethics and the Company's Code of Business Conduct; and

- Achieve responsible use of and control over all assets and resources of the Company entrusted to me.

I acknowledge that the Company's Code of Business Conduct describe procedures for the internal reporting of violations of such Code. I will comply with those reporting requirements. I will also promote compliance with them by others under my supervision, as well as prompt reporting by them of violations of such Code. I further acknowledge that the consequences of my failure to adhere to this Code of Ethics or the Company's Code of Business Conduct may result in disciplinary action, up to and including termination for cause.

(Emphasis added).

31. Additionally, the Company has adopted Corporate Governance Guidelines (as of March 12, 2015), which sets forth the following functions and responsibilities of the Board, in relevant part:

> **Responsibilities of the Board of Directors**
>
> The Board of Directors, elected by the shareholders, is the ultimate decision-making body of the Company, except with respect to matters reserved to the shareholders. The Board selects the Chief Executive Officer who is charged with overall responsibility for managing the Company's business. ***The primary function of the Board is oversight – defining and enforcing standards of accountability that enable senior management to execute their responsibilities fully and in the interests of shareholders.*** Consistent with that function, the following are the primary responsibilities of the Board:
>
> - Evaluating the performance of the Company and its senior management, which includes (i) overseeing the conduct of the Company's business to evaluate whether it is being effectively managed, including through regular meetings of the outside Directors without the presence of management; and (ii) selecting, regularly evaluating and planning for the succession of the Chief Executive Officer and other members of senior management as the Board deems appropriate, including fixing the compensation of such individuals;
>
> - Reviewing the Company's strategic plans and objectives, including the principal risk exposures of the Company;
>
> - Providing advice and counsel to the Chief Executive Officer and other senior management of the Company;
>
> - Assisting management in the oversight of compliance by the Company with applicable laws and regulations, including the public reporting obligations of the Company;
>
> - Overseeing management with a goal of ensuring that the assets of the Company are safeguarded through the maintenance of appropriate accounting, financial and other controls;
>
> - Appointing the members of and overseeing any required or appropriate Committees of the Board established for purposes of the execution of any delegated responsibilities of the Board;

- Establishing the form and amount of compensation for Directors, taking into account their responsibilities as such and as members of any Committee of the Board; and

- Evaluating at least annually the overall effectiveness of the Board, as well as selecting and recommending to shareholders for election an appropriate slate of candidates for the Board.

In discharging their responsibilities, ***Directors must exercise their business judgment to act in a manner that they believe in good faith is in the best interests of the Company and its shareholders.*** Directors are expected to attend all or substantially all Board meetings and meetings of the Committees of the Board on which they serve. Directors are also expected to spend the necessary time to discharge their responsibilities appropriately and to ensure that other existing or future commitments do not materially interfere with their responsibilities as members of the Board.

**Structure and Operation of the Board of Directors**

The Board does not believe that it is advisable to establish term limits or a mandatory retirement age for its Directors because they may deprive the Company and its shareholders of the contribution of Directors who continue to provide valuable service to the Company and who may have been able to develop valuable insights into the Company and its operations over time. As an alternative to term limits or a mandatory retirement age, the continued tenure of each Director will be re-considered at the end of his or her term, taking into account the results of the Board's most recent self-evaluation. In addition, it is the sense of the Board that any Director whose principal occupation or business association has changed substantially from the time he or she was elected should volunteer to resign from the Board. While it is not the sense of the Board that the Director should in all cases resign, the Board believes that it would be desirable to consider the appropriateness of the Director's continued service.

***

**Access to Management, Management Information and Counsel**

Directors will have free access to management and management information. Management will be responsive to requests for information from Board members. The Board encourages the Chairman of the Board to invite members of management to make presentations at Board meetings in order to provide particular insights into aspects of the Company's business or to provide individuals with exposure to the Board for purposes of management development. Directors may suggest possible guests to the Chairman.

(Emphasis added).

32. With respect to the Audit Committee Defendants, the Company's 2016 Proxy provides the following, in relevant part:

> **Audit Committee**
>
> In accordance with its charter, the Audit Committee acts to oversee the integrity of our financial statements and system of internal controls, the annual independent audit of our financial statements, the performance of our internal audit services function, ***our compliance with legal and regulatory requirements, the implementation and effectiveness of our disclosure controls and procedures, and the evaluation and oversight of risk issues,*** and also acts to ensure open lines of communication among our independent auditors, accountants, internal audit and financial management.
>
> (Emphasis added).

33. Additionally, the 2016 Proxy states the following with respect to the Audit Committee's responsibilities over food safety risks:

> **Enhanced Oversight of Food Safety Risks**
>
> In the wake of food-borne illness incidents that had a significant negative impact on our business during 2015 and into 2016, ***the Audit Committee and management agreed on additional procedures to enhance the committee's oversight over food safety risks.*** This enhanced oversight will involve increased reporting to the Audit Committee regarding food safety-related matters, as well as participation by one or more members of the Board in certain food safety audits, trainings, and other activities. In light of his extensive background in operations for large-scale restaurant enterprises, Mr. Charlesworth has been designated as the principal liaison to the Audit Committee in connection with its enhanced food safety oversight role.
>
> (Emphasis added).

34. Additionally, the Audit Committee is governed by the Audit Committee Charter (revised September 17, 2014), which states that the Audit Committee has the following responsibilities, in relevant part:

> *Review of Performance of Internal Auditors.* The Committee shall annually review the experience and qualifications of the senior members of the internal audit function (or the internal audit service providers), including the responsibilities, staffing, budget and quality control procedures of the internal audit function. If the internal audit services are outsourced, the Committee shall be responsible for the

engagement, evaluation and termination of the internal audit service providers and shall approve fees paid to the internal audit service providers. As part of its responsibility to evaluate any internal audit service providers, the Committee shall review the quality control procedures applicable to the service providers. The Committee shall also obtain not less frequently than annually a report of the service providers addressing such service providers' internal control procedures, issues raised by their most recent internal quality control review or by any inquiry or investigation by governmental or professional authorities for the preceding five years and the response of such service providers.

***

*Audits by Internal and Independent Auditors.* The Committee shall discuss with the head of internal audit (or the internal audit service providers) and the independent auditors the overall scope and plans for their respective audits, including the adequacy of staffing, budgets, and other factors that may affect the effectiveness and timeliness of such audits. In this connection, the Committee shall discuss with management, the head of internal audit (or the internal audit service providers) and the independent auditors the Company's major risk exposures (whether financial, operating or otherwise), the adequacy and effectiveness of the Company's internal control over financial reporting and the steps management has taken to monitor and control such exposures, among other considerations that may be relevant to their respective audits.

***

*Review of Disclosure Controls and Procedures.* The Committee shall review with the Chief Executive Officer, the Chief Financial Officer and the General Counsel the Company's disclosure controls and procedures and shall review periodically, but in no event less frequently than quarterly, management's conclusions about the effectiveness of such disclosure controls and procedures, including any material non-compliance with them.

***

*Oversight of Compliance and Ethics Program.* The Committee shall periodically, but not less frequently than annually, review with management, including the General Counsel, the implementation and effectiveness of the Company's compliance and ethics program, including the "whistleblowing" procedures referred to above. In performing such oversight, the Committee shall also review with appropriate members of management, including the head of internal audit (or service providers) and, if appropriate, the independent auditors any correspondence with, or other action by, regulators or governmental agencies and any employee complaints or published reports that raise concerns regarding the Company's financial statements, accounting or auditing matters or compliance with the Company's Code of Business Conduct and Ethics or other applicable law or listing

> standards. The Committee shall also meet periodically with the chief legal officer to review the material legal affairs of the Company.

35. With respect to the Compensation Committee, the 2016 Proxy states the following, in relevant part:

> The Compensation Committee oversees our executive compensation policies and programs. In accordance with its charter, the committee determines the compensation of our Co-Chief Executive Officers based on an evaluation of their performance, and approves the compensation level of our other executive officers following an evaluation of their performance and recommendation by the Co-Chief Executive Officers.
>
> The Compensation Committee charter also grants the committee the authority to: review and make recommendations to the Board with respect to the establishment of any new incentive compensation and equity-based plans; review and approve the terms of written employment agreements and post-service arrangements for executive officers; review our compensation programs generally to confirm that those plans provide reasonable benefits to us; recommend compensation to be paid to our outside directors; review disclosures to be filed with the SEC and distributed to our shareholders regarding executive compensation and recommend to the Board the filing of such disclosures; assist the Board with its functions relating to our compensation and benefits programs generally; and other administrative matters with regard to our compensation programs and policies. The committee may delegate any of its responsibilities to a subcommittee comprised of one or more members of the committee, except where such delegation is not allowed by legal or regulatory requirements.

36. With respect to the NCG Committee Defendants, the 2016 Proxy states the following, in relevant part:

> The responsibilities of the Nominating and Corporate Governance Committee include reviewing, at least annually, the adequacy of our corporate governance principles and recommending to the Board any changes to such principles as deemed appropriate, and recommending to the Board appropriate guidelines and criteria to determine the qualifications to serve and continue to serve as a director. The Nominating and Corporate Governance Committee identifies and reviews the qualifications of, and recommends to the Board, (i) individuals to be nominated by the Board for election to the Board at each annual meeting, (ii) individuals to be nominated and elected to fill any vacancy on the Board which occurs for any reason (including increasing the size of the Board) and (iii) appointments to committees of the Board.
>
> The committee, at least annually, reviews the size, composition and organization of the Board and its committees and recommends any policies, changes or other action

> it deems necessary or appropriate, including recommendations to the Board regarding retirement age, resignation or removal of a director, independence requirements, frequency of Board meetings and terms of directors. A number of these matters are covered in our Corporate Governance Guidelines, which the committee also reviews at least annually. The committee also reviews the nomination by our shareholders of candidates for election to the Board if such nominations are within the time limits and meet other requirements established by our bylaws. The committee oversees the annual evaluation of the performance of the Board and its committees and reviews and makes recommendations regarding succession plans for positions held by executive officers.

37. Finally, the Chipotle Board was responsible for risk oversight:

> **Role of the Board of Directors in Risk Oversight**
>
> While our executive officers and various other members of management are responsible for the day-to-day management of risk, the Board of Directors exercises an oversight role with respect to risk issues facing our company, principally through considering risks associated with our company strategy as part of its oversight of our overall strategic direction, as well as delegation to the Audit Committee of the responsibility for evaluating enterprise risk issues. Under the terms of its charter, the Audit Committee discusses with management, our internal auditors and our independent auditors our major risk exposures, whether financial, operating or otherwise, as well as the adequacy and effectiveness of steps management has taken to monitor and control such exposures (including, for instance, our internal control over financial reporting). ***The Audit Committee's oversight of risk management includes its review each year of an annual risk assessment conducted by our internal audit department, which functionally reports to the Audit Committee. The Audit Committee also recommends from time to time that key identified risk areas be considered by the full Board, and individual Board members also periodically ask the full Board to consider an area of risk. In those cases the Board considers the identified risk areas at its regularly-scheduled meetings, including receiving reports from and conducting discussions with the appropriate management personnel.***

(Emphasis added).

38. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the fiduciary duty of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

obligations as directors and/or officers of Chipotle, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39. The Individual Defendants breached their duties of loyalty, care and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures with respect to food safety; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with restaurant procedures and federal, state and local food safety regulations; (iii) permitting the Company to issue materially false and misleading statements concerning the effectiveness of the Company's policies and procedures with respect to food safety resulting in the commencement of the Securities Class Action and the criminal investigation into the history of the Company's food safety practices; (iv) permitting the Company to violate the California Health and Safety Code by failing to timely notify the local health authorities upon learning that two Chipotle employees at the Simi Valley Restaurant were experiencing symptoms associated with an acute gastrointestinal illness; (v) consciously disregarding the results of the Company's own August 2015 Internal Audit, which revealed "multiple instances of non-compliance with restaurant procedures" and failing to timely conduct a follow up audit to ensure that the areas of non-compliance had been remediated; (vi) failing to commit the necessary resources for risk management, as evidenced by the *de minimis* time and expenditures spent by the Company on store audits and risk assessment; (vii) consciously disregarding and failing to ensure that the Company's risk assessment procedures adhered to best practices; (viii) failing to exercise their oversight duties commensurate with the risk, given the recognition by senior management and the Board that Chipotle may be at a higher risk for food-borne illness outbreaks than its competitors due to its use of fresh produce and meats and its reliance on employees cooking with traditional methods by not: (a) periodically monitoring various news outlets, such as *CBS News*, which reported on the Simi Valley Outbreak on August 22, 2015; or (b) periodically visiting certain Chipotle restaurant locations and/or Chipotle's suppliers to ensure that employees and/or suppliers were complying with restaurant procedures, as well as federal, state and local food safety

regulations; (ix) causing and/or allowing the Company to shut down the Simi Valley restaurant and sanitize it prior to contacting local health authorities, thus preventing health officials from conducting a proper investigation and identifying the source of the outbreak; (x) failing to maintain accurate books and records with respect to restaurant operations and incidents and/or outbreaks regarding food-borne illnesses; and (xi) maintaining and implementing the Norwalk Protocol which, among other things, fails to include a requirement that the Company immediately notify local health authorities upon learning that two Chipotle employees at the Simi Valley Restaurant were experiencing symptoms associated with an acute gastrointestinal illness.

## SUBSTANTIVE ALLEGATIONS

### Background

40. Chipotle, together with its subsidiaries, operates Chipotle Mexican Grill restaurants, which serve a focused menu of burritos, tacos, burrito bowls (a burrito without the tortilla) and salads, made using fresh ingredients. As of December 31, 2015, the Company operated 1,971 Chipotle restaurants throughout the United States, as well as 11 in Canada, seven in England, four in France, and one in Germany. According to the Company's annual report on Form 10-K filed on February 5, 2016 with the SEC (the "2015 10-K"), the Company stated that "We focus on finding the highest quality ingredients we can to make great tasting food; on building a special people culture that is centered on creating a team of top performers empowered to achieve high standards; on building restaurants that are operationally efficient and aesthetically pleasing; and on doing all of this with the highest regard for the safety of our customers and increasing awareness and respect for the environment."

41. The 2015 10-K went on to state "our vision is to change the way people think about and eat fast food. We do this by avoiding a formulaic approach when creating our restaurant experience, looking to fine-dining restaurants for inspiration. We use high-quality raw ingredients, classic cooking methods and a distinctive interior design and have friendly people to take care of each customer—features that are more frequently found in the world of fine dining. Our approach is also guided by our belief in an idea we call 'Food With Integrity.' Our objective is to find the

highest quality ingredients we can—ingredients that are grown or raised with respect for the environment, animals and people who grow or raise the food."

**<u>The Multiple Outbreaks of Food-Borne Illness at Chipotle Restaurants</u>**

*Hazel Dell, Washington, Norovirus Outbreak*

42. According to the Amended Class Action Complaint filed in the Securities Class Action on June 17, 2016 ("ACAC"), in early August 2015, a norovirus outbreak occurred at a Chipotle restaurant located in Hazel Dell, Washington ("Hazel Dell Outbreak"). The Hazel Dell Outbreak has never been publicly acknowledged by any news outlet, the Washington State Department of Health, or Chipotle. Plaintiffs in the Securities Class Action uncovered the existence of this outbreak in email communications between Washington State Department of Health officials and Chipotle corporate employees, provided pursuant to FOIA requests to the Washington State Department of Health.

43. According to the internal emails between health officials with the Washington State Department of Health, before reporting to work, a Chipotle restaurant employee at the Hazel Dell restaurant informed her manager that she was sick. The manager replied that she needed to come into work or find someone to cover for her. The employee reported for work and stayed for four hours and was vomiting. According to Joe M. Graham, Food Safety Program Supervisor for the Washington State Department of Health, the fact that this worker reported to work sick and was vomiting was "one of the proverbial smoking guns for this outbreak."

*Simi Valley, California, Norovirus Outbreak*

44. During the week of August 18, 2015, a norovirus outbreak sickened at least 234 people who had dined at a Chipotle restaurant in Simi Valley, California (the "Simi Valley Outbreak"). On August 22, 2015, *CBS News* published an article[2] reporting that "A Chipotle Restaurant in the Simi Valley Town Center is under fire Saturday after multiple reports of customers falling ill after eating at the restaurant have surfaced." The Article further stated that

[2] http://losangeles.cbslocal.com/2015/08/22/dozens-fall-ill-after-eating-at-simi-valley-chipotle/

"Chipotle issued an official statement on Saturday [August 22, 2015], claiming that, 'The safety and well being of our customers is always our highest priority. When we were contacted by customers who reported feeling poorly after visiting our restaurant in Simi Valley, we immediately began a review of the incident, and have taken all of the necessary steps to ensure that it is safe to eat there.'"

45. Additionally, the *CBS News* article reported that after receiving several complaints from customers stating that they began to feel ill after eating at the Simi Valley Chipotle restaurant, the restaurant was closed for a brief period of time, according to a sign posted on the door, because of a "lack of staffing" issue.

46. With respect to the Simi Valley Outbreak, according to a January 6, 2016 *Wall Street Journal* article, Doug Beach ("Beach"), a spokesman for the Ventura County Environmental Health Division, stated that "Chipotle knew on [August] 18, [2015] that at least one employee in the Simi Valley restaurant was complaining of gastrointestinal illness, and that the company continued to serve food at that location for two days." According to the *Wall Street Journal* article, Beach further stated that, "Chipotle didn't inform local health officials until [August] 21, after it had already shut down overnight on [August 20] to sanitize the restaurant, throw out all the food and reopen the next morning with a new crew." Additionally, according to an official chronology of the Simi Valley norovirus outbreak prepared by the Division, on August 22, 2015, the Division received a phone message from the Chipotle corporate office stating that the Simi Valley restaurant had 17 sick employees, all of which had been replaced as of August 22, 2015 with temporary staffing.

47. According to public inspection records by the County of Ventura Environmental Health Division, during an inspection of Chipotle's Simi Valley Restaurant that took place on August 24, 2015 in connection with the norovirus outbreak, the inspector noted the following, in relevant part:

> This Division has received two complaints encompassing three individuals that have allegedly become ill after eating at Chipotle Mexican Grill between the dates

of 8/16/2015 to 8/20/2015. The foods eaten by these individuals is currently being ascertained, as is the extent of their symptoms.

The area manager for Chipotle Mexican Grill, Sam Fakhreddine, today reported they received their first customer complaint regarding a foodborne illness on August 20, 2015 via a computer complaint hotline. A second complaint was received on August 21, 2015, and ***to date forty-six customer complaints and another seventeen employee complaints have been received.*** It should also be noted that a highly susceptible population of seventeen children from Grace Brethren School in Simi Valley was among the 46 complainants that the corporate office has received.

According to the area manager, ***after two or more complaints are received, the corporate policy is to initiate the "Norwalk Protocol."***

The seventeen employees who complained of gastro-intestinal symptoms are required by the "Norwalk Protocol" to remain away from work ***for at least five days*** after they last experience any gastrointestinal symptoms.

According to the area manager, ***once the "Norwalk Protocol" was established, the facility was shut down to allow the facility to be cleaned and sanitized thoroughly by the existing staff members.*** During this time all food (potentially hazardous food and non-potentially hazardous foods) that was handled by employees, prepped, handled, cooked and/or cooled was discarded.

All seventeen employees that reported experiencing gastro-intestinal symptoms were replaced by staff members from other Chipotle restaurants who are not allowed by the corporate office to return to their original facilities for a period of five days. According to the area manager, all "ill" employees are being paid sick time above and beyond the normal sick day protocol. ***Under normal circumstances, effective July 1, 2015, all employees with at least one year of service time will receive five days of sick pay, and no pay with less than one year of service time.***

In addition, none of the employees at this Chipotle location work at any other Chipotle Mexican Grills. However, during the investigation two employees were confirmed to work at the 'Islands Restaurant' two doors away. One employee, Maria Canales, stated that she did not experience any gastro-intestinal symptoms. However, ***Cynthia Hernandez, stated that she experienced "stomach cramps" on August 18, 2015, a day that she worked at Islands Restaurant. Ms. Hernandez, according to the "Scheduled & Actual Labor Usage" Log, worked on the dates from August 17, 2015 to August 20, 2015.***

Furthermore, ***the kitchen manager "Ben S." was reported to have gastro-intestinal symptoms on Tuesday, August 18, 2015.*** It was reported that he saw his

> medical doctor on Thursday, August 20, 2015. According to the Area Manager, "Ben S." was diagnosed with a gastro-intestinal virus and told not to return to work.

(Emphasis added).

48. Based on the Inspection Report, two Chipotle employees began complaining of gastro-intestinal symptoms on August 18, 2015. Yet, the Company continued to serve food at the Simi Valley location for two more days until it finally instituted the Norwalk Protocol on August 20, 2015.

49. Additionally, the Company waited until after the restaurant was thoroughly cleaned and sanitized before informing local health officials on August 21, 2015. Pursuant to Section 113949.5(b) of the California Health and Safety Code (Cal Health & Saf Code § 113949.5), "a person in charge shall notify the local enforcement agency ***when he or she is aware*** that two or more food employees are concurrently experiencing symptoms associated with an acute gastrointestinal illness." (Emphasis added). Yet, despite the foregoing, Chipotle waited until at least August 21, 2015, three days after learning that two of its employees were experiencing gastrointestinal symptoms, to notify local health authorities. Additionally, Chipotle contacted local health authorities only after the Simi Valley restaurant had been shut down and sanitized from top to bottom, thus hindering any investigation that was undertaken by the local health authorities to determine the source of the norovirus outbreak.

50. Further, although Chipotle failed to timely notify authorities of the foregoing and attempted to conceal the problem by shutting down and sanitizing the restaurant, the inspection of the restaurant on August 24, 2015 still revealed multiple violations. According to public inspection records by the County of Ventura Environmental Health Division, County health inspectors found the following violations:

a. "Food handlers employed at this facility do not possess a valid food handler card and/or records documenting that food employees possess a valid food handler card are not maintained by the food facility for review as required;"

b. "Flying insects observed within the food facility;"

c. “Equipment or utensils are not clean, fully operative and in good repair” specifically, the inspector observed an “accumulation of mildew on the deflector panel inside of the ice machine”, an “accumulation of mildew on the backsplash/ wall junction above the ware washing sink” and an “accumulation of grease and food debris in the lower compartment of the deep fryer;”

d. “The premises and/or floors, walls, or ceiling are in an unsanitary condition;”

e. “The Restroom is unclean or in disrepair;”

f. “Wall and/or ceiling surfaces are deteriorated and/or damaged;” and

g. “Equipment is connected directly to the sewer.”

51. At a follow up inspection on August 27, 2015, the county health division dropped off containers for Chipotle to use in submitting food samples for testing, which were picked up the next day. Alarmingly, the inspector found an additional violation during the August 27 follow up inspection. Specifically, the inspector found that “cooked beef was observed holding at 118 º [Fahrenheit] at the steam table . . . hot potentially hazardous food is held below 135 degrees Fahrenheit” According to the Food Safety and Inspection Service of the United States Department of Agriculture, hot food should not be left at such low temperatures because doing so “cause[s] bacteria (such as Staphylococcus aureus, Salmonella Enteritidis, Escherichia coli O157:H7, and Campylobacter) to grow to dangerous levels that can cause illness.”[3] In subsequent inspections on September 17, 2015 and January 20, 2016, food safety inspectors found five additional violations.

52. Unfortunately, the Simi Valley Outbreak was the first of many, thus evidencing the Individual Defendants’ failure to focus on food safety, as discussed below.

*Minnesota Salmonella Outbreak*

53. In August and September 2015, a salmonella outbreak sickened approximately 64 people who had dined at Chipotle restaurants located in Minnesota. The Minnesota Department of Health (the “MDH”) and the Minnesota Department of Agriculture identified tomatoes as the source of the Salmonella outbreak. According to a press release issued by the MDH on September

[3] http://www.fsis.usda.gov/shared/PDF/Danger_Zone.pdf

16, 2015, the MDH identified 22 different Chipotle restaurant locations that were linked to the outbreak. Nine people were hospitalized as a result of the outbreak and investigators were working with state and federal partners to trace the tomatoes back to the farm of origin. The MDH also reported that meal dates for the cases ranged from August 16 to August 28, 2015, and people became ill between August 19 and September 3, 2015. Those infected ranged between 10 and 69 years old.

*Multi-State E. coli Outbreak*

54. Beginning on October 19, 2015, an E. coli outbreak sickened a total of 53 people who had dined at Chipotle restaurants in the following nine states: California (3), Illinois (1), Maryland (1), Minnesota (2), New York (1), Ohio (3), Oregon (13), Pennsylvania (2) and Washington (27). According to the FDA, 20 people were hospitalized as a result of the E. coli outbreak. On November 3, 2015, the Company issued a press release addressing, for the first time, the Multistate E. coli outbreak and announcing that it had immediately closed 43 restaurants in Oregon and Washington while investigators search for a cause. The November 3 Press Release stated the following, in relevant part:

> **Chipotle Moves Aggressively to Address Issues in Washington and Oregon**
>
> Company voluntarily closes restaurants; replaced food; cooperates fully with investigation
>
> DENVER—(BUSINESS WIRE)—November 3, 2015—on the heels of an E. coli incident that was linked to eight of its restaurants in Oregon and Washington state, Chipotle Mexican Grill (NYSE: CMG) has taken a number of immediate steps to assist investigators as they conduct their review of the incident in Oregon and Washington. Among the specific actions the company has taken since the incident began are:
>
> - Immediately closing 43 restaurants in Oregon and Washington state out of an abundance of caution, even though only eight restaurants have drawn concern, while investigators search for a cause;
>
> - Conducting additional deep cleaning and full sanitization of its restaurants in the area;

- Conducting environmental testing in its restaurants, and food testing in its restaurants and distribution centers in addition to testing being conducted by health department officials;

- Replacing all food items in the restaurants we closed, out of an abundance of caution;

- Batch testing some ingredients before resupplying;

- Continuing to help in the investigation; and

- Retaining two preeminent food safety consulting firms (including Seattle-based IEH Laboratories and Consulting Group) to help the company assess and improve upon its already high standards for food safety.

> ***"The safety of our customers and integrity of our food supply has always been our highest priority,"*** said Steve Ells, chairman and co-CEO of Chipotle. "We work with a number of very fresh ingredients in order to serve our customers the highest-quality, best-tasting food we can. If there are opportunities to do better, we will push ourselves to find them and enhance our already high standards for food safety. Our deepest sympathies go out to those who have been affected by this situation and it is our greatest priority to ensure the safety of all of the food we serve and maintain our customers' confidence in eating at Chipotle."
>
> While no cause yet has been identified by investigating health officials, Chipotle continues to work swiftly and thoroughly with health department officials as they look to conclude this investigation.

(Emphasis added).

55. According to the ACAC, rather than disclose the true reason for the store closures, Chipotle instead chose to post signs on the doors of the Chipotle restaurants in Oregon blaming the closures on "equipment issues." Additionally, similar signs were observed at several closed Chipotle locations that blamed the closures on "supply issues."

56. Additionally, despite the Company's representations in the November 3 Press Release, the Center for Disease Control ("CDC") was far from concluding its investigation into this E. coli outbreak. In fact, as of November 3, 2015, the CDC had not yet made its first public announcement regarding its investigation into this outbreak.

57. The next day on November 4, 2015, the CDC made its initial web posting announcing the status of its investigation into this E. coli outbreak. The CDC web posting reported that 39

people were ill in Washington and Oregon, and stated, in relevant part, that "most of the ill people ate at several locations of Chipotle Mexican Grill before getting sick," and that "CDC and state and local public health partners are ***continuing laboratory surveillance through PulseNet*** to identify additional ill persons and to interview them. Updates will be provided when more information is available." (Emphasis added).

58. Indeed, the CDC posted additional information on its website on November 5, November 6 and November 9, 2015, updating the total number of people sickened by the E. coli outbreak to 41 people and stating that the "CDC and state and local public health partners are ***continuing laboratory surveillance through PulseNet*** to identify additional ill persons and to interview them." (Emphasis added).

59. On November 9, 2015, the Washington Department of Health issued a press release providing the following update on the status of its investigation into the October E. coli outbreak, in relevant part:

> Food safety and disease investigation staff from the Washington State Department of Health are ***still working to investigate the cause*** of an outbreak of illnesses linked to 27 cases of E. coli O26 illnesses in Washington. The first round of test results did not find E. coli bacteria in food samples taken from several Chipotle restaurants according to officials at the Food and Drug Administration.
>
> The 27 cases, connected in this outbreak include people from Clark (11), Cowlitz (2), Island (2), King (6), Skagit (5), and Whatcom (1) counties. Ten of these people were hospitalized, no Hemolytic Uremic Syndrome (HUS) complications or deaths have been reported. Most people who are ill report eating at Chipotle restaurants before getting sick.
>
> In Washington, the most recent case reported eating at Chipotle on October 24. While health officials believe the risk for new exposures is very low, the number of cases in this outbreak may rise or fall as pending lab tests determine if more ill people have this specific strain of E. coli infection. In Washington, four tests are still in progress.
>
> ***
>
> The type of E. coli in this outbreak is a strain of Shiga toxin-producing E. coli (STEC O26). It can cause bloody diarrhea, abdominal cramps, fever, and vomiting, and sometimes result in severe, life-threatening illness which can, in some cases, be fatal.

> Local and state health officials in Washington and Oregon ***are investigating,*** working with the U.S. Food and Drug Administration and the U.S. Centers for Disease Control and Prevention.
>
> (Emphasis added).

60. Despite the foregoing statements from the CDC and the Washington Department of Health stating that they were continuing to investigate the E. coli outbreak, on November 10, 2015, Chipotle issued a press release announcing the following, in relevant part:

> **Chipotle to Reopen Northwest Restaurants**
>
> All test results negative for E. Coli; ***no ongoing threat***
>
> DENVER—(BUSINESS WIRE)—Nov. 10, 2015—Chipotle Mexican Grill (NYSE: CMG) will reopen all 43 restaurants in the Seattle and Portland, Ore. Markets that the company voluntarily closed. The restaurants are opening in the coming days with a fresh supply of all new ingredients.
>
> ***Health officials have concluded that there is no ongoing risk from this incident.*** Chipotle has taken important steps to make certain that their food is as safe as it can be, including:
>
> - Conducting additional deep cleaning and sanitization in all its restaurants nationwide.
> - Replacing all ingredients in the closed restaurants.
> - Confirming that none of its employees in these restaurants had E. coli. Note: No Chipotle employees have E. coli stemming from this incident.
> - Working with health officials to improve food handling procedures.
> - Testing fresh produce, raw meat, and dairy items (cheese and sour cream) prior to restocking restaurants.
> - Going above and beyond required testing, and enhancing nationwide testing of produce and fresh meat.
> - Testing food, restaurant surfaces, and equipment in its restaurants (to date, Chipotle has received nearly 900 test results, all of which showed no E. coli).

- Implementing additional safety procedures, and audits, in all of its 2,000 restaurants to ensure that robust food safety standards are in place.

Since this issue began, Chipotle has taken a number of additional steps to help health officials investigate this incident. Those measures included:

- Immediately closing 43 restaurants in Oregon and Washington out of an abundance of caution, although the incident was limited to 11 restaurants.

- Conducting independent testing in its restaurants and distribution center in addition to testing conducted by health department and Food and Drug Administration officials, all of which showed no E. coli.

- Actively assisting health authorities during all phases of the investigation.

- Retaining two preeminent food safety scientists to help the company assess and improve upon its already high standards for food safety.

Details surrounding the investigation include:

- The most recent reported date that a meal was served that may be linked with this incident is October 24. Incubation period for E. coli is typically three to four days after exposure, but may be as short as one day or as long as 10 days, according to the Centers for Disease Control and Prevention.

- Eleven Chipotle restaurants, including six restaurants in Oregon and five in Washington have been linked to this incident by the health departments. Out of an abundance of caution, Chipotle voluntarily closed 43 restaurants in Oregon and Washington.

- No Chipotle locations outside of Oregon and Washington have been connected to this issue in any way.

- No cause has been established between this issue and any ingredient. Both Chipotle and health officials have been conducting food and environmental testing in Chipotle restaurants and distribution centers, but tests have not confirmed a link to any ingredient.

- No Chipotle employees are among the confirmed cases.

***"The safety of our customers and integrity of our food supply has always been our highest priority," said Steve Ells, chairman and co-CEO of Chipotle.*** "If there are any opportunities for us to do better in any facet of our sourcing or food handling – from the farms to our restaurants – we will find them. We are sorry to those affected by this situation, and it is our greatest priority to ensure that we go above

> and beyond to make certain that we find any opportunity to do better in any area of food safety."
>
> (Emphasis added).

61. Contrary to Chipotle's representations that "health officials have concluded that there is no ongoing risk from this incident," on November 20, 2015, the CDC provided another web update on the status of its investigation (the "November 20 CDC Update"). The November 20 CDC Update reported, for the first time, that in addition to the Washington and Oregon cases, the E. coli outbreak had been linked to Chipotle customers in California, New York, Ohio and Minnesota and stated, in relevant part, that "CDC and local public health partners are continuing laboratory surveillance through PulseNet to identify additional ill persons and to interview them." The November 20 CDC Update further stated the following:

> The epidemiological evidence available to investigators at this time suggests that a meal item or ingredient served at Chipotle Mexican Grill restaurants at several states is a likely source of this outbreak. The investigation has not identified what specific food is linked to illness. Chipotle Mexican Grill is assisting public health officials with understanding the distribution of food items served at locations where ill people ate and ***this work is ongoing.***
>
> (Emphasis added).

62. On November 20, 2015, Chipotle issued another press release providing the following update on the E. coli investigation, in relevant part:

> **Chipotle Updates on E. Coli Investigation**
>
> DENVER—(BUSINESS WIRE)—Nov. 20, 2015—Chipotle Mexican Grill (NYSE: CMG) ***continues to work closely with state and federal health officials, as the investigation continues*** into an E. coli incident initially linked to 11 Chipotle restaurants in Washington and Oregon.
>
> The Centers for Disease Control and Prevention (CDC) reduced the number of cases connected to Chipotle from 50 to 37 cases on November 18 (with 24 in Washington and 13 in Oregon). This reduction of nearly 25% was based upon more sensitive testing which revealed the cases were not related to Chipotle. The CDC has informed Chipotle that it identified six additional cases in which initial testing matches the E. coli strain involved in the Washington and Oregon incident. Although one of the individuals has no known link to Chipotle, five individuals did

report eating at Chipotle, including two in Turlock, Calif., one in Akron, Ohio, one in Amherst, NY, and one in Burnsville, Minn.

Investigators have suggested that in incidents like this, it is not unusual to see additional cases after the initial incident as the investigation moves forward. The source of the problem appears to have been contained during a period in late October. Forty-two of the 43 cases linked to Chipotle, reported visiting one of the restaurants in question between October 13 and October 30. One person reported having eaten November 6.

In response to this incident, Chipotle has taken aggressive steps to make sure its restaurants are as safe as possible. There have been no reported new cases in Washington or Oregon since Chipotle put its remediation plan into effect.

Specifically, the company conducted deep cleaning at the restaurants that have been linked to this incident, replacing ingredients in those restaurants, changing food preparation procedures, providing all necessary supply chain data to investigators, and surveying employees to be sure none have had any symptoms of illness (note: no Chipotle employees in any states have been ill related to this incident). Similar actions are immediately being taken in response to these newly reported cases.

Chipotle is also taking significant steps to be sure all of its food is as safe as possible. Specifically, the company is expanding testing of key ingredients, examining all of its food-safety procedures to find any opportunity for improvement, and is working with two renowned food safety scientists to assess all of its food safety programs, from the farms that provide its food to its restaurants.

***"We take this incident very seriously because the safety of our food and wellbeing of our customers is always our highest priority," said Steve Ells, chairman and co-CEO of Chipotle.*** "We are committed to taking any and all necessary actions to make sure our food is as safe as possible, and we are working diligently with the health agencies."

"We offer our sincerest apologies to those who have been affected," said Ells.
"We will leave no stone unturned to ensure the safety of our food – from enhancing the safety and quality assurance program for all of our fresh produce suppliers, to examining all of our food safety procedures from farm to restaurant, and expanding testing programs for produce, meat and dairy items before they are sent to our restaurants."

(Emphasis added).

63. On December 4, 2015, the CDC provided another web update on its investigation (the "December 4 CDC Update"), and reported, among other things, that "[s]ince the last update

on November 20, seven more ill people have been reported from California (1), Illinois (1), Maryland (1), Ohio (2), Pennsylvania (1), and Washington (1).”

64. The December 4 CDC Update further stated, among other things, that “[a]mong people for whom information is available, illnesses started on dates ranging from October 19, 2015 to November 13, 2015,” that “whole genome sequencing has been performed on STEC O26 isolates from 21 ill people in Washington (16), California (2), Minnesota (2), and New York (1). All 21 isolates were highly related genetically to one another. This provides additional evidence that illnesses outside the Pacific Northwest are related to the illnesses in Oregon and Washington[,]” and that “CDC and state and local public health partners are ***continuing laboratory surveillance through PulseNet*** to identify additional ill people and to interview them.” (Emphasis added).

65. Also on December 4, 2015, the Company issued a press release entitled “Chipotle Commits to Become Industry Leader in Food Safety.” The press release stated that “Chipotle has taken aggressive actions to implement industry-leading food safety and food handling practices in all of its restaurants and throughout its supply chain. Its enhanced food safety program will establish Chipotle at the forefront of food safety protocols in the restaurant industry.”

66. The press release also contained a comment from Mansour Samadpour, Ph.D., CEO of IEH Laboratories and Consulting Group, who stated “While Chipotle’s food safety practices were already well within industry norms, I was asked to design a more robust food safety program to ensure the highest level of safety and the best quality of all meals served at Chipotle.” Mr. Samadpour went on to state that “I am happy to report that our proposed program was adopted in its entirety, without any modification. While it is never possible to completely eliminate all risk, this program eliminates or mitigates risk to a level near zero, and will establish Chipotle as an industry leader in this area.” [redacted]

67. Yet, despite the purported enhanced safety protocols that the Company claimed it was taking, Chipotle was faced with another massive foodborne illness outbreak just days after the press release was issued.

*Boston Norovirus Outbreak*

68. In December 2015, a norovirus outbreak sickened at least 141 Boston College students who dined at a Chipotle restaurant in Boston, Massachusetts. Additionally, another 12 students who did not eat at the restaurant also had norovirus symptoms, as the virus is highly contagious. According to the CDC, norovirus can be transmitted by contact with an infected person, contaminated food or water, or by touching contaminated surfaces. City inspectors closed the Chipotle, located in Brighton near Boston College's campus, "until further notice" after reporting three critical health violations following a visit on December 7, 2015. According to the Boston Inspection Services Department[4], the three violations were as follows:

> a. Chicken on the service line was observed to be kept at 128 F and steak was observed to be kept at 124 F, well below the required temperature range of at least 140 F;
>
> b. ***There was an employee that was sick during their shift on Thursday;*** and
>
> c. There were multiple reports of foodborne illness from the Boston College Chipotle location which posed an imminent health hazard.
>
> (Emphasis added).

69. According to an article by *Bloomberg* entitled "Inside Chipotle's Contamination Crisis[5]," the source of the Boston Norovirus Outbreak was "a sick worker who wasn't sent home although Chipotle began offering paid sick leave in June."

70. On December 16, 2015, Chipotle ran print advertisements in 60 newspaper markets with an apology from Ells[6]. However, his apology only went to the victims of the current nine-state *E. coli* 026 outbreak and the Boston College norovirus outbreak. The letter stated the following, in relevant part:

---

[4] http://www.cityofboston.gov/isd/health/mfc/viewinsp.asp?inspno=278271
[5] http://www.bloomberg.com/features/2015-chipotle-food-safety-crisis/
[6] http://www.eater.com/2015/12/16/10310980/chipotle-ceo-apology-steve-ells

> As a chef, nothing is more important to me than serving my guests food that is safe, delicious, and wholesome. ***From the beginning, all of our food safety programs have met or exceeded industry standards.*** But recent incidents, an E. coli outbreak that sickened 52 people and a norovirus outbreak that sickened approximately 140 people at a single Chipotle restaurant in Boston, have shown us that we need to do better, much better.
>
> To achieve our goal of establishing leadership in food safety, we collaborated with preeminent food safety experts to design a comprehensive food safety program that dramatically reduces risk on our farms, throughout the supply chain, and in our restaurants. The process began with a farm-to-fork risk assessment of every ingredient and all of our restaurant protocols and procedures.
>
> Throughout our supply chain, we are implementing high-resolution sampling and testing of many of our ingredients to prevent contaminants, including E. coli, from getting into our restaurants. Testing of this kind is unprecedented in the restaurant industry because of the large number of samples tested. We are also working with our supplier partners to further enhance their food safety programs.
> ***We have also designed many improvements within our restaurants to ensure our food is as safe as possible.*** This includes the introduction of additional microbiological kill steps to eliminate microbial risk. Additionally, we are rolling out new sanitation procedures in our restaurants and implementing additional food safety training for all of our restaurant employees. More information about these changes is available at chipotle.com/foodsafety.
>
> In the end, it may not be possible for anyone to completely eliminate all risk with regard to food (or from any environment where people congregate), but we are confident that we can achieve near zero risk. Chipotle is an incredibly focused company. Our menu has remained virtually unchanged for the last 22 years and we only have 64 ingredients in our food. Rest assured that we have looked at each of these ingredients, where they come from and how they can be made even safer. ***I believe our restaurants are safer today than they have ever been.***

(Emphasis added).

71. Despite Ells' statements regarding the purported improvements in Chipotle's food safety program, the outbreaks of food-borne illness continued.

*Second E. coli Outbreak*

72. On December 22, 2015, the FDA issued an update stating that the FDA, CDC, and state and local officials are investigating a second, more recent outbreak of a different, rare DNA fingerprint of E. coli (STEC 026) linked to Chipotle restaurants. The CDC reported that five

people have been reported with the new variant of STEC 026 from a total of three states: Kansas (1), North Dakota (1), and Oklahoma (3). The Kansas and North Dakota cases ate at the same restaurant in Kansas. The three separate Oklahoma cases all ate at the same Chipotle restaurant. The FDA stated that the epidemiologic evidence available at this time suggests that a common meal item or ingredient served at Chipotle restaurants in several states is likely a source of both E. coli outbreaks.

73. All in all, more than 500 people around the country have become sick from consuming Chipotle food since July 2015, according to public health officials. And those are just the ones who went to a doctor and were properly diagnosed. Food-safety experts say they believe that with any outbreak, the total number of people affected is at least 10 times the reported number. Even worse is that the sources of most of the outbreaks are yet to be determined. Dr. Ian Williams, the longtime chief of outbreak response and prevention at CDC, stated that "One of the challenges here has been that we have been able to identify the restaurants where people ate, ***but because of the way Chipotle does its record-keeping, we have been unable to figure out what food is in common across all those restaurants***[7]." (Emphasis added).

**The Company is Served with a Grand Jury Subpoena**

74. On January 6, 2016, the Company filed a current report on Form 8-K (the "January 6 Form 8-K") announcing the following:

> Receipt of Grand Jury Subpoena
>
> In December 2015, Chipotle was served with a Federal Grand Jury Subpoena from the U.S. District Court for the Central District of California in connection with an official criminal investigation being conducted by the U.S. Attorney's Office for the Central District of California, in conjunction with the U.S. Food and Drug Administration's Office of Criminal Investigations. The subpoena requires us to produce a broad range of documents related to a Chipotle restaurant in Simi Valley, California, that experienced an isolated norovirus incident during August 2015. We intend to fully cooperate in the investigation. It is not possible at this time to determine whether we will incur, or to reasonably estimate the amount of, any fines,

[7] http://www.foodsafetynews.com/2015/12/chipotle-outbreak-illness-count-hits-514-as-cmg-stock-dives-below-500/#.V3Z7iX6rRhE

> penalties or further liabilities in connection with the investigation pursuant to which the subpoena was issued.

75. On February 2, 2016, the Company filed a current report on Form 8-K along with an accompanying press release with the SEC disclosing the following, in relevant part:

> On January 28, 2016, Chipotle was served with a subpoena ***broadening the scope of the previously-announced criminal investigation*** by the U.S. Attorney's office for the Central District of California. The new subpoena requires us to produce documents and information ***related to company-wide food safety matters dating back to January 1, 2013***, and supersedes the subpoena served in December 2015 that was limited to a single Chipotle restaurant in Simi Valley, California. We intend to fully cooperate in the investigation.

(Emphasis added).

76. That Chipotle could face criminal charges in connection with its food safety programs, and that the U.S. Attorney's office for the Central District of California broadened the scope of the criminal investigation, demonstrates the seriousness of Chipotle's situation. As stated by Doug Beach, a spokesman for the Ventura County Environmental Health Division, "it's unusual to have the federal government involved[8]."

**<u>The Individual Defendants Knew that the Company Was at a Higher Risk for Food-Borne Illness Outbreaks than its Competitors</u>**

77. The Individual Defendants were aware that the Company was at a higher risk for food-borne illness outbreaks and yet, failed to take measures to implement robust safety programs and/or failed to monitor the Company's compliance with food safety protocols. This was even more troubling given the Company's recognition in its annual report on Form 10-K filed with the SEC on February 4, 2015 (the "2014 10-K") that the Company is at a higher risk for food-borne illness outbreaks:

> ***Instances of food-borne or localized illnesses could cause the temporary closure of some restaurants or result in negative publicity, thereby resulting in a decline in our sales, and could adversely affect the price and availability of the meat, produce or dairy we use to prepare our food.***
>
> Instances of food-borne illnesses, real or perceived, whether at our restaurants or those of our competitors, may subject us to liability to affected customers, and could

[8] http://www.reuters.com/article/us-chipotle-mexican-ecoli-idUSKBN0UK1RF20160107

> result in negative publicity about us or the restaurant industry that adversely affects our sales. **<u>We may be at a higher risk for food-borne illness outbreaks than some competitors due to our use of fresh produce and meats rather than frozen, and our reliance on employees cooking with traditional methods rather than automation.</u>** The risk of illnesses associated with our food might also increase in connection with an expansion of our catering business or other situations in which our food is served in conditions we cannot control.
>
> **<u>On a small number of occasions one or more Chipotle restaurants have been associated with customer illness, and on those occasions our sales have sometimes been adversely impacted, at times even in markets beyond those impacted by the illness.</u>** If our customers become ill from food-borne or localized illnesses or if an illness is attributed to our food, even incorrectly, we could also be forced to temporarily close some restaurants, further impacting sales. In addition, reports linking nationwide or regional outbreaks of food-borne illnesses have caused us to temporarily suspend serving some produce items in our foods or to otherwise alter our menu. **<u>Similarly, past outbreaks of E. coli relating to certain food items caused consumers to avoid certain products and restaurant chains</u>**, Asian and European countries have experienced outbreaks of avian flu, and incidents of "mad cow" disease have occurred in Canadian and U.S. cattle herds. These problems, other food-borne illnesses (such as hepatitis A or norovirus) and injuries caused by food tampering have had in the past, and could have in the future, an adverse effect on the price and availability of affected ingredients. A decrease in customer traffic as a result of these health concerns or negative publicity, or as a result of a change in our menu or dining experience or a temporary closure of any of our restaurants, would adversely impact our restaurant sales and profitability. Furthermore, if we react to these problems by changing our menu or other key aspects of the Chipotle experience, we may lose customers who do not accept those changes, and may not be able to attract enough new customers to generate sufficient revenue to make our restaurants profitable. Customers may also shift away from us if we choose to pass along to consumers any higher ingredient costs resulting from supply problems associated with outbreaks of food-borne illnesses, which would also have a negative impact on our sales and profitability.

(Emphasis added).

78. In fact, the Simi Valley Outbreak was not the first time that the Company has experienced a massive norovirus outbreak. In April 2008, more than 500 people became ill after eating at a Chipotle restaurant located near Kent State University in Kent, Ohio. As reported by *Business Insider*[9], activists pointed to the Kent Ohio Outbreak, which was rumored to have been

[9] http://www.businessinsider.com/chipotles-past-food-poisoning-outbreaks-2015-11

linked to an infectious employee, as evidence of the necessity of providing paid sick days and discouraging ill employees from showing up to work.

79. Although this should have been a huge sign to the Individual Defendants that they needed to enhance their safety protocols and provide paid sick leave for Chipotle employees, the Individual Defendants failed to do so. It was not until 2015, seven years after the Kent State Outbreak, when Chipotle began offering paid sick leave to employees[10]. To make matters even worse, according to the August 24, 2015 Inspection Report of the Simi Valley Chipotle Restaurant, effective July 1, 2015, all Chipotle employees with at least one year of service time received only five days of sick pay, and no pay with less than one year of service. Thus, although Chipotle's Norwalk Prevention Protocols (the "Norwalk Protocol") requires any employee who vomits or suffers from a combination of the following: diarrhea, nausea, fever, or stomach cramps, to not return to work until five complete days have passed, it is highly unlikely that employees who experience these symptoms would report this to their managers, given that they only receive five days of paid sick leave and even then, only if they have been employed for at least one year.

80. Moreover, although defendant Ells stated that the norovirus outbreaks in Simi Valley and Boston were caused by breaches of protocol[11], which were purportedly established at Chipotle after the Kent State Outbreak in 2008, it is clear that these protocols, even if they had been followed, were inadequate.

81. For example, as previously stated, the August 24, 2015 Inspection Report of the Simi Valley Restaurant states that two Chipotle employees began complaining of gastro-intestinal symptoms on August 18, 2015. Yet, the Company continued to serve food at the Simi Valley location for two more days until it finally instituted the Norwalk Protocol on August 20, 2015.

82. Additionally, the Company waited until after the restaurant was thoroughly cleaned and sanitized before informing local health officials on August 21, 2015. Pursuant to Section

---

[10] http://www.forbes.com/sites/nancygagliardi/2016/01/06/looks-like-a-tough-year-ahead-for-chipotle/#50f30fc961f9
[11] http://www.bloomberg.com/features/2015-chipotle-food-safety-crisis/

113949.5(b) of the California Health and Safety Code (Cal Health & Saf Code § 113949.5), "a person in charge shall notify the local enforcement agency ***when he or she is aware*** that two or more food employees are concurrently experiencing symptoms associated with an acute gastrointestinal illness." (Emphasis added). Yet, despite the foregoing, Chipotle waited until at least August 21, 2015, three days after learning that two of its employees were experiencing gastrointestinal symptoms, to notify local health authorities. Additionally, Chipotle contacted local health authorities only after the Simi Valley restaurant had been shut down and sanitized from top to bottom, thus hindering any investigation that was undertaken by the local health authorities to determine the source of the Outbreaks. Not surprisingly, the Norwalk Protocol does not include a provision that requires Chipotle to immediately notify the local health authorities upon learning that two or more food employees are concurrently experiencing symptoms associated with an acute gastrointestinal illness thus, rendering the Norwalk Protocol inadequate and contrary to health regulations.

83. Additionally, although the Norwalk Protocol requires an employee who vomits or suffers from a combination of the following: diarrhea, nausea, fever, or stomach cramps, to not return to work until five complete days have passed, it is clear that the Individual Defendants failed to ensure that employees were complying with this policy. [redacted]

[redacted]

84. Had the Individual Defendants actually taken steps to monitor employees' compliance with Chipotle's food safety policies, the norovirus outbreaks could have been prevented or, at the very least, mitigated.

85. Additionally, page 6 of the Norwalk Protocol, entitled "Vomit Incident Checklist," states that a designated employee must clean up the vomit using a specified checklist. The last step on the checklist states "the employee who performs the cleanup must sanitize his or her shoes with the 4% bleach solution, go home, shower, change clothes, and either return to work or have the rest of the day off (***this is up to the manager***)." (Emphasis added). Based on the foregoing, it is clear that a store manager and/or field leader who does not have any medical training should not be given the discretion to determine whether or not the person who performs the cleanup should return to work or have the rest of the day off. Additionally, given that norovirus is highly contagious, the employee who performs the cleanup should not be allowed to return to work after going home, showering and changing clothes. As stated by the CDC[12], "because symptoms come on suddenly, an infected person who vomits in a public place may expose many people."

86. Thus, given that the source of the norovirus outbreaks in Kent State, Simi Valley and Boston was a sick employee, the Individual Defendants were aware that the Company's safety protocols were lax and/or not being complied with. However, instead of enhancing the Company's food safety policies to ensure it was in compliance with industry standards, the Individual Defendants breached their fiduciary duties and committed gross mismanagement by attempting to cover up and conceal all of the evidence of the Simi Valley Outbreak by taking steps such as sanitizing the restaurant and replacing all sick employees with healthy employees before notifying local health officials.

**The Individual Defendants Systematically Failed to Maintain Internal Controls to Monitor Implementation and Compliance with Basic Food Safety Policies and Consciously Failed to Prevent Additional Outbreaks From Occurring**

[12] http://www.cdc.gov/vitalsigns/norovirus/index.html

87. Food safety is critical to a restaurant like Chipotle, a fact that the Individual Defendants were aware of given the acknowledgment by the Company in the 2014 10-K that it may be at a higher risk for food-borne illness outbreaks due to the Company's use of fresh produce and meats and its reliance on employees cooking with traditional methods. Accordingly, the Individual Defendants were well aware of the need to establish and implement a robust food safety program focusing on preventing food-borne illness outbreaks.

88. Yet, despite the foregoing, the Individual Defendants consciously failed to take action to prevent further outbreaks from occurring. As set forth in paragraph 44, on August 22, 2015, *CBS News* published an article reporting that "[a] Chipotle Restaurant in the Simi Valley Town Center is under fire Saturday after multiple reports of customers falling ill after eating at the restaurant have surfaced." The Article further stated that "Chipotle issued an official statement on Saturday [August 22, 2015], claiming that, 'The safety and well being of our customers is always our highest priority. When we were contacted by customers who reported feeling poorly after visiting our restaurant in Simi Valley, we immediately began a review of the incident, and have taken all of the necessary steps to ensure that it is safe to eat there.'"

89. Yet, despite the *CBS news* report on the Simi Valley Outbreak, according to a Board Pre-Read Executive Summary from Chipotle's Safety, Security and Risk Department provided to the Board on August 24, 2015 in advance of the Board meeting that took place **<u>on September 1, 2015</u>**, the Safety, Security and Risk Department stated that "there were no material food safety events this quarter." CMG/7045-000596. The fact that the *CBS News* report went unnoticed by the Board is evidenced by the complete absence of information and/or discussion pertaining to the Simi Valley Outbreak in the meeting minutes from the September 1, 2015 Board meeting and the materials provided to the Board in advance of the September 1, 2015 meeting[13]. Indeed, the first time that the Board even acknowledged the Simi Valley Outbreak was during the December 16,

[13] Defendants Ells, Moran, Charlesworth, Flynn, Baldocchi, Flanzraich, Friedman, Musk and Gillett attended the September 1, 2015 Board meeting. CMG/7045-001640.

2015 Board meeting, thus demonstrating the Board's utter and complete conscious disregard of its fiduciary duty.

90. Additionally, Chipotle's Internal Audit Report from August 2015 (the "Internal Audit Report"), which was provided to and discussed during an Audit Committee meeting on August 31, 2015 (CMG/7045-001366), provided a summary of the hours and costs that the Company had incurred as of July 31, 2015 on internal audits[14]. The Internal Audit Report indicates that although the Company had a total budget of 303 hours for store audits, the Company had only spent 95 hours on store audits as of July 31, 2015, and was under budget 208 hours as of July 31, 2015, with only 150 hours estimated for store audits for the remainder of the year, leaving a shortfall of 58 hours the Company had originally allocated to store audits for 2015. Additionally, the Internal Audit Report indicates that the Company had an annual total budget of $38,339 for store audits, yet only spent $13,204 as of July 31, 2015, and estimated additional expenditures of $17,626.61 for the remainder of the year, making a total of $30,830.61 or $7,508.39 under budget for the year. Additionally, with respect to the 2016 risk assessment internal audit, although the Company had a total budget of 61 hours, the Company had only spent 1 hour on the 2016 risk assessment audit as of July 31, 2015, which is rather shocking given the Company's public statements concerning the importance of food safety. Additionally, the Company had a total budget of $10,855 for the 2016 risk assessment audit, yet only spent $188 as of July 31, 2015. Thus, based on the lack of resources spent on risk assessment, it is clear that the Individual Defendants knowingly failed to prioritize food safety.

91. Indeed, the *de minimis* time and expenditures spent on store audits and the risk assessment internal audit evidence that the Individual Defendants were not committed to identifying and mitigate the risks associated with food safety. This failure to commit the necessary resources for risk management stands in stark contrast to the Company's public statements that the safety of the Company's customers and integrity of its food supply has always been Chipotle's

---

[14] Chipotle produced a more complete version of the August 2015 Internal Audit Report on May 2, 2016 (the "Internal Audit Report"). The Internal Audit Report is not bates stamped, but is labeled as PDF No. 01889783.

"highest priority." *See* November 3, 2015 Press Release (Steve Ells, chairman and co-CEO of Chipotle, who stated "the safety of our customers and integrity of our food supply has always been our highest priority." Ells continued, stating "we work with a number of very fresh ingredients in order to serve our customers the highest-quality, best-tasting food we can. If there are opportunities to do better, we will push ourselves to find them and enhance our already high standards for food safety. Our deepest sympathies go out to those who have been affected by this situation and it is our greatest priority to ensure the safety of all of the food we serve and maintain our customers' confidence in eating at Chipotle."); *see also* November 10, 2015 Press Release ("The safety of our customers and integrity of our food supply has always been our highest priority," said Steve Ells, Chairman and co-CEO of Chipotle. "If there are any opportunities for us to do better in any facet of our sourcing or food handling – from the farms to our restaurants – we will find them. We are sorry to those affected by this situation, and it is our greatest priority to ensure that we go above and beyond to make certain that we find any opportunity to do better in any area of food safety."); *see also* November 20, 2015 Press Release ("we take this incident very seriously because the safety of our food and wellbeing of our customers is always our highest priority," said Steve Ells, chairman and Co-CEO of Chipotle. "We are committed to taking any and all necessary actions to make sure our food is as safe as possible, and we are working diligently with the health agencies.").

92. Additionally, the Internal Audit Report stated that "multiple instances of non-compliance with restaurant procedures were noted, including improper cooking procedures, inaccurately marked food items" and recommended that Field Leadership and the Training Department reinforce key procedures with restaurant employees. CMG/7045-001368. Given that the Outbreaks took place from August 2015 through December 2015 and the minutes/Board materials from subsequent Board meetings failed to raise and/or address whether the recommendations were implemented and whether the violations were corrected, it is clear that the Individual Defendants consciously disregarded red flags showing that Company employees and/or restaurants were not operating in compliance with restaurant procedures and failed in their

oversight duties to follow up to ensure that the areas of non-compliance were rectified. These findings are even more troubling due to the minimal effort made by the Company to audit its stores as demonstrated by the Company's lack of budgeting.

93. Further, it appears that the foregoing observations of non-compliance failed to have any immediate effect on the frequency of the Company's store audits. As set forth in a pre-read executive summary by the Safety, Security and Risk Department provided to the Board on December 8, 2015 in advance of the Board meeting on December 16, 2015, the Safety, Security and Risk Department stated the following, in relevant part:

> **Restaurant Operations and Food Safety Audit**
>
> The SSR field audit team was authorized a headcount of three additional people, for a total of 6.5, and we will be performing scored operations and food safety audits for every Team Director (TD) each quarter. We will also conduct audits in 70-90% of our restaurants each quarter. In addition, the audits have been streamlined to focus on operations and safety and less on cultural issues, allowing each auditor the opportunity to visit twice as many restaurants. Through these stepped-up audits, our operational leaders will be provided with crisp, objective, scored assessments of restaurant food safety as well as operational execution on customer service, cleanliness and food quality. By visiting the vast majority of restaurants ***each quarter,*** this audit team will have a magnified impact upon food safety and operational execution, ***as compared to the current status quo wherein each Field Leader is visited only annually.*** CMG/7045-002441

(Emphasis added).

94. Had the Individual Defendants taken immediate steps to increase the frequency of the store audits after the occurrence of the Simi Valley Outbreak, they would have learned that many employees were not complying with restaurant procedures and/or local health regulations. For example, in an article by *Bloomberg* entitled "Inside Chipotle's Contamination Crisis," *Bloomberg* reported the following, in relevant part:

> An alarm goes off every hour in every Chipotle restaurant, to remind workers to wash their hands and put on new latex gloves. But three former managers, who asked to remain anonymous to speak openly about their former employer, ***said the alarm was often ignored when the restaurants were busy. Field managers came by every month or so, and for a few days afterward employees observed the hand-washing rule, says a former manager, who worked in a restaurant outside San***

> ***Francisco. Then they'd slack off again.*** He also notes that Chipotle put more emphasis on the safe handling of meat than produce. Another former manager, from Arizona, says Chipotle assumed the speed and skill of seasoned culinary workers, while her restaurant was staffed mostly by young employees on their first job. Arnold says new employees aren't expected to work as efficiently as more experienced ones.

95. Yet, in breach of their fiduciary duties, the Individual Defendants ignored the red flags that were raised during [redacted]

96. [redacted]

> [redacted]

> [redacted]

> [redacted]

> [redacted]

97. Again, the fact that the Board failed to immediately [redacted]

[redacted] is inadequate and demonstrates bad faith.

98. Further, in the section of the Internal Audit Report entitled "Internal Audit Self-Evaluation," the Company stated "we utilized the Institute of Internal Audit (IIA) standards to evaluate our performance during the year." Although the Company stated that "Overall, we assessed that we generally conform with IIA standards," the self-evaluation revealed otherwise indicating that the Company did not conform with IIA Standards 1300 and 2100[15].

99. Standard 1300 provides that "the chief audit executive must develop and maintain a quality assurance and improvement program that covers all aspects of the internal audit activity and continuously monitors its effectiveness. This program includes periodic internal and external quality assessments and ongoing internal monitoring." [redacted]

100. Standard 2100 provides that "the internal audit activity must evaluate and contribute to the improvement of risk management, control and governance processes using a systematic and disciplined approach." The Internal Audit Report indicates that Chipotle failed to comply with

[15] Chipotle produced a more complete version of the Internal Audit Report on May 2, 2016. The Internal Audit Report is not bates stamped, but is labeled as PDF No. 01889783.

Standard 2100. The Internal Audit Report admits this failure and states the following, in relevant part:

> Standard 2100 encompasses risk assessment procedures. ***It is considered best practice to take a broader and more formalized approach in performing risk assessment procedures than is currently in practice at Chipotle.*** It is the opinion of IA that this level of detail is not necessary or appropriate in the Chipotle environment, and that our risk assessment procedures include an acceptable level of detail. However, a third party reviewer may comment that our risk assessment and evaluation could be more comprehensive. PDF No. 01889783.

101. The foregoing indicates that Chipotle's risk assessment procedures do not follow best practices, and that the Individual Defendants were aware of the deficiencies in Chipotle's risk assessment procedures and failed to make changes to strengthen the Company's internal audit procedures all the while trumpeting Chipotle's food safety measures.

102. In sum, Chipotle has admitted that [redacted] The Board had knowledge of all these deficiencies.

**<u>The Individual Defendants Were More Concerned With Reputation Instead of Food Safety</u>**

103. Instead of addressing the Outbreaks and keeping the public apprised of the investigations into the Outbreaks, including the sources of the Outbreaks and steps that the Company is taking to improve its food safety policies, the Individual Defendants were more concerned with how the Outbreaks would impact Chipotle's reputation and profitability.

104. For example, a pre-read executive summary prepared by Pete Olds for the Pacific South Region and provided to the Board on December 8, 2015 in advance of the December 16, 2015 Board meeting stated the following, in relevant part:

> ***We had a norovirus outbreak at our Simi Valley restaurant in August. The source could not be identified***, but dozens of guests and about half of our staff displayed symptoms. We were closed for half a day to implement Norwalk protocols. Our Field Leader (FL), TD and safety & security team communicated regularly with the local health department. [redacted]

105. Additionally, [redacted]

> [redacted]

> [redacted]

[redacted]

106. Additionally, instead of accepting responsibility for the outbreaks and assuring the public that the Company is working hard to determine the source of the Outbreaks and has made changes to its food safety policies, the Individual Defendants attempted to [redacted]

[redacted]

> [redacted]

> [redacted]

> [redacted]

(Emphasis added).

107. During a conference call that took place on February 2, 2016, the following exchange took place between analyst David Palmer from RBC Capital Markets LLC and defendants Moran and Crumpacker:

> Palmer – Thanks. Good evening. Could you comment a little bit about that investigation? What is the nature of that, and just what are they looking for? And then separately, with regard to the direct marketing campaign, could you talk about perhaps what messages will be in there? I would assume some messages about safety, and then I would also imagine value being part of that. Thanks.
>
> Moran - Yeah, David, there's not much to say at this point about the investigation because we just don't know tremendously much about it, but basically, there is a statute in California dealing with essentially selling adulterated food or selling food that can be harmful. And because of that statute, the United States Attorney for the Central District of California has opted to undertake an investigation. And obviously, we're cooperating with that investigation and providing all the documents that they'd like to look at and I think they're just wanting to make sure that everything we did was on the up-and-up. And I think that obviously we're confident that at the close of such an investigation, that's what they found. And I'm sorry, it's a federal statute under which that investigation is taking place.
>
> Crumpacker - And with regard to the direct mail – or the direct marketing campaign, there are a variety of different messages. ***None of them actually include messages about food safety. The messages on both the printed version of direct mail as well as the mobile direct marketing are really about taste and quality.*** And the messages with regard to food safety are things that we drive out through PR communications and on our owned channels like our website and the new food safety website that I said that we were launching earlier in my prepared statements.
>
> So, the direct marketing is very much about delicious and wonderful food. It's very similar to what we've done in the past in that regard. And it's proven to be very effective for us at driving traffic in the past. Now we don't know of course exactly how these incidents will impact redemption on these things, but given how successful they've been in the past, we're confident that they're going to drive substantial traffic.
>
> (Emphasis added).

108. To further illustrate Chipotle's refusal to accept responsibility for the Outbreaks, on December 21, 2015, Bryant S. "Corky" Messner of Messner Reeves sent a letter to Heather Huntley, Esq. and Paula Kocher, Esq. of the CDC accusing the CDC of misinforming the public through the various updates issued by the CDC with respect to the E. coli incident (the "Messner Reeves Letter"). The Messner Reeves Letter raised the following concerns, criticizing the CDC :

> "Despite no ongoing threat, with four weeks passing between the last exposure date and the most recent [CDC] web update, the web updates did not serve to protect the public and, in fact, led to inaccurate conclusions,"

***

"Chipotle has concerns that various web updates do not meet the standards promulgated by the CDC. Each web update must stand on its own and independently comply with the CVDC guidelines, and it appears that many of the web updates do not."

***

"The CDC's December 4, 2015 web update misinformed the public as the current status of the outbreak' [and] "… in the web update CDC made no effort to advise the public that these ill individuals had no known connection with Chipotle,"

***

"… Chipotle does not believe the web updates between November 4, 2015, and November 6, 2015 provided the public with information that was clear and useful, as mandated by CDC regulations,"

***

"Similarly, on November 20, 2015, the CDC reported six cases of E. coli 026 throughout four additional States. It does not appear that the information provided in this update was useful to the public."

***

"The HHS has adopted various guidelines for the dissemination of adverse information through the media. See 45 C.F.R. 17.1 et seq. It is the CDC's position that these regulations not apply to CDC."

***

"… CDC officials have made misleading statements and unnecessary comments to the media about matters which relate to an ongoing agency investigation. On November 20, 2015, a CDC representative was quoted by a national news outlet as follows: The cause of the outbreak hasn't been determined, but it 'probably wasn't meat,' Matt Wise, a CDC epidemiologist who is leading the investigation, said in an interview. He noted that a 'couple of vegetarians' are among those sickened. 'The fact that these outbreaks don't seem to be confined to a geographical region is harmful to the brand', he said Chipotle's brand-perception problem has just gone coast to coast."

***

> "It is our understanding that the CDC is relying upon the holding of *Dimare Fresh Inc. v. U.S.* in its justification of the web updates."

109. Despite Chipotle's attempt to shift the blame to the CDC for purportedly "misinforming the public," on April 15, 2016, the CDC sent a letter in response to Corky Messner disagreeing with Chipotle's statements (the "CDC Letter"). The CDC Letter stated the following, in relevant part:

> This is in response to your letter, dated December 21, 2015 from Messner Reeves, LLP. In your letter you express concern that certain web updates related to multistate outbreaks of Shiga toxin-producing *Escherichia coli* O26 (STEC O26) infections linked to Chipotle Mexican Grill restaurants (http://www.cdc.gov/ecoli/2015/o26-11-15/index.html) do not include "the most accurate information available" and that they "actually misinform the public." You also raise concerns that these web updates "…do not conform with CDC guidelines, and Office of Management and Budget ("OMB") and Department of Health and Human Services ("HHS") regulations concerning dissemination of information to the public."
>
> **Background**
>
> The Centers for Disease Control and Prevention (CDC) is the lead federal agency for protecting the health and safety of people at home and abroad, providing credible information to enhance health decisions and promoting health through strong partnerships. CDC follows guidance as specified in OMB Guidelines for Ensuring and Maximizing the Quality, Objectivity, and Integrity of Information Disseminated by Federal Agencies (see http://www.whitehouse.gov/sites/default/files/omb/fedreg/reproducible2.pdf and http://aspe.hhs.gov/infoquality/Guidelines/cdcinfo2.shtml). CDC also follows the Transparency and Open Government Memorandum for Heads of Executive Departments and Agencies, which requires us to take appropriate action, consistent with law and policy, to disclose information rapidly in forms that the public can readily find and use (https://www.whitehouse.gov/the_press_office/TransparencyandOpenGovernment ). This guidance was issued to ensure the public trust and establish a system of transparency, public participation, and collaboration.
>
> CDC, the U.S. Food and Drug Administration, the U.S. Department of Agriculture Food Safety and Inspection Service, and public health and regulatory officials in several states investigated two outbreaks of STEC O26 infections. Fifty-five people were infected with the outbreak strain of STEC O26 from eleven states in the initial outbreak. The DNA fingerprint of this STEC O26 was extremely rare, providing strong laboratory evidence that the illnesses were all linked to a common contaminated food item. Twenty-one ill people were hospitalized. There were no reports of hemolytic uremic syndrome and no deaths. The majority of illnesses were

reported from Washington and Oregon during October 2015. The epidemiologic evidence available at that time suggests that a common meal item or ingredient served at Chipotle Mexican Grill restaurants in several states was a likely source of this outbreak. The investigation did not identify what specific food was linked to illness. Forty-seven (87%) of 54 ill people interviewed reported eating at a Chipotle Mexican Grill restaurant in the week before their illness started. CDC also investigated a second, more recent outbreak of another rare DNA fingerprint of Shiga toxin-producing *E. coli* O26 (STEC O26) linked to Chipotle Mexican Grill. Because it was not known whether these infections were related to the initial outbreak of STEC O26 infections, these illnesses were not included in the case count for that outbreak. All five (100%) people infected in the second outbreak reported eating at a Chipotle Mexican Grill in the week before illness started. Three ill people ate at a single Chipotle location in Oklahoma and two ill people ate at a single Chipotle location in Kansas. This investigation also did not identify what specific food was linked to the illnesses. On February 1, 2016, CDC posted a final web update declaring that the two outbreaks appeared to be over.

**Responses to concerns raised in your letter:**

Regarding your statement on page 1, "*Despite no ongoing threat, with four weeks passing between the last exposure date and the most recent web update, the web updates did not serve to protect the public and, in fact, led to inaccurate conclusions*," CDC has the following response:

An infected person is included in the case-count of an outbreak if he/she meets a specific case- definition. The development of case definitions for an outbreak investigation is a cornerstone of public health epidemiology practice, the principles of which are amply described in standard reference textbooks (e.g., Gregg MD. Field Epidemiology, Second Edition. New York: Oxford University Press, 2002). The case definitions for these two investigations define cases as those that appear on reports of ill people to the PulseNet system (http://www.cdc.gov/pulsenet) infected with the molecularly-defined outbreak strain of the pathogen; they are not based on whether a person consumed food at Chipotle Mexican Grill before becoming ill. All multistate foodborne outbreak caused by *Escherichia coli*, *Salmonella enterica*, and *Listeria monocytogenes* use this type of "molecular" case definition. It is a basic tenant of the science of epidemiology that using an exposure as a part of a case definition biases epidemiologic assessment of the outbreak source. In other words, requiring exposure to Chipotle restaurants in order to meet the case definition would preclude the ability to assess other exposures as potential causes of the outbreak.
PulseNet, a program coordinated by CDC, is the national subtyping network of public health and food regulatory agency laboratories that work together to detect and investigate foodborne and other outbreaks. DNA "fingerprinting" is performed on *E. coli* and other bacteria isolated from ill people by using a technique called pulsed-field gel electrophoresis (http://www.cdc.gov/pulsenet/pathogens/pfge.html) or PFGE. PulseNet manages a

national database of these DNA fingerprints to identify possible outbreaks. It takes an average of 2 to 3 weeks between the time a person becomes ill and when the illness is reported to PulseNet (http://www.cdc.gov/ecoli/reporting-timeline.html). For non-O157 STEC infections like STEC O26, published estimates suggest that there are over 100 illnesses that remain undiagnosed for each one that is reported to PulseNet (http://wwwnc.cdc.gov/eid/article/17/1/P1-1101_article), meaning that the official case counts typically substantially underestimate the impact of outbreaks.

In the initial outbreak of 55 cases linked to Chipotle Mexican Grill Restaurants, the case definition is an *E. coli* O26 infection with isolate matching PFGE pattern EVCX01.1180 reported to PulseNet with an isolation date on or after October 20, 2015. In the second outbreak linked to Chipotle Mexican Grill Restaurants, the case definition is an *E. coli* O26 infection with isolate matching PFGE pattern EVCX01.0670 with an isolation date on or after November 24, 2015. Reported illness onset dates in these two outbreaks range from October 19, 2015 to December 1, 2015. Given that two to three weeks typically pass between when a person becomes ill to when the illness is reported to PulseNet and the most recent illness onset date of December 1, 2015, we disagree that there was "no ongoing threat" at the time of the web postings, particularly since the investigation of these two outbreaks linked to Chipotle Mexican Grill Restaurants has not identified a specific cause. A public health professional would not conclude that transmission had ceased until at least several weeks after the last reported case.

CDC believes that the web postings served to protect and inform the public as well as inform public health and regulatory partners at the federal, state, and local level about this ongoing outbreak investigation in three ways. First, information provided in these web posting provided people who may have become ill after eating at Chipotle Mexican Grill locations with information they might need to seek diagnosis and treatment for a potentially serious illness (*E. coli* O26 infection); medical attention would also entail provision of information on measures to prevent secondary transmission of STEC infection to other close contacts such as family members. Second, this information also could assist in identifying additional ill people who might provide critical information essential to determine the specific cause of the outbreak. Third, the web postings provided information the public might use to protect themselves by choosing to avoid certain food exposures associated with the outbreak.

Regarding your statement on page 3, "*Chipotle has concerns that various web updates do not meet the standards promulgated by the CDC. Each web update must stand on its own and independently comply with the CDC guidelines, and it appears that many of the web updates do not.*" CDC has the following response:

Each web posting by CDC followed and complied with all applicable agency guidelines and policy. This included a formal review and clearance process before release as specified in "Guidelines for Ensuring the Quality of Information

Disseminated to the Public" (http://aspe.hhs.gov/infoquality/Guidelines/cdcinfo2.shtml)

Regarding your statements on page 3, "*The CDC's December 4, 2015 web update misinformed the public as the current status of the outbreak" and "… in the web update CDC made no effort to advise the public that these ill individuals had no known connection with Chipotle,"* CDC has the following response:

The December 4, 2015 web posting provided the public as well as public health and regulatory partners in federal, state, and local agencies with updated information regarding an ongoing investigation. This included information on the seven ill people which had been newly identified since the preceding web posting on November 20, 2015. CDC reported in this posting that several of these individuals did not recall eating at Chipotle Mexican Grill in the week before their illness began. Specifically, the December 4, 2015 web posting includes the following statement in the "What's New " and "Investigation Update" sections: "Of the three most recent illnesses reported in November, only one ill person, whose illness started on November 10, reported eating at Chipotle Mexican Grill in the week before their illness began." The December 4, 2015 web posting also included the information that seven additional ill people had been reported from California (1), Illinois (1), Maryland (1), Ohio (2), Pennsylvania (1), and Washington (1) since the preceding update. Two of these people became ill in October and five became ill in November 2015. The update also stated that Illinois, Maryland, and Pennsylvania had been added to the list of states reporting illnesses, bringing the total to nine states. In all multistate foodborne outbreak investigations coordinated by the CDC, including these, ill people are included on the basis of the "DNA fingerprint" of the bacterium causing illness. In this investigation, the fingerprint of both STEC O26 strains are extremely rare, indicating that ill people are highly likely to be related to a common contaminated food source. Several reasons could explain why ill people included in such investigations may not report consuming the food item causing the outbreak. First, these people may not remember eating at Chipotle Mexican Grill before they got sick, but actually did. It can be several weeks from the time a person gets sick until they are confirmed to be part of an outbreak and interviewed by the health department. Second, they may have gotten sick by "secondary transmission," that is, through close contact with someone else who got sick after eating at a Chipotle Mexican Grill. There is evidence of secondary transmission as the mode of infection for at least two people in this investigation who did not report eating at Chipotle before becoming sick. Third, it could be due to a contaminated ingredient served at Chipotle restaurants having been sent to a limited number of other places, where the person ate the contaminated and then became ill.

Regarding your statement on page 4, "… *Chipotle does not believe the web updates between November 4, 2015, and November 6, 2015 provided the public with information that was clear and useful, as mandated by CDC regulations,*" CDC has the following response:

The web postings on November 4, 2015, November 5, 2015, and November 6, 2015 provided information regarding the ongoing outbreak investigation linked to Chipotle Mexican Grill that, at the time, was limited to illnesses in Washington and Oregon. At that point in the investigation, the content of the web updates summarized information that had already been released publicly by health officials in Washington and Oregon. As stated previously, each of these web postings followed and complied with all applicable agency guidelines and policy which included a formal review and clearance process prior to release as specified in "Guidelines for Ensuring the Quality of Information Disseminated to the Public" (http://aspe.hhs.gov/infoquality/Guidelines/cdcinfo2.shtml). The web postings served to protect and inform the public as well as inform public health and regulatory partners at federal, state, and local agencies about this ongoing outbreak investigation in three ways. First, information provided in these web posting provided people who may have become ill after eating at Chipotle Mexican Grill locations with information they might need to seek diagnosis and treatment for a potentially serious illness (*E. coli* O26 infection); medical attention would also entail provision of information on measures to prevent secondary transmission of STEC infection to other close contacts such as family members. Second, this information also could assist in identifying additional ill people who might provide critical information essential to determine the specific cause of the outbreak. Third, the web postings provided information the public might use to protect themselves by choosing to avoid certain food exposures associated with the outbreak.

Regarding your statement on page 5, "*Similarly, on November 20, 2015, the CDC reported six cases of E. coli O26 throughout four additional States. It does not appear that the information provided in this update was useful to the public.*" CDC has the following response:

The November 20, 2015 CDC web posting provided the public as well as public health and regulatory partners in federal, state, and local agencies information regarding the ongoing investigation. This included information on the eight ill people which had been newly identified since the previous posting on November 17, 2015. CDC believes that the web postings served to protect and inform the public as well as inform public health and regulatory partners at federal, state, and local agencies about this ongoing outbreak investigation in three ways. First, information provided in these web posting provided people who may have become ill after eating at Chipotle Mexican Grill locations with information they might need to seek diagnosis and treatment for a potentially serious illness (*E. coli* O26 infection); medical attention would also entail provision of information on measures to prevent secondary transmission of STEC infection to other close contacts such as family members. Second, this information also could assist in identifying additional ill people who might provide critical information essential to determine the specific cause of the outbreak. Third, the web postings provided information the public might use to protect themselves by choosing to avoid certain food exposures associated with the outbreak.

Regarding your statement on page 6, "*The HHS has adopted various guidelines for the dissemination of adverse information through the media. See 45 C.F.R. 17.1* et seq. *It is the CDC's position that these regulations not apply to CDC.*" CDC has the following response:

CDC adheres to applicable sections *45 C.F.R. 17.1* et seq. However, *45 C.F.R. 17.4* applies only to regulatory investigations and trial-type proceedings. CDC is not a regulatory agency with respect to food and the food supply. As such, this section does not apply to CDC.

Regarding your statement on page 7, "*…CDC officials have made misleading statements and unnecessary comments to the media about matters which relate to an ongoing agency investigation. On November 20, 2015, a CDC representative was quoted by a national new outlet as follows: The cause of the outbreak hasn't been determined, but it 'probably wasn't meat,' Matt Wise, a CDC epidemiologist who is leading the investigation, said in an interview. He noted that a 'couple of vegetarians' are among those sickened. 'The fact that these outbreaks don't seem to be confined to a geographical region is harmful to the brand', he said Chipotle's brand-perception problem has just gone coast to coast.*" CDC has the following response:

The first two statements attributed to Dr. Wise are correctly attributed to Dr. Wise and constitute an accurate characterization of the investigation findings to date ("The cause of the outbreak hasn't been determined, but it 'probably wasn't meat,' Matt Wise, a CDC epidemiologist who is leading the investigation, said in an interview. He noted that a 'couple of vegetarians' are among those sickened."). As shown on page 1 of Exhibit B in the Information Quality Challenge submitted by Messner Reeves, LLC, the third statement ("The fact that these outbreaks don't seem to be confined to a geographical region is harmful to the brand", he said, "Chipotle's brand-perception problem has just gone coast to coast") is clearly attributed to Asit Sharma, "an Analyst at the Motley Fool" who is not an employee of CDC or any Department of Health and Human Services agency.

Regarding your statement on page 7, "*It is our understanding that the CDC is relying upon the holding of* Dimare Fresh Inc. v U.S. *in its justification of the web updates.*" CDC has the following response:

CDC is not relying upon the holding of *Dimare Fresh Inc. v U.S.* with regards to web updates for the multistate outbreaks of Shiga toxin-producing *Escherichia coli* O26 infections linked to Chipotle Mexican Grill Restaurants (http://www.cdc.gov/ecoli/2015/O26-11-15/index.html). While *Dimare* may support CDC's actions in this investigation, the agency's actions are governed by its statutory authority as a federal public health agency.

110. Indeed, news agencies also criticized and questioned Chipotle's response to the Outbreaks and the aftermath. An article published by *Forbes* on December 9, 2015[16] stated the following, in relevant part:

> One observation as to why the company has been hit so hard from an outside observer's perspective is that ***Chipotle were slow to talk about the E. coli outbreak in terms of investigating the problem and making changes.*** The good news is that the Company was very proactive in closing restaurants – which was great. Yet ***very quiet on what they were doing to investigate and solve the problem.*** This gets the media asking the obvious question of "what is going on?" "What is the source of the problem"? "What is Chipotle doing about it?" "Who is in charge and what are they doing?" Without clear answers, the media will speculate – it is all they can do. This then results in Chipotle likely feeling that the media is making it worse and stirring up trouble.

(Emphasis added).

111. An article published by *CNN* on June 14, 2016 entitled "Chipotle stock hits lowest level in three years" stated the following, in relevant part:

> RJ Hottovy, an analyst with Morningstar, said that social media may be one reason why consumers remain skittish. It's kept Chipotle's problems in the spotlight for longer as people tweet, Instagram and post to Facebook and Snapchat about short lines at the stores.
>
> Hottovy added that ***the fact that Chipotle still hasn't identified what ingredient or ingredients actually led to the outbreak is worrisome*** -- even though Chipotle has made numerous changes to its supply chain management process to prevent future problems.
>
> The fact that the Centers for Disease Control and Prevention has officially declared that the outbreak is over doesn't seem to matter either.
>
> "Consumers are skittish since ***Chipotle never discovered the root cause of the problem.*** Customers appear to be less forgiving," Hottovy added.

112. A third article published by *Barrons* on June 18, 2016 entitled "How to Profit as Chipotle Shares Get Grilled" stated the following, in relevant part:

> **ASIDE FROM A SLEW** of Buy One, Get One Free deals aimed at groups that everyone trusts–nurses and teachers–***it's hard to say what Chipotle is doing to***

[16] http://www.forbes.com/sites/davidacheson/2015/12/09/chipotle-in-trouble-again/#1983a1d44d94

> ***address its food-safety woes.*** The promotions focus on the freshness of the food while ignoring what is on everyone's mind: Is it safe to eat? You can ferret about for the information, of course, but having to search reinforces the notion that Chipotle is being defined by the crisis rather than the response to the crisis.
>
> ***Chipotle's management seems intent on trying to promote its way back to profitability instead of addressing the enormously difficult challenge of making sure everyone knows that the food preparation methods are beyond safe.***
>
> This is ironic, and not in an interesting way. The company's founder, chairman, and co-CEO, Steven Ells, built Chipotle under the motto "Food With Integrity," but its postcrisis steps seem more reminiscent of the corporate strategy known as CYA.
>
> (Emphasis added).

113. Additionally, given the magnitude and scope of the Outbreaks that the Company experienced in 2015, the Board should have been especially diligent in monitoring the Company's food safety risks and taking steps to prevent further outbreaks from occurring. Yet, on March 8, 2016, a Chipotle restaurant located in Billerica, Massachusetts, shut down for two days after word emerged that at least one employee had tested positive for the norovirus. According to *USA Today*[17], Chris Arnold, Chipotle's spokesman, stated that "we closed the restaurant on Tuesday after four of our employees – none of whom worked while sick – called to say they were at home and not feeling well . . . we look forward to opening tomorrow." Yet, Richard Berube, director of the Billerica Board of Health, informed *USA Today* that "***the store initially opened its doors on Tuesday and only closed them after [Berube] sent an inspector to the store because his office was alerted to the potential outbreak by Boston's local television news station WHDH.***" The fact that the Company did not immediately voluntarily close down its Billerica store and notify the local health authorities after learning that an employee had tested positive for norovirus demonstrates the Individual Defendants' complete and utter disregard for the safety of its employees and its customers.

114. Throughout the Relevant Period and in blatant disregard of and in breach of their fiduciary duties, the Individual Defendants breached their duties of loyalty, care and good faith

[17] http://www.usatoday.com/story/money/2016/03/09/chipotle-store-closed-norovirus-fears/81521094/

by: (i) failing to implement and enforce a system of effective internal controls and procedures with respect to food safety; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with restaurant procedures and federal, state and local food safety regulations; (iii) permitting the Company to issue materially false and misleading statements concerning the effectiveness of the Company's policies and procedures with respect to food safety resulting in the commencement of the Securities Class Action and the criminal investigation into the history of the Company's food safety practices; (iv) permitting the Company to violate the California Health and Safety Code by failing to timely notify the local health authorities upon learning that two Chipotle employees at the Simi Valley Restaurant were experiencing symptoms associated with an acute gastrointestinal illness; (v) consciously disregarding the results of the Company's own August 2015 Internal Audit, which revealed "multiple instances of non-compliance with restaurant procedures" and failing to timely conduct a follow up audit to ensure that the areas of non-compliance had been remediated; (vi) failing to commit the necessary resources for risk management, as evidenced by the *de minimis* time and expenditures spent by the Company on store audits and risk assessment; (vii) consciously disregarding and failing to ensure that the Company's risk assessment procedures adhered to best practices; (viii) failing to exercise their oversight duties commensurate with the risk, given the recognition by senior management and the Board that Chipotle may be at a higher risk for food-borne illness outbreaks than its competitors due to its use of fresh produce and meats and its reliance on employees cooking with traditional methods by not: (a) periodically monitoring various news outlets, such as *CBS News*, which reported on the Simi Valley Outbreak on August 22, 2015; or (b) periodically visiting certain Chipotle restaurant locations and/or Chipotle's suppliers to ensure that employees and/or suppliers were complying with restaurant procedures, as well as federal, state and local food safety regulations; (ix) causing and/or allowing the Company to shut down the Simi Valley restaurant and sanitize it prior to contacting local health authorities, thus preventing health officials from conducting a proper investigation and identifying the source of the outbreak; (x) failing to maintain accurate books and records with respect to restaurant operations and incidents and/or outbreaks

regarding food-borne illnesses; and (xi) maintaining and implementing the Norwalk Protocol which, among other things, fails to include a requirement that the Company immediately notify local health authorities upon learning that two Chipotle employees at the Simi Valley Restaurant were experiencing symptoms associated with an acute gastrointestinal illness.

## **DAMAGES TO CHIPOTLE CAUSED BY THE INDIVIDUAL DEFENDANTS**

115. As a direct and proximate result of the Individual Defendants' misconduct, Chipotle failed to maintain proper internal controls, consciously disregarded multiple red flags alerting the Individual Defendants to multiple areas of non-compliance with restaurant procedures and federal, state and local food safety regulations, caused the Company to release false and misleading statements and substantially damaged the Company's credibility, corporate image and goodwill.

116. Chipotle has expended and will continue to expend significant sums of money. Additional expenditures and damages that the Company has incurred as a result of the Individual Defendants' breaches of their fiduciary duty include:

a. Costs incurred from investigating, defending and payment of any settlement or judgment in the Securities Class Action for violations of federal securities laws;

b. Costs incurred from implementing enhanced food safety programs;

c. Costs incurred from temporarily closing certain Chipotle restaurants that were involved in the Outbreaks;

d. Costs incurred in connection with the criminal investigation being conducted by the U.S. Attorney's Office for the Central District of California, in conjunction with the U.S. Food and Drug Administration's Office of Criminal Investigations, and possible files and/or penalties based on the U.S. Attorney's Office and FDA's findings; and

e. Costs incurred from the loss of Chipotle's customers' confidence in the Company's services resulting in lost sales.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

117. Plaintiff brings this action derivatively in the right and for the benefit of Chipotle to redress injuries suffered, and to be suffered, by Chipotle as a direct result of breaches of fiduciary duty and unjust enrichment.

118. Plaintiff is a shareholder of Chipotle, was a shareholder of Chipotle at the time of the wrongdoing alleged herein, and has been a shareholder of Chipotle continuously since that time.

119. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

120. Chipotle is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

121. The wrongful acts complained of herein subject, and will continue to subject, Chipotle to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

122. The wrongful acts complained of herein were unlawfully concealed from Chipotle shareholders.

123. Throughout the Relevant Period, the Individual Defendants made false and misleading statements about the effectiveness of Chipotle's internal controls and violated multiple corporate governance principles, thus representing evidence of the Individual Defendants' breaches of fiduciary duties.

124. As a result of the facts set forth herein, Plaintiff has not made any demand on the Current Director Defendants to institute this action since demand would be a futile and useless act because the Current Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. The wrongful acts complained of herein show multiple breaches by the Individual Defendants, including the Current Director Defendants, of their fiduciary duties of loyalty, due care and oversight.

125. A majority of the Board is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action for the reasons set forth above and below.

126. As of the date of this Complaint, the Current Board consists of the following nine individuals: defendants Charlesworth, Musk, Moran, Flynn, Gillett, Ells, Baldocchi, Friedman and Flanzraich.

127. Demand upon the Current Director Defendants is futile because a majority of the Current Director Defendants are neither independent nor disinterested, thus rendering demand upon them as futile.

128. With respect to Defendant Ells, Ells is the founder of Chipotle and is Co-CEO and has served as Chairman of the Board since 2005. He has also served as a director of the Company since 1996. As conceded by the Company in the 2016 Proxy, Defendant Ells is not an independent director due to his insider status. Additionally, as demonstrated above, Ells has repeatedly made and/or caused the Company to issue false and misleading statements to the public regarding the Company's commitment to food safety and the adequacy of Chipotle's quality controls related to food safety. Further, Ells is a named defendant in the Securities Class Action and therefore faces a substantial likelihood of liability, rendering him incapable of independently exercising his business judgment and demand futile.

129. With respect to Defendant Moran, Moran is Co-CEO of the Company and has served in this position since January 1, 2009, after serving as the Company's President and COO since March 2005. He has also served as a Director of the Company since 2006. Moran previously served as CEO of Messner Reeves, where he was employed since 1996, and as general counsel of Chipotle. As conceded by the Company in the 2016 Proxy, Defendant Moran is not an independent director due to his insider status. Also in the 2016 Proxy, the Company states that Moran "has an ***outstanding skill set in such areas as risk management and crisis handling***, and is also thoroughly familiar with management personnel throughout [the Company]." (Emphasis added). Additionally, Moran is a named defendant in the Securities Class Action and therefore faces a

substantial likelihood of liability, rendering him incapable of independently exercising his business judgment and demand futile.

130. With respect to Charlesworth, Charlesworth has served as a director since 1999. He previously worked for McDonald's for 26 years, most recently as President of the Midwest Division of McDonald's USA from July 1997 to December 2000. Charlesworth is a member of the Audit Committee. According to the 2016 Proxy, the Company stated that Charlesworth's "experience with McDonald's included responsibility for managing a large and diverse employee workforce similar in many ways to Chipotle's, and also gave him a ***detailed knowledge of restaurant operations and food safety***, site selection and related matters." (Emphasis added).

131. With respect to defendant Musk, Musk has served as a director of the Company since 2013. According to the 2016 Proxy, the Company stated that Musk's "***extensive experience with*** fast-growing and innovative companies as well as ***restaurants and other retail operations***, and his experience on numerous boards of directors, are an asset to [Chipotle's] board." (Emphasis added).

132. With respect to defendant Flynn, Flynn has served as a director of the Company since 1998 and is a member of the Audit Committee. Prior to retiring in 2001, Flynn spent 39 years at McDonald's where he held a variety of executive and management positions, most recently as Executive Vice President responsible for strategic planning and acquisitions. According to the 2016 Proxy, the Company stated "from his background as a senior-level restaurant industry executive, Mr. Flynn developed strong capabilities in guiding corporate strategy, and ***tremendous knowledge of the operational aspects of the restaurant business as well***" (emphasis added).

133. With respect to defendant Baldocchi, Baldocchi has served as a director of the Company since 1997. Baldocchi is also the Chairperson of the Audit Committee. According to the 2016 Proxy, the Company stated Baldocchi's "extensive involvement with restaurant companies over a period of 17 years has given Mr. Baldocchi an ***in-depth knowledge of restaurant company finance, operations and strategy.***" (Emphasis added).

134. With respect to defendant Flanzraich, Flanzraich has served as a director of the Company since 2007 and is a member of the Audit Committee. According to the 2016 Proxy, the Company stated "Mr. Flanzraich's executive experience has helped him develop outstanding skills in leading and managing strong teams of employees, and in oversight of the growth and financing of businesses in a rapidly-evolving market. His legal background is also ***valuable to us in the risk management area.***" (Emphasis added).

135. As set forth above, the majority of the Current Director Defendants have substantial experience in the restaurant industry. As such, the Current Director Defendants had a duty to implement and oversee effective internal controls over food safety and restaurant operations. This is especially true given the Company's recognition that Chipotle may be at a higher risk for foodborne illnesses than its competitors and the risk that foodborne illnesses could pose to the Company and its operations.

136. Specifically, the Company included the following risk factors in its 2014 and 2015 10-Ks, respectively:

> ***Instances of food-borne or localized illnesses could cause the temporary closure of some restaurants or result in negative publicity, thereby resulting in a decline in our sales, and could adversely affect the price and availability of the meat, produce or dairy we use to prepare our food.***
>
> Instances of food-borne illnesses, real or perceived, whether at our restaurants or those of our competitors, may subject us to liability to affected customers, and could result in negative publicity about us or the restaurant industry that adversely affects our sales. ***We may be at a higher risk for food-borne illness outbreaks than some competitors due to our use of fresh produce and meats rather than frozen, and our reliance on employees cooking with traditional methods rather than automation.*** The risk of illnesses associated with our food might also increase in connection with an expansion of our catering business or other situations in which our food is served in conditions we cannot control.
>
> On a small number of occasions one or more Chipotle restaurants have been associated with customer illness, and on those occasions our sales have sometimes been adversely impacted, at times even in markets beyond those impacted by the illness. ***If our customers become ill from food-borne or localized illnesses or if an illness is attributed to our food, even incorrectly, we could also be forced to temporarily close some restaurants,*** further impacting sales. In addition, reports

linking nationwide or regional outbreaks of food-borne illnesses have caused us to temporarily suspend serving some produce items in our foods or to otherwise alter our menu. Similarly, past outbreaks of E. coli relating to certain food items caused consumers to avoid certain products and restaurant chains, Asian and European countries have experienced outbreaks of avian flu, and incidents of "mad cow" disease have occurred in Canadian and U.S. cattle herds. These problems, other food-borne illnesses (such as hepatitis A or norovirus) and injuries caused by food tampering have had in the past, and could have in the future, an adverse effect on the price and availability of affected ingredients. A decrease in customer traffic as a result of these health concerns or negative publicity, or as a result of a change in our menu or dining experience or a temporary closure of any of our restaurants, would adversely impact our restaurant sales and profitability. Furthermore, if we react to these problems by changing our menu or other key aspects of the Chipotle experience, we may lose customers who do not accept those changes, and may not be able to attract enough new customers to generate sufficient revenue to make our restaurants profitable. Customers may also shift away from us if we choose to pass along to consumers any higher ingredient costs resulting from supply problems associated with outbreaks of food-borne illnesses, which would also have a negative impact on our sales and profitability.

(Emphasis added).

*******

***Instances of food-borne illnesses could adversely affect customer perceptions of, or the price or availability of, ingredients we use to prepare our food, which may adversely impact our sales.***

***Past reports linking nationwide or regional incidents of food-borne illnesses such as salmonella, E. coli, hepatitis A, lysteria or norovirus to certain produce items have caused us to temporarily suspend serving some ingredients in our foods or to otherwise alter our menu, and have resulted in consumers avoiding certain products for a period of time.*** Similarly, outbreaks of avian flu, incidents of "mad cow" disease, or similar concerns have also caused consumers to avoid any products that are, or are suspected of being, affected. These problems, and injuries caused by food tampering have had in the past, and could have in the future, an adverse effect on the price and availability of affected ingredients. A decrease in customer traffic as a result of these health concerns or negative publicity, or as a result of a change in our menu or dining experience or a temporary closure of any of our restaurants, would further adversely impact our restaurant sales and profitability. In addition, if we react to these problems by changing our menu or other key aspects of the Chipotle experience, we may lose customers who do not accept those changes, and may not be able to attract enough new customers to generate sufficient revenue to make our restaurants profitable. Customers may also shift away from us if we choose to pass along to consumers any higher ingredient or operating costs resulting from supply problems or operational changes associated with incidents of food-borne illnesses, which would also have a negative impact on our sales and profitability.

(Emphasis added).

137. Thus, given the foregoing, the Current Director Defendants had a duty to keep abreast of all material food safety events in the Company's restaurants and should have been diligent in implementing an effective food safety program and monitoring employees' compliance with the foregoing, as well as applicable federal, state and local food safety regulations. This is especially true for: (i) defendant Charlesworth, whom the Company touted in the 2016 Proxy as having "Detailed knowledge of restaurant operations and food safety;" (ii) defendant Moran, whom the Company touted in the 2016 Proxy as having "an outstanding skill set in such areas as risk management and crisis handling;" (iii) defendant Flynn, whom the Company touted as having "tremendous knowledge of the operational aspects of the restaurant business;" and (iv) defendant Baldocchi, whom the Company touted in the 2016 Proxy as having "considerable experience with high-growth companies in the restaurant industry. Because of their failure to implement an effective food safety program and monitor the Company's compliance with the foregoing, as well as federal, state and local food safety regulations, Defendants Charlesworth, Moran, Flynn and Baldocchi face a substantial likelihood of liability rendering them incapable of exercising their business judgment and demand futile.

138. Additionally, the Board should have been diligent in monitoring significant events involving food safety issues and/or foodborne illness outbreaks at Chipotle's restaurants. As set forth above, on August 22, 2015, *CBS News* published an article reporting that "[a] Chipotle Restaurant in the Simi Valley Town Center is under fire Saturday after multiple reports of customers falling ill after eating at the restaurant have surfaced." The article further stated that "Chipotle issued an official statement on Saturday [August 22, 2015], claiming that, 'The safety and well being of our customers is always our highest priority. When we were contacted by customers who reported feeling poorly after visiting our restaurant in Simi Valley, we immediately began a review of the incident, and have taken all of the necessary steps to ensure that it is safe to eat there.'"

139. Yet, despite the *CBS News* report on the Simi Valley Outbreak, there was no mention of the incident in the Board Pre-Read Executive Summary from Chipotle's Safety, Security and Risk Department provided to the Board on August 24, 2015 in advance of the Board meeting that took place on September 1, 2015. CMG/7045-000596. The fact that the *CBS News* report went unnoticed by the Board is evidenced by the complete absence of information and/or discussion pertaining to the Simi Valley Outbreak in the meeting minutes from the September 1, 2015 Board meeting and the materials provided to the Board in advance of the September 1, 2015 meeting[18]. Indeed, the first time that the Board even acknowledged the Simi Valley Outbreak was during the December 16, 2015 Board meeting, thus demonstrating the Board's utter and complete conscious disregard of its fiduciary duty.

140. Additionally, given the magnitude and scope of the Outbreaks that the Company experienced in 2015, the Board should have been especially diligent in monitoring the Company's food safety risks. Yet, on March 8, 2016, a Chipotle restaurant located in Billerica, Massachusetts, shut down for two days after word emerged that at least one employee had tested positive for the norovirus. According to *USA Today*[19], Chris Arnold, Chipotle's spokesman, stated that "we closed the restaurant on Tuesday after four of our employees – none of whom worked while sick – called to say they were at home and not feeling well . . . we look forward to opening tomorrow." Yet, Richard Berube, director of the Billerica Board of Health, informed USA Today that "the store initially opened its doors on Tuesday and only closed them after [Berube] sent an inspector to the store because his office was alerted to the potential outbreak by Boston's local television news station WHDH." The fact that the Company did not immediately voluntarily close down its Billerica store and notify the local health authorities after learning that an employee had tested positive for norovirus demonstrates the Company's complete and utter disregard for the safety of its employees and its customers.

[18] Defendants Ells, Moran, Charlesworth, Flynn, Baldocchi, Flanzraich, Friedman, Musk and Gillett attended the September 1, 2015 Board meeting. CMG/7045-001640.

[19] http://www.usatoday.com/story/money/2016/03/09/chipotle-store-closed-norovirus-fears/81521094/

141. Demand upon the Audit Committee Defendants (Baldocchi, Charlesworth, Flanzraich and Gillett), as well as Ells and Moran, would be futile because they were aware of the minimal effort made by the Company to audit its stores as well as the results of the August 2015 Internal Restaurant Audit which found "multiple instances of non-compliance with restaurant procedures, including improper cooking procedures [and] inaccurately marked food items" and yet, they failed to conduct additional and more thorough store audits or follow up to ensure that the areas of non-compliance were rectified. According to the minutes from an Audit Committee meeting that took place on August 31, 2015, Matt Bush, the Company's Internal Audit Manager, "ran through the report on IA's audit of restaurant operations, leading off with a description of how the audit was constructed and then running through the findings, which the Committee discussed in detail. There was also discussion among the meeting and management regarding mitigation plans for the audit findings and potential impacts of the audit findings on the Company's business and financial results." CMG/7045-001346-47. Additionally, defendants Baldocchi, Charlesworth, Flanzraich, Gillett, Ells and Moran were in attendance at this meeting. CMG/7045-001346.

142. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

143. Additionally, [redacted]

[redacted]

[redacted]

144. After learning that the internal store audit revealed multiple instances of non-compliance with restaurant procedures, Defendants Baldocchi, Charlesworth, Flanzraich, Gillett, Ells and Moran failed to take action to immediately follow up to ensure that these areas of non-compliance were corrected. Indeed, this is confirmed by the 2016 Risk Assessment & Internal Audit Plan, dated December 2015 and presented during the December 15, 2015 Audit Committee meeting[21], which stated the following, in relevant part:

> **2016 PLANNED INTERNAL AUDIT ACTIVITIES**
>
> Restaurant Audit – Scoping TBD. There have been, and will continue to be, significant changes to restaurant operations to enhance procedures around food safety. Potential topics include evaluating execution on new procedures, ***follow up on observations from the 2015 restaurant audit***, and perform daily analytics over turnover. CMG/7045-001551.
>
> (Emphasis added).

145. Thus, by December 2015, after the Company had already experienced multiple outbreaks of foodborne illnesses across the country, the Board still had not followed up on the observations from the August 2015 restaurant audit to ensure that the areas of noncompliance had been corrected and did not plan to do so until 2016. This constitutes bad faith and is particularly

[21] Defendants Charlesworth, Flanzraich, Gillett, Flynn and Friedman were all in attendance during this meeting. CMG/7045-002552.

egregious given that as of August 2015, the Company was well under budget with respect to store audits. Accordingly, defendants Baldocchi, Charlesworth, Flanzraich, Gillett, Ells and Moran face a substantial likelihood of liability rendering them incapable of independently exercising their business judgment and demand futile.

146. Defendants Flynn, Friedman and Charlesworth are long-term incumbent directors. Additionally, defendants Flynn and Charlesworth are holdover directors and prior executives of McDonald's, Chipotle's former parent company and thus, have a long standing association with one another which prevents them from independently considering a demand against one another. That Flynn, Friedman and Charlesworth lack independence is evidenced by a letter from CtW Investment Group to Chipotle shareholders, dated April 13, 2016, requesting that Company shareholders withhold support for the reelection of Flynn and Friedman at the annual meeting on May 11, 2016 (the "CtW Letter"). The CtW Letter states the following, in relevant part:

> Dear Chipotle Shareholders:
>
> Chipotle Mexican Grill, Inc. (NYSE: CMG) stands at a critical juncture. The last three quarters' onslaught of negative headlines, a federal criminal investigation and a nearly 40% share price collapse since October has reminded us that balanced leadership and independent board oversight are critical to sustainable, long-term value creation. In light of the board's failure to effectively address governance shortcomings – most critically the flaws recruitment processes which have resulted in an entrenched and insular board with a startling lack of racial and gender diversity – ***we urge you to withhold support for the reelection of Nominating and Corporate Governance Committee long-term incumbents Patrick Flynn and Darlene Friedman*** at Chipotle's annual meeting of shareholders on May 11, 2016.
>
> For investors, the following are of immediate concern:
>
> - With the company facing slowing momentum and potential growth challenges going forward, Chipotle is in need of genuinely independent oversight now more than ever. However much Chipotle may owe its conception to co-CEOs Monty Moran and Steve Ells, Chipotle's growth has long since outsized its corporate governance arrangements.
>
> - Persistent governance problems including excessively long director tenures (a median tenure of 17 years) and low demographic diversity (an all-white and overwhelmingly male) are symptoms of enduring

board insularity and a lack of recognition that governance needs to evolve alongside a rapidly growing corporation.

- Following multiple calls from shareholders for reform, the board is refusing to adopt a meaningful form of proxy access despite 49.9% shareholder support at last year's annual meeting.

For these reasons, we believe shareholders must intervene now: the Chairperson of the Nominating and Governance Committee, Mr. Flynn (18 years on the board), and long-time incumbent member, Ms. Friedman (21 years on the board), must be held accountable for failing to sufficiently refresh the board and failing to bring about the attentive, independent and diverse oversight of management that shareholders deserve.

***

**The recent food safety crisis shows that more independent and diverse Board oversight is overdue.**

As shareholders, ***we understand the gravity of the current situation resulting from the national string of six food safety failures since July.*** As demonstrated by well-known instances of food safety failure involving competitors, it is clear that Chipotle has a long road ahead in rebuilding its value proposition with shareholders and customers alike. ***The last three quarters were a crucial time for Chipotle to demonstrate competent leadership in crisis. In contrast, the response has been publicly labelled as a mere PR blitz – one that was slow, superficial and unconvincing.***

***While Chipotle has made efforts to more clearly communicate the company's latest food safety practices, the question remains as to the effectiveness of Chipotle's systems of oversight. We are particularly worried about the board's decision to install only a single member of the Audit Committee as a food safety liaison. This central function should not be left to one person. Even more concerning is the designee picked by the board, John Charlesworth. He should not be considered independent given his excessively long, 17-year director tenure.*** A more comprehensive approach that would go further in reassuring shareholders and customers would be to establish a standalone food safety and sustainability committee and to recruit several new directors that could bring fresh, objective expertise to the human capital and supply chain challenges likely at issue.

**Lengthy director tenures and lack of Board diversity are symptomatic of entrenchment and insularity.**

Chipotle's corporate governance shortfalls are a manifestation of the board's insular composition. In addition to having one of the least diverse, least independent boards among the S&P 500, ***Chipotle's average director tenure is***

***among the very highest at a median of 17 years, with 6 directors having served for over a decade. Moreover, 4 of 7 outside directors were first appointed to the board while the company was privately held, meaning Patrick Flynn, Darlene Friedman, Albert Baldocchi and John Charlesworth were all recruited under a management-dominated process. Indeed, two of these four – Mr. Flynn and Mr. Charlesworth – are holdovers and prior executives of former Chipotle parent, McDonald's.*** With the exception of the appointment of Neil Flanzraich to replace Ms. Friedman as Chairperson of the Compensation Committee in September 2015, ***Mr. Baldocchi, Mr. Flynn and Ms. Friedman have collectively chaired the board's three committees for the entire time the company has been public.***

For a company of Chipotle's national footprint it is also striking that ***3 of 7 outside directors, including recent appointee Kimbal Musk, have strong ties to the Denver and Boulder, Colorado metropolitan areas where Chipotle is headquartered and where co-CEOs Ells and Moran attended college, respectively.***

In addition to geographic homogeneity, Chipotle exhibits a shocking dearth of racial and gender diversity. Incredibly, despite amending the Corporate Governance Guidelines and Nominating & Corporate Governance Charter to broaden diversity language in March 2015, the board concurrently installed an eighth white, male director on a board that is now 100% white and 89% male.
We strongly believe that demographic diversity in the boardroom leads to healthier debates, better decisions and greater adaptability to change. Empirical studies have also found a positive relationship between company performance and greater board diversity. For instance, research conducted jointly by researchers at Rutgers and Iowa State University found that the percentage of women and minorities on boards of directors is positively correlated with financial indicators of firm performance.

In our view, a board exhibiting low diversity, questionable independence and high tenure is most liable to function as an echo chamber and not as an effective means of differentiated thought leadership or oversight. ***This potential risk is heightened by the collective lack of outside board experience, specifically independent director experience at other companies.*** Only one director has any significant prior service as an outside, independent director, spotlighting a worrying lack of governance experience on this board. Alongside greater board diversity, having multiple directors with established track records of successful shareholder representation would better equip the board to execute its core oversight function.

***

With a refreshed composition and new voices, we are confident Chipotle's board can overcome these impediments to effective leadership and growth; however, these changes cannot afford any further delay. As longstanding incumbents of the Nominating and Corporate Governance Committee, directors Flynn and Friedman bear responsibility for this board's stagnation. While Ms. Friedman herself brings

> a modicum of gender diversity to the board, her failure to address the board's broader composition over her 21 year tenure suggests that the board will be better served by replacing her with a fresh and diverse nominee.
>
> Chipotle's long-term outlook depends on a strong, independent and diverse board equipped to provide rigorous and forward-thinking oversight. Refreshment is the first step. To reverse the course of stagnation and implement serious refreshment, I urge you to join us in opposing the reelection of directors Flynn and Friedman on May 11, 2016.

(Emphasis added).

147. Based on the foregoing, given that Flynn, Friedman, Charlesworth, Ells, Moran and Baldocchi have longstanding ties to one another given that they have served as directors and/or officers of Chipotle for many years, they are incapable of independently considering a demand to commence litigation against themselves and the other Individual Defendants.

148. The Individual Defendants' conduct described herein and summarized above demonstrates a pattern of misconduct that could not have been the product of legitimate business judgment as it was based on intentional, reckless, and disloyal misconduct. Thus, none of the Individual Defendants, who constitute a majority of the current Board of the Company, can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Individual Defendants faces a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.

149. Based on the foregoing, the Current Director Defendants face a sufficiently substantial likelihood of liability and accordingly, there is a reasonable doubt as to each Defendant's disinterestedness in deciding whether pursuing legal action would be in the Company's best interest. Accordingly, demand upon the Current Director Defendants is excused as being futile.

## **CAUSES OF ACTION**

## **COUNT I**

**(Against the Individual Defendants for Breach of Fiduciary Duty)**

150. Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

151. The Individual Defendants owed and owe Chipotle fiduciary obligations, including the obligations of good faith, fair dealing, loyalty and care. Among other things, the Individual Defendants owed a fiduciary duty to Chipotle to supervise the issuance of its press releases and public filings and ensure that they were truthful, accurate and conformed to federal and state securities law. The Individual Defendants breached their duties of loyalty, care and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures with respect to food safety; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with restaurant procedures and federal, state and local food safety regulations; (iii) permitting the Company to issue materially false and misleading statements concerning the effectiveness of the Company's policies and procedures with respect to food safety resulting in the commencement of the Securities Class Action and the criminal investigation into the history of the Company's food safety practices; (iv) permitting the Company to violate the California Health and Safety Code by failing to timely notify the local health authorities upon learning that two Chipotle employees at the Simi Valley Restaurant were experiencing symptoms associated with an acute gastrointestinal illness; (v) consciously disregarding the results of the Company's own August 2015 Internal Audit, which revealed "multiple instances of non-compliance with restaurant procedures" and failing to timely conduct a follow up audit to ensure that the areas of non-compliance had been remediated; (vi) failing to commit the necessary resources for risk management, as evidenced by the *de minimis* time and expenditures spent by the Company on store audits and risk assessment; (vii) consciously disregarding and failing to ensure that the Company's risk assessment procedures adhered to best practices; (viii) failing to exercise their oversight duties commensurate with the risk, given the recognition by senior management and the Board that Chipotle may be at a higher risk for food-borne illness outbreaks than its competitors due to its use of fresh produce and meats and its reliance on employees cooking with

traditional methods by not: (a) periodically monitoring various news outlets, such as *CBS News*, which reported on the Simi Valley Outbreak on August 22, 2015; or (b) periodically visiting certain Chipotle restaurant locations and/or Chipotle's suppliers to ensure that employees and/or suppliers were complying with restaurant procedures, as well as federal, state and local food safety regulations; (ix) causing and/or allowing the Company to shut down the Simi Valley restaurant and sanitize it prior to contacting local health authorities, thus preventing health officials from conducting a proper investigation and identifying the source of the outbreak; (x) failing to maintain accurate books and records with respect to restaurant operations and incidents and/or outbreaks regarding food-borne illnesses; and (xi) maintaining and implementing the Norwalk Protocol which, among other things, fails to include a requirement that the Company immediately notify local health authorities upon learning that two Chipotle employees at the Simi Valley Restaurant were experiencing symptoms associated with an acute gastrointestinal illness.

152. By reason of the foregoing, Chipotle was damaged.

**COUNT II**

**(Against the Individual Defendants for Waste of Corporate Assets)**

153. Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

154. Defendants breached their fiduciary duties by failing to properly supervise and monitor Chipotle by allowing the Company to engage in an illegal, unethical and improper course of conduct.

155. As a result of the Individual Defendants' illicit course of conduct and breaches of fiduciary duty, Chipotle has wasted valuable corporate assets through payments of compensation to the Individual Defendants because the Company has incurred significant potential liability for legal costs, penalties, fines, and/or legal fees in connection with the defense of the Individual Defendants' unlawful course of conduct complained of herein.

156. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

157. By reason of the foregoing, Chipotle was damaged.

**<u>COUNT III</u>**

**(Against the Individual Defendants for Unjust Enrichment)**

158. Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

159. Through the wrongful course of conduct and actions complained of herein, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Lihua. The wrongful conduct was continuous and resulted in ongoing harm to the Company. The Individual Defendants were unjustly enriched pursuant to receiving compensation and/or director remuneration while breaching their fiduciary duties to the Company, as alleged herein. That compensation included: (i) Defendant Baldocchi received $235,825 in total compensation for 2015; (ii) Defendant Charlesworth received $215,075 in total compensation for 2015; (iii) Defendant Flanzraich received $243,325 in total compensation for 2015; (iv) Defendant Flynn received $237,825 in total compensation for 2015; (v) Defendant Friedman received $237,825 in total compensation for 2015; (vi) defendant Gillett received $174,816 in total compensation for 2015; (vii) defendant Musk received $203,825 in total compensation for 2015; (viii) defendant Ells received $13,837,894 in total compensation for 2015; (ix) defendant Moran received

$13,561,077 in total compensation for 2015; and (x) defendant Crumpacker received $4,282,588 in total compensation for 2015.

160. Plaintiff, as a shareholder of Chipotle, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, from their wrongful course of conduct and fiduciary breaches.

161. By reason of the foregoing, Chipotle was damaged.

## **COUNT IV**

**(Derivatively Against the Individual Defendants for Gross Mismanagement)**

162. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

163. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Chipotle in a manner consistent with the operations of a publicly held corporation.

164. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Chipotle has sustained significant damages.

165. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Directing Defendants to account to Chipotle for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B. Directing Chipotle to take all necessary actions to reform its corporate governance and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein, including, but not limited to, a shareholder vote resolution for amendments to Chipotle's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote on corporate governance policies;

C. Awarding to Chipotle restitution from the Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants.

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E. Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: April 2, 2018

*/s/ Jeffrey A. Berens*
Jeffrey A. Berens
BERENS LAW LLC
2373 Central Park Boulevard, Suite 100
Denver, CO 80238
Tel: (303) 861-1764
Fax: (303) 395-0393
jeff@jberenslaw.com

FARUQI & FARUQI, LLP
Stuart J. Guber
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Tel: (215) 277-5770
Fax: (215) 277-5771
sguber@faruqilaw.com

FARUQI & FARUQI, LLP
Nadeem Faruqi
Nina M. Varindani
369 Lexington Avenue, 10th Floor
New York, New York 10017
Tel: (212) 983-9330
Fax: (212) 983-9331
nfaruqi@faruqilaw.com
nvarindani@faruqilaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Court's Electronic Mail Notice List.

*/s/ Jeffrey A. Berens*
Jeffrey A. Berens
BERENS LAW LLC