**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-2011-WJM-KLM
Consolidated with Civil Action No. 16-cv-3180-WJM-KLM

SEAN GUBRICKY, derivatively on behalf of nominal Defendant, Chipotle Mexican Grill, Inc.,

    Plaintiff,

v.

STEVE ELLS,
MONTGOMERY F. (MONTY) MORAN,
MARK CRUMPACKER,
JOHN S. CHARLESWORTH,
KIMBAL MUSK,
PATRICK J. FLYNN,
STEPHEN GILLETT,
ALBERT S. BALDOCCHI,
DARLENE J. FRIEDMAN, and
NEIL W. FLANZRAICH,

    Defendants,

and

CHIPOTLE MEXICAN GRILL, INC.,

    Nominal Defendant.

ROBBINS GELLER RUDMAN & DOWD LLP, and
MOTLEY RICE LLC,

    Intervenors.

---

**ORDER APPROVING DERIVATIVE ACTION SETTLEMENT**

---

    Before the Court is Plaintiff Sean Gubricky's Unopposed Motion for Final

Approval of Derivative Action Settlement (ECF No. 115) and Gubricky's Unopposed

Motion for Award of Attorneys' Fees and Reimbursement of Expenses (ECF No. 116). The Court held a settlement fairness hearing ("Settlement Hearing") on March 15, 2018, and announced at the end of that hearing that it was taking these motions under advisement.

The Court is now prepared to rule. For the reasons explained below, objections to the Proposed Settlement will be overruled and both motions will be granted.

## I. BACKGROUND

### A. Events Leading to the Proposed Settlement

Gubricky filed this Rule 23.1 derivative action on August 8, 2016. (ECF No. 1 (redacted public complaint); *see also* ECF No. 20 (unredacted restricted complaint).) Gubricky alleged that a series of foodborne illness outbreaks at Chipotle restaurants evidenced severe mismanagement in breach of Chipotle's directors' fiduciary duties owed to the corporation and its shareholders.

On June 7, 2017, the Court granted Defendants' motion to dismiss, finding that Gubricky had "failed to plead demand futility under controlling Delaware standards." *Gubricky v. Ells*, 255 F. Supp. 3d 1119, 1122 (D. Colo. 2017) (ECF No. 90). The Court dismissed Gubricky's complaint without prejudice and gave him an opportunity to make a demand on Chipotle's board of directors. *Id.* at 1134.

Rather than make a demand, Gubricky eventually filed his Unopposed Motion for Preliminary Approval of Settlement. (ECF No. 110.) There, Gubricky announced that he had been "engaged in active settlement negotiations for months prior to the Court's decision [on the motion to dismiss]," and that those negotiations had now produced "an agreement in principle to settle the Pending Action (the 'Proposed Settlement')." (*Id.*

at 2.)

**B.     The Proposed Settlement Itself**

The Proposed Settlement does not award any form of monetary compensation to Chipotle or its shareholders. Rather, it focuses on corporate governance reforms.

The first major reform is a requirement that Chipotle establish—and maintain for at least two years after final approval of the Proposed Settlement—a Food Safety Advisory Council ("Council"), which must meet at least quarterly and must comprise a minimum of three independent consulting experts in food safety. The Council will investigate, evaluate, and make recommendations regarding food safety to Chipotle's Executive Director of Food Safety, who will participate in all Council meetings and serve as the liaison between Chipotle and the Council. The Council must continually review Chipotle's food safety procedures and strategies, validate existing initiatives, and advise on opportunities for improvement. The Council's recommendations must be reported to the company at least quarterly and more often as needed. Further, the Executive Director of Food Safety must report the Council's activities to the board of directors on a quarterly basis. (ECF No. 110-2 ¶ 2.)

This Council was, in fact, already in place and operating as of November 2016. (*Id.*)

The second major reform is a requirement that Chipotle amend its whistleblower program to ensure that: (a) Chipotle's general counsel must report to the Audit Committee details of any significant foodborne illness complaints and must provide a detailed report concerning his or her investigation of such complaints no later than the next Audit Committee meeting; (b) a log of such significant foodborne illness

complaints, as well as the results of all investigations of such complaints, must be made in writing and maintained by the CFO and general counsel for a period approved by the Audit Committee; and (c) Chipotle will continue to allow its independent auditor access to the log and investigation results upon request. (*Id.* ¶ 9.)

The third major reform is a "commit[ment]" that, by May 2018, at least three of Chipotle's current board members will no longer hold that office and at least three new board members will have been appointed. Similar to the first reform, however, this was already mostly accomplished: "For avoidance of doubt, Montgomery Moran's departure from the Board, Chipotle's four new Board appointees as of December 2016, and the four Board members who will not be running for reelection to the Board in 2017 shall be credited towards Chipotle's compliance with this provision." (*Id.* ¶ 1.)

The Proposed Settlement also included Defendants' stipulation not to oppose an award of attorneys' fees and expenses up to $375,000. (ECF No. 110-1 § 10.1.) This amount would include, if approved by the Court, a $1,000 service fee to each Named Plaintiff. (*Id.*)

C. **Preliminary Approval & Related Filings**

The Court granted preliminary approval to the Proposed Settlement. (ECF No. 111 ¶ 1.) The Court set an approval hearing for March 15, 2018, and required Chipotle to distribute notice (by U.S. mail to all shareholders of record, by posting on its website, and by press release) at least 45 business days before the settlement hearing. (*Id.* ¶¶ 2–6.)

On February 23, 2018, Gubricky filed a motion for final approval of the Proposed Settlement (ECF No. 115), and a motion for attorneys' fees and expenses in the amount

of $375,000 (ECF No. 116).

On March 1, 2018, Chipotle filed its "Proof of Mailing and Posting." (ECF No. 127.) It contains a declaration from an in-house Chipotle lawyer who attests that notice of the settlement was placed on the company's website on December 22, 2017, and that the required press release went out the same day. (ECF No. 127-1 at 2.) The in-house lawyer also attaches to his declaration an affidavit of Alexander Villanova, a project manager at Epiq Class Action & Claim Solutions ("Epiq"), which Chipotle hired to act as "notice administrator." Villanova says that Epiq received shareholder data from Chipotle and used it to print notices, which were mailed on January 8, 2018. (ECF No. 127-1 at 8.) Villanova does not say in his declaration how many notices went out (he does in a later declaration, *see* Part II, below), but he says that thirty-one notices came back as undeliverable and that Epiq re-mailed notices to updated addresses if the Postal Service provided an updated address. (*Id.*) Also, Epiq received three requests "for additional copies of the Notice to send to beneficial holder positions," and Epiq fulfilled those requests. (*Id.* at 9.)

**D.  Objections**

The Court received four objections, or apparent objections, to the Proposed Settlement: (1) a 9-page objection from Mark D. Blau ("Blau Objection") (ECF No. 123); (2) a 2-page objection from Kaleb E. Keller ("Keller Objection") (ECF No. 129); (3) a 1-page letter from Olof Hellen which expresses skepticism regarding, but no clear objection to, the Proposed Settlement ("Hellen Letter") (ECF No. 131); and (4) a 6-page objection from David Rubenstein ("Rubenstein Objection") (ECF No. 138).

Regarding the Blau Objection, the Court ordered the parties to file responses

(ECF No. 128), which they did (ECF Nos. 133, 135)—the substance of the matters raised is addressed below.

Regarding the Keller Objection, the Court stated that it needed no response to the substance of his objections, but the Court ordered Chipotle to respond to Keller's claim that he had not received notice of the Proposed Settlement until shortly before the objection deadline. (ECF No. 130.) Chipotle filed its response. (ECF No. 134.) Again, the substance of the matter is addressed below.

Regarding the Hellen Letter, the Court declared it inexcusably untimely and, in any event, not sufficiently specific to qualify as a proper objection. (ECF No. 132.) The Court therefore struck it. (*Id.*)

Regarding the Rubenstein Objection, it was received by the Clerk's office in the mail shortly before the Settlement Hearing, but the Clerk's office did not make the undersigned aware of the objection until a few hours after the Settlement Hearing. Nonetheless, assuming the Rubenstein Objection's untimeliness could be excused, Rubenstein essentially repeats arguments already asserted in by Blau and Keller. Thus, the Court ordered that it needed no responses to the Rubenstein Objection. (ECF No. 139.)

## II. TIMELINESS OF NOTICE

As described below, whether to approve a derivative settlement turns on a number of substantive factors. Before the Court can reach those factors, however, it must resolve whether the parties complied with the required notice procedures. The Keller Objection states that Keller received notice for the first time by U.S. mail on February 26, 2018—just a few days shy of the March 1, 2018 deadline to file objections.

(ECF No. 129 at 2.) "[P]resumably," Keller continues, "many other Current Chipotle Shareholders did also [*i.e.*, receive notices very close to the objection deadline]." (*Id.*) Rubenstein goes further, claiming he did not receive notice until March 10, 2018. (ECF No. 138 at 2.)

In response to the Keller Objection (Chipotle did not have a chance to respond to the Rubenstein Objection, due to its late filing), Chipotle submitted a supplemental declaration from Villanova. (ECF No. 134-1.) He there stated that the initial mailing—presumably referring to the January 8, 2018 mailing—went to "each of the 760 record holders identified to [Epiq] by Chipotle." (*Id.* ¶ 4.) Subsequently, Epiq

> received requests from nominees for Notices to be mailed directly to potential class members identified by the nominees. To date, Epiq has received 3 of these requests. These requests were received on February 13, 2018 (requesting 13,762 Notices), February 20, 2018 (requesting 4,196 Notices), and February 28, 2018 (requesting 7,139 Notices). Accordingly, these requests were fulfilled on February 16, 2018, February 23, 2018, and March 2, 2018, respectively.

(*Id.*) Epiq also received requests from nominees for

> additional copies of the Notice for them [*i.e.*, the nominees] to forward on[ ]to potential class members. To date, Epiq has received 3 of these requests. These requests were received on February 15, 2018 (requesting 65,500 Notices), February 23, 2018 (requesting 2,500 Notices), and February 28, 2018 (requesting 2,750 Notices). Accordingly, these requests were fulfilled on February 16, 2018, February 26, 2018, and February 28, 2018, respectively.

(*Id.* ¶ 5.)

Based on this, Chipotle states that Keller "is apparently a beneficial holder of Chipotle's securities who received notice of the settlement after the entity who holds his shares requested that he receive notice." (ECF No. 134 at 4.) This is probably not just

7

"apparent," given that Keller submits his TD Ameritrade statement showing Chipotle stock ownership—effectively admitting that TD Ameritrade is his nominee. (ECF No. 129 at 6.) Similarly, Rubenstein submits his Vanguard statement as proof of stock ownership, effectively admitting that Vanguard is his nominee. (ECF No. 138 at 13.)

Chipotle additionally asserts that this problem of nominee versus beneficial holder comes up frequently (not surprisingly, given that most investors possess their shares through a bank or brokerage) and courts have routinely held that notice was adequate if timely sent to nominees. *See Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008) ("in each case in which a court has confronted this issue, notice provided to the class members' nominees—*i.e.*, the brokerage houses—has been deemed sufficient even if brokerage houses failed to timely forward the notice to the beneficial owners"). Indeed, the Tenth Circuit is among those courts. *See DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935 (10th Cir. 2005). Noting the problem of beneficial ownership in the settlement notice context, *id.* at 939–40, the Tenth Circuit emphasized that

> due process . . . does not require *actual* notice to each party intended to be bound by the adjudication of a representative action.
>
> For due process purposes, rather than looking at actual notice rates, our precedent focuses upon whether the district court gave the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort.

*Id.* at 944 (citations and internal quotation marks omitted; emphasis in original). The Tenth Circuit reasoned that notice procedures are adequate if they are "sufficient to flush out any objections that might arise to the fairness of the settlement." *Id.* at 946.

8

In this case, objections were indeed "flushed out," even if somewhat belatedly. The Court therefore finds that Chipotle properly distributed notice and that Keller's and Rubenstein's objections in this regard are overruled.

## III. LEGAL STANDARD

"The authority to approve a settlement of a class or derivative action is committed to the sound discretion of the trial court." *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984). "In exercising its discretion, the trial court must approve a settlement if it is fair, reasonable and adequate." *Id.*

> In assessing whether the settlement is fair, reasonable and adequate the trial court should consider:
>
> (1) whether the proposed settlement was fairly and honestly negotiated;
>
> (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
>
> (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and
>
> (4) the judgment of the parties that the settlement is fair and reasonable.

*Id.* (internal quotation marks omitted).

## IV. SETTLEMENT ANALYSIS

### A. Whether the Proposed Settlement Was Fairly and Honestly Negotiated

The Blau and Rubenstein Objections attack this element. Rubenstein claims that the Proposed Settlement "gives the impression . . . of the parties putting on a show for the benefit of the Court and inattentive shareholders." (ECF No. 138 at 4.) Blau further argues that Defendants "bargained for [the Proposed Settlement] when they were at the

apex of their negotiating position, from shareholders who did not make the required pre-suit demand under Delaware law. These shareholders were at the nadir of their negotiating position, with no real path by which to proceed in Court and no leverage." (ECF No. 123 at 2.) In contrast, says Blau, he issued a pre-suit demand to the Chipotle board of directors, which they "completely ignored," leading him to file his own lawsuit in this Court, which was drawn to U.S. District Judge Philip A. Brimmer. *See Blau v. Ells et al.*, No. 17-cv-1836-PAB-KLM (filed July 28, 2017).[1] Thus, says Blau, he already did precisely what this Court required of Gubricky—he made a demand on the board—and so Defendants should not be allowed to "prematurely conclude" his admittedly "substantially similar" lawsuit. (ECF No. 123 at 3.) Blau recognizes, in other words, that the Proposed Settlement would obligate him, as a Chipotle shareholder encompassed by Gubricky's derivative action, to end his lawsuit.

Blau's argument has aspects implicating all of the elements the Court must consider. However, specifically regarding this first element (fair and honest, arms-length negotiations), Blau's objection, and Rubenstein's to a lesser degree, rest on the inference that settlement negotiations took place only after the Court issued its order (on June 7, 2017) requiring a demand on the board, thus placing Defendants at the "apex of their negotiating position" and Gubricky at his "nadir."

Gubricky and Defendants dispute this inference. They represent that settlement discussions began in May 2016, including a demand by Gubricky's counsel that

---

[1] Blau's lawsuit remains in its earliest stages. Service of process was completed in September 2017. Soon after the undersigned's preliminary approval of the Proposed Settlement in October 2017, Defendants moved to stay Blau's lawsuit, which motion the Magistrate Judge granted on February 2, 2018.

Chipotle establish a food safety committee substantially in the form that Chipotle later established as the Food Safety Advisory Council; and that most of the reforms set forth in the Proposed Settlement were agreed to in principle through active settlement negotiations before June 7, 2017.  (ECF No. 133 at 7, 9–10; ECF No. 135 at 9–10.)  At the Settlement Hearing, counsel reaffirmed the statements on the record, as officers of the Court.  The Court accordingly finds that the Proposed Settlement was honestly and fairly negotiated.

**B.    Whether Serious Questions of Law and Fact Exist, Placing the Ultimate Outcome of the Litigation in Doubt**

Having made a pre-suit demand, Blau says that he is "uniquely positioned to assert and prosecute Chipotle's derivative claims against the Individual Defendants." (ECF No. 123 at 4.)  Blau seems to be saying that serious questions of law and fact will not exist in his lawsuit, and so the Proposed Settlement should not be approved.  (*See id.* at 6 n.4 ("Blau will . . . easily be able to clear his Fed. R. Civ. P. 23.1 pleading hurdle, move [the lawsuit] into active discovery, and prosecute the Company's claims on the merits against the Individual Defendants . . . .").)

Both Gubricky and Defendants disagree, arguing that one who makes a pre-suit demand is usually in a *worse position* than one who does not.  (ECF No. 133 at 5; ECF No. 135 at 4–6.)  This is so, they say, because "once a demand has been made, absent a wrongful refusal, the stockholders' ability to initiate a derivative suit is terminated." *Stotland v. GAF Corp.*, 469 A.2d 421, 422 (Del. 1983).  Thus, any subsequent derivative claim based on the demand is limited to wrongful refusal *of the demand*.  "[T]he decision to refuse demand is treated as any other disinterested and independent decision of the board—it is subject to the business judgment rule.  Accordingly, for the Court, the only

issues to be examined are the good faith and reasonableness of [the board's] investigation [of the demand]." *Ironworkers Dist. Council of Philadelphia & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *24 (Del. Ch. May 8, 2015) (footnote omitted), *aff'd*, 132 A.3d 748 (Del. 2016). "The pleading burden [on a claim of poor business judgment] is a heavy one . . . ." *Id.*

The parties' point is important, but it does not necessarily demonstrate that Blau is in a *worse* position than Gubricky. This Court has already stated that plaintiffs who do not make a demand and instead rely on the demand-futility doctrine—as Gubricky did—face "impossibly sky-high pleading burdens." *Gubricky*, 255 F. Supp. 3d at 1134. Thus, Gubricky and Blau appear to be on relatively equal footing. This at least establishes that Blau is *not* in the position of strength he claims.

On the other hand, saying that Gubricky and Blau are both in a weak position relative to Defendants folds back into Blau's argument that Gubricky negotiated the Proposed Settlement from a weak position. But if this reality is given too much weight, it could make settlement of derivative actions brought under Delaware law nearly impossible. That is, under Delaware law, plaintiffs who make a demand and plaintiffs who do not both face substantial pleading burdens. The only plaintiff who can negotiate a settlement with some semblance of strength—at least with respect to the threat of a court decision on the merits—is the apparently rare plaintiff who has already made it beyond the pleading stage. However, making approval of derivative settlements as difficult as pleading derivative claims would be detrimental to shareholders, who can obtain benefits through settlements, even if not the sort of benefits they might obtain after surviving a motion to dismiss.

12

In short, realistically speaking, there is probably no "serious" doubt about the outcome of this lawsuit, but how much that should weigh into the approval analysis is another matter, addressed below.[2]

## C.     Whether the Value of an Immediate Recovery Outweighs the Mere Possibility of Future Relief after Protracted and Expensive Litigation

Addressing Blau's objection as it relates to this consideration, Gubricky and Defendants note that the only option open to Gubricky (making a demand) and the option Blau chose (to submit a demand) creates a protracted, expensive process in and of itself. (ECF No. 133 at 9–10; *see also* ECF No. 135 at 7–8.) This is so, as explained by the District of New Jersey, because a demand sets in motion numerous other actions:

> First, the corporation has to hire lawyers to represent the corporation's interests in the litigation. Second, the corporation often has to pay the legal bills of its officers and directors pursuant to indemnification agreements. Third, . . . corporations often form a special litigation committee [ ("SLC") ] to investigate the allegations in the suit. The cost of forming such a committee can dwarf the other expenses in the litigation because SLCs typically hire a law firm with no

---

[2] The Fifth Circuit is often cited for the proposition that "[s]ettlements of shareholder derivative actions are particularly favored because such litigation is notoriously difficult and unpredictable. The courts, therefore, do not lightly reject such settlements." *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983). Indeed, the undersigned has cited this very proposition repeatedly. *See In re Davita Healthcare Partners, Inc.*, 2015 WL 3582265, at *3 (D. Colo. June 5, 2015); *Mohammed v. Ells*, 2014 WL 4212687, at *3 (D. Colo. Aug. 26, 2014); *Make A Difference Found., Inc. v. Hopkins*, 2012 WL 917283, at *2 (D. Colo. Mar. 19, 2012). Perhaps derivative litigation is "notoriously . . . unpredictable" in the situation evident in *Maher*, where the parties proceeded to discovery (it is not clear if the plaintiffs survived a motion to dismiss or if the defendants never brought one) and the defendants' summary judgment motion was denied. *See Maher*, 714 F.2d at 445–46, 448. Perhaps one could say it is also true in the undersigned's previous cases, all of which involved a settlement while a motion to dismiss was pending. *See In re Davita*, 2015 WL 3582265, at *2; *Mohammed*, 2014 WL 4212687, at *2; *Make A Difference*, 2012 WL 917283, at *1. In any event, derivative litigation almost certainly is not "notoriously . . . unpredictable" in the present situation. Indeed, the outcome is nearly a foregone conclusion.

> connection to the case to ensure the firm's independence, and the law firm then commences a full-blown investigation, complete with extensive document review and interviews of dozens of people close to the alleged events. Fourth, the corporation incurs additional indirect costs when its key personnel have to divert attention from other corporate duties to assist with the litigation. These costs can be considerable, . . . on average, more than six law firms [are] involved in [the] lawsuit.

*In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 480 (D.N.J. 2012) (quoting Jessica Erickson, *Corporate Governance in the Courtroom: An Empirical Analysis*, 51 Wm. & Mary L. Rev. 1749, 1805 (2010)) (alterations in original).

In addition, Gubricky's position is that, even if the case proceeded on the merits, "[c]orporate governance reforms are likely the most important relief that can be secured." (ECF No. 115 at 10.) Thus, given that corporate governance reforms are *currently* on the table, Gubricky believes that securing them now rather than later is advantageous.

**D.     The Judgment of the Parties That the Settlement Is Fair and Reasonable**

This is a somewhat unusual factor because it would be a rare case that the parties come to the Court with a proposed settlement that one or both of them considered unfair or unreasonable. Consideration of this factor stems from judicial deference to securities and derivative litigators' experience in the field. *See Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 548 (D. Colo. 1989) ("Courts have consistently refused to substitute their business judgment for that of counsel and the parties."). In any event, Gubricky and Defendants believe the settlement is fair and reasonable.

**E.      Synthesis: Whether the Proposed Settlement is Fair, Reasonable, and Adequate**

This Court has stated that a settlement primarily comprising corporate governance reforms can be deemed fair and reasonable when those reforms "are specifically and appropriately designed to prevent the alleged director misconduct that formed the basis for this action." *Make A Difference*, 2012 WL 917283, at *2; *see also Maher*, 714 F.2d at 466 ("[A] settlement may fairly, reasonably, and adequately serve the best interest of a corporation, on whose behalf the derivative action is brought, even though no direct monetary benefits are paid by the defendants to the corporation."); *Zimmerman v. Bell*, 800 F.2d 386, 391 (4th Cir. 1986) ("Influencing the future conduct of management may serve the interests of the corporation as fully as a recovery for past misconduct, and a settlement may be accepted 'even though no direct monetary benefits are paid by the defendants to the corporation.'" (quoting *Maher*)); *Sved v. Chadwick*, 783 F. Supp. 2d 851, 864 (N.D. Tex. 2009) (approving derivative litigation settlement because it "offers tangible, long-term remedial measures that are specifically designed to avoid the alleged missteps in [the company's] past and protect shareholders as the company moves forward").

In addition, when a court receives only a small number of objections, it counsels in favor of the settlement's fairness and reasonableness. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (where 27,883 notices were sent to class members, but only 72 class members requested exclusion from the settlement and only 18 class members objected, court stated that

15

"this small number of objections weigh[s] in favor of the settlement"). Here, the Blau Objection and the Rubenstein Objection are the only substantive objections. But Blau's interest, in particular, is clear: he does not want to lose his own later-filed, "substantially similar" lawsuit.

Nonetheless, Blau and Rubenstein still raise an interesting point about the particular governance reforms contained in the Proposed Settlement. As Blau puts it, "all [Defendants] have agreed to do is 'implement' reforms *that are already in place at the Company* and pay relatively modest attorneys' fees." (ECF No. 123 at 4–5 (emphasis in original).) This is partially an overstatement—the Proposed Settlement requires what are, by all accounts, true amendments to Chipotle's whistleblower program and audit committee charter. But the "centerpiece" reform—the Food Safety Advisory Council—began operating almost a year before the Proposed Settlement; and the process of breaking up Chipotle's board of directors (which had remained relatively steady in terms of membership for many years, allegedly contributing to what some shareholders believed to be corporate lethargy and a lack of internal accountability), was already underway. The parties have cited no cases where this sort of corporate reform was at issue, and, at first blush, it does appear somewhat unsatisfying for Gubricky to settle for already-existing "reforms."

Acknowledging that, however, the analysis would then return to the second and third factors, asking whether Gubricky could likely do better by pressing forward with the lawsuit. Having considered the matter thoroughly, the Court is sympathetic to Blau's objection that approval of the Proposed Settlement would excuse the Chipotle board from a legal obligation to consider his demand, and thereby excuse Chipotle from a

process that could lead to meaningful investigation and additional salutary changes within the company.  The Court also recognizes the ongoing criminal investigation into Chipotle's food safety practices, which may eventually reveal additional damning information about the company and Defendants.  Nonetheless, the Court cannot say with confidence that Gubricky could likely do better—obtain even more significant reforms, or hold Defendants personally liable for monetary damages—by continuing to litigate.

Under the circumstances, the Proposed Settlement is more than fair and reasonable to Gubricky and Chipotle's other shareholders because, in truth, it is likely Defendants who could have dictated the outcome.  Indeed, Defendants probably could have stood firm and prevailed completely.  But they have agreed to the Proposed Settlement, and the Court's job is not to question whether *Defendants* are getting a fair deal.  *See generally* 7C Charles Alan Wright *et al.*, Federal Practice & Procedure § 1839 (3d ed., Apr. 2017 update) (court's role in a Rule 23.1(c) context is to ensure that the plaintiff and his or her attorneys are not taking a deal favorable to them but detrimental to shareholders generally).

For all of these reasons, the Proposed Settlement will be approved.

## V.  ATTORNEYS' FEES

As noted above (Part I.B), Gubricky's counsel requests a $375,000 fee award, which would encompass fees themselves, expenses, and $1,000 service awards to Gubricky and other named plaintiffs, up to $5,000.

**A.     Fees & Expenses**

The fee application covers attorneys' fees billed in this lawsuit, in the *Lashkari*

lawsuit consolidated into this one (*see* ECF No. 89), and in three similar lawsuits filed in Denver District Court—all of which are part of the Proposed Settlement. In total, twenty-four timekeepers billed to these cases (eighteen attorneys, five paralegals, and one "clerk"). (*See* ECF No. 115-3 ¶ 8; ECF No. 115-4 ¶ 8; ECF No. 115-5 ¶ 6; ECF No. 115-6 ¶ 8; ECF No. 115-7 ¶ 8; ECF No. 115-8 ¶ 8; ECF No. 115-9 ¶ 8.)

Gubricky's counsel represents that all of these timekeepers together expended 1,754.70 hours investigating and litigating these cases, which, at their typical rates, would amount to $1,065,684.75 in fees—an overall blended rate of $607.33 per hour. (*See* ECF No. 116 at 5.) They agree to accept $375,000, inclusive of $11,770.95 in expenses. Subtracting those expenses, the portion of the award attributable to fees works out to an overall blended rate of $207 per hour—well below a typical hourly rate for similar work in Denver. Even if this Court were to conclude that 1,754.70 hours was excessive and that, say, only 1,000 hours was reasonable, that would still work out to an overall blended rate of about $363 per hour—still within the range of reasonable hourly rates for similar work in Denver.

Gubricky's counsel points to cases similarly obtaining corporate governance reforms where the plaintiffs' attorneys were awarded $4 million, $9.5 million, $9.2 million, and $595,000. (ECF No. 116 at 9–10.) Thus, $375,000, inclusive of expenses, appears comparatively inexpensive. Even Blau, who otherwise opposes the Proposed Settlement, deems the attorneys' fees "relatively modest." (ECF No. 123 at 5.)

Rubenstein, on the other hand, deems the proposed fee award "manifestly excessive." (ECF No. 138 at 6.) But Rubenstein is simply incorrect to say that Plaintiffs' counsel are accepting a "slight discount to the lodestar." (*Id.*) It is actually

18

about a two-thirds discount. Moreover, Rubenstein shows no awareness that the fee award encompasses fees billed in five lawsuits by twenty-four timekeepers. The Court therefore rejects Rubenstein's arguments in opposition to the fee award.

The Court will award $375,000, as requested.

**B.     Service Awards**

Gubricky's counsel points to a number of cases from this District providing service awards to named plaintiffs, in amounts between $7,500 and $10,000. (ECF No. 116 at 12.) Thus, $1,000 per plaintiff and $5,000 total appears modest, and will be approved.

## VI. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Plaintiff's Unopposed Motion for Final Approval of Derivative Action Settlement (ECF No. 115) is GRANTED;

2. Pursuant to Federal Rule of Civil Procedure 23.1(c), the Proposed Settlement (ECF Nos. 110-1, 110-2, 110-3, 110-4) is APPROVED;

3. Plaintiff's Unopposed Motion for Award of Attorneys' Fees and Reimbursement of Expenses (ECF No. 116) is GRANTED;

4. Plaintiff is AWARDED $375,000 inclusive of attorneys' fees, expenses, and service awards for the Named Plaintiffs;

5. The Named Plaintiffs are each AWARDED service awards of $1,000 each, not to exceed $5,000 in the aggregate, to be paid from the $375,000 award approved above;

6. The various objections to the Proposed Settlement (ECF Nos. 123, 129, 138) are

OVERRULED;

7. The Clerk shall enter final judgment dismissing this action with prejudice pursuant to the parties' settlement. The parties shall bear their own costs except as provided above; and

8. The Clerk shall file a copy of this order in Case No. 16-cv-3180 and shall terminate that case as well.

Dated this 4th day of April, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge